**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **21 Civ. 1772 (        )** |
| **-against-** | **JURY TRIAL DEMANDED** |
| **AIRBORNE WIRELESS NETWORK, KALISTRATOS KABILAFKAS (also known as Kelly Kabilafkas, also known as Mark McKinney), TIMOLEON KABILAFKAS (also known as Tim Kabilafkas), CHRYSILIOS CHRYSILIOU, PANAGIOTIS BOLOVIS, JACK EDWARD DANIELS, ERIC SCHEFFEY, AND MOSHE RABIN,** | |
| **Defendants,** | |
| **-and-** | |
| **TIMOLEON KABILAFKAS, in his capacity as trustee of the TIM KABILAFKAS REVOCABLE TRUST DATED JULY 24, 2001, AND MAGDALINE KABILAKFAS, in her capacity as trustee of the MAGDALINE KABILAFKAS 1989 TRUST DATED MAY 27, 1989 (also known as the Magdaline Kabilafkas Revocable Trust),** | |
| **Relief Defendants.** | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission" or "SEC"), for its

Complaint against Defendants Airborne Wireless Network ("Airborne"), Kalistratos "Kelly"

Kabilafkas, also known as Mark McKinney ("Kabilafkas"), Timoleon Kabilafkas ("Tim

Kabilafkas"), Chrysilios Chrysiliou ("Chrysiliou"), Panagiotis Bolovis ("Bolovis"), Eric

Scheffey ("Scheffey"), Moshe Rabin ("Rabin"), and Jack Edward Daniels ("Daniels")

(collectively, "Defendants"), and Timoleon Kabilafkas in his capacity as the trustee of the Tim Kabilafkas Revocable Trust Dated July 24, 2001 ("TKRT") and Magdaline Kabilafkas in her capacity as trustee of the Magdaline Kabilafkas 1989 Trust Dated May 27, 1989, also known as the Magdaline Kabilafkas Revocable Trust ("MKRT," and together with the TKRT, "Relief Defendants"), alleges as follows:

## SUMMARY

1.      Between August 2015 and at least May 2018, Kelly Kabilafkas orchestrated a scheme to defraud market participants, including retail investors in this district, using a publicly traded company, Airborne Wireless Network, which he secretly controlled.  Kabilafkas launched the scheme by covertly acquiring millions of Airborne shares, then arranging to deceive brokers and a transfer agent so he and his associates could deposit those shares in their brokerage accounts and sell them.   The fraud culminated when Kabilafkas, Daniels, and Airborne inflated the company's stock price through multi-million dollar promotional campaigns, allowing Kabilafkas and his associates to reap $23 million by dumping the shares, obtained for a small fraction of that amount, on an unsuspecting market.  During the same time, Airborne also raised over $22 million from investors while its public filings contained numerous material misstatements and omissions.  Together, Defendants netted over $45 million in illicit proceeds.

2.      In October 2015, Kabilafkas bought all the issued and outstanding stock in the public shell company, Ample-Tee, Inc. ("Ample-Tee"), which ultimately became Airborne. More specifically, Kabilafkas bought both the control block of about 84.1 million restricted shares ("Restricted Shares") and about 30 million shares that had purportedly been issued to about 30 residents of Thailand ("Thai Shareholders") in a 2013 distribution submitted on Form S-1 ("S-1 Shares").  In fact, the Thai Shareholders were simply nominees who never owned the

stock and did not interact with the Defendants. The S-1 Shares did not bear restrictive legends, meaning that, unlike the Restricted Shares, these shares could be deposited and sold more easily.

3.      Kabilafkas repeatedly made false and misleading statements and engaged in additional deceptive conduct to conceal his involvement with, and controlling interest in, Ample-Tee.  Among other things, Kabilafkas funneled the funds he used to purchase Ample-Tee's shares through a bank account in the name of a charitable religious organization, and he placed the Restricted Shares in the name of his nominee CEO, Daniels.

4.      Although Kabilafkas installed Daniels as Airborne's CEO, Kabilafkas controlled the company.  Almost immediately, he used Daniels to sign a Form 8-K filed with the Commission falsely stating that Daniels had used his own, personal funds to purchase the controlling interest in the company.  That filing also omitted the material information that (i) Kabilafkas—not Daniels—was the company's true control person, (ii) Kabilafkas also bought the 30 million S-1 Shares in the transaction, and (iii) the true purchase price was $300,000, not $250,000.  Neither Kabilafkas, Daniels, nor Airborne has ever corrected these materially false statements and omissions, which have been repeated in multiple, later filings made with the Commission on Forms 10-Q, 10-K, and S-1.  Behind the scenes, Kabilafkas also concealed his ongoing control of the company by, among other things, using email accounts bearing Daniels's name, accessing Airborne's bank and credit card accounts under others' login credentials, and writing checks on Airborne's corporate bank account.

5.      While Airborne and Daniels spread the false statements about Airborne's true control person, Kabilafkas distributed millions of S-1 Shares among himself and the remaining defendants:  Tim Kabilafkas, Bolovis, Scheffey, and Chrysiliou, along with an entity used by Rabin to operate an girls Jewish boarding school in Florida ("The School," and collectively,

Kabilafkas's "Associates").  Kabilafkas also used other nominees to conceal that he controlled and benefitted from additional S-1 Shares.

6.     Kabilafkas and his Associates then falsely completed share transfer paperwork, and made other false and misleading statements, to deceptively persuade Airborne's transfer agent to reissue S-1 Share certificates in their names, and the name of at least one nominee, and convince broker-dealers to accept them for deposit and clear them for sale to the public.

7.     In certain of these brokerage accounts, despite the account being ostensibly opened by and held in one of the Associates' names, Kabilafkas controlled the trading because he and his father were intended to be, and ultimately were, the beneficiaries of the proceeds of the sales of Airborne shares.

8.     To drive up demand for Airborne's shares—and, thus, Airborne's share price—Kabilafkas and Airborne organized an elaborate online, print, and television promotional campaign.  Kabilafkas, through Airborne, Daniels, and other third parties, spent millions of dollars to attract potential investors with advertisements that concealed the fact that Airborne was a vehicle for Kabilafkas's fraudulent scheme.  Throughout these promotions, when Airborne's share price was inflated, Kabilafkas and his Associates dumped about 11.8 million S-1 Shares on unsuspecting investors for proceeds in excess of $22 million.

9.     Bolovis transferred millions of dollars he generated selling S-1 Shares back to Kabilafkas, Tim Kabilafkas, and the Kabilafkas family, directly and through the TKRT. Kabilafkas also used other nominees and agents to funnel additional illicit proceeds back to himself and the Relief Defendants.  Among other things, Kabilafkas and his family used (i) about $9.2 million to purchase real property in Southern California, (ii) over $4.3 million to pay

federal, state, and local tax liabilities, (iii) at least $350,000 for luxury vehicles, and (iv) over $450,000 to make improvements to Kabilafkas's home.

10.     At no time during the scheme did Kabilafkas, Airborne, or Daniels disclose Kabilafkas's role as a control person or the fact that, while Airborne was raising money from investors, he and his Associates were dumping millions of shares into the public market.  In fact, from 2017 through 2018, while these materially false and misleading statements and omissions were publicly available, Airborne raised about $22.8 million dollars from unsuspecting investors through at least eight offerings (both public and private).

11.     By engaging in this fraudulent conduct, each of the Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a).  Alternatively, Kabilafkas, as Airborne's control person, is liable for Airborne's violations of the Exchange Act under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

12.     All the Defendants except Daniels and Rabin also violated Section 17(a)(2) of the Securities Act.

13.     By this Complaint, the SEC seeks, among other relief, injunctions, disgorgement with prejudgment interest, civil penalties, and such other and further relief as the Court considers just, equitable, or proper.

## JURISDICTION AND VENUE

14.     The SEC sues under Sections 20(b) of the Securities Act, [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

15.     This Court has jurisdiction over this action under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Defendants have directly or indirectly, made use of the means or instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

16.     Venue in this District is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the offers and sales of securities and certain of the acts, practices, transactions, and courses of business constituting the violations alleged occurred in the District.  As detailed below, promotional activity, including television advertising, targeted and reached investors in this District, including investors who bought Airborne shares during the relevant promotional campaign.  Airborne's promotional campaign also included advertising on an electronic billboard in New York City's Times Square, and communications with and payments to media companies in Manhattan.  In addition, certain of the Defendants tried to open brokerage accounts with at least one broker in this District, and Airborne obtained money in an offering from at least one investor, a limited liability company, in this District.  Finally, Airborne's stock was at all relevant times quoted and traded on the Manhattan-based OTC Link ATS.  For each trade in Airborne stock, the Depository Trust Company ("DTC") performed necessary clearing services that were processed through its data center in Manhattan, and which facilitated the actual exchange of stock for money between the Defendants and purchasers of Airborne shares.

## DEFENDANTS

17.     **Airborne Wireless Network,** a Nevada corporation headquartered in Simi Valley, California, was originally incorporated in January 2011 as Ample-Tee, Inc. to focus "on

selling hard-to find ergonomic products for the physically disabled, such as chairs, workstations, back/arm/leg/wrist supports, through [its] proposed online website." On or around May 24, 2016, the company announced its name change to Airborne Wireless Network, and later dramatically changed its line of business to, purportedly, "developing, marketing and licensing a high-speed meshed broadband airborne wireless network by linking commercial aircraft in flight." Airborne does not have a class of securities registered with the Commission under Section 12 of the Exchange Act, but Airborne made periodic filings with the Commission between 2013 and 2019.

18.     At all times relevant to this Complaint, Airborne's stock was a "penny stock" as defined by the Exchange Act. Airborne's stock traded at less than $5.00 per share and met none of the exceptions to penny stock classification under Section 3(a)(51) and Rule 3a51-1 of the Exchange Act.

19.     **Kalistratos ("Kelly") Kabilafkas**, age 45, is an individual residing in Moorpark, California. Kabilafkas bought Ample-Tee's S-1 Shares and the controlling block of restricted stock, placing the latter in the name of his nominee, Daniels. During the Commission's investigation that preceded this action, Kabilafkas invoked his Fifth Amendment privilege against self-incrimination, refusing to answer questions during sworn testimony and refusing to produce any documents.

20.     **Timoleon ("Tim") Kabilafkas**, age 74, is Kabilafkas's father and resides in Moorpark, California. Like Kabilafkas, during the Commission's investigation that preceded this action, Tim Kabilafkas invoked his Fifth Amendment privilege against self-incrimination, refusing to answer questions during sworn testimony and refusing to produce any documents.

21.     **Chrysilios Chrysiliou**, age 60, is an individual who at all times relevant to the Complaint resided in Westlake Village, California.  Chrysiliou provided Kabilafkas with the funds used to purchase the Ample-Tee shell.  During the Commission's investigation that preceded this action, Chrysiliou, invoked his Fifth Amendment privilege against self-incrimination, refusing to answer questions during sworn testimony and refusing to produce any documents.

22.     **Panagiotis Bolovis**, age 42, is an individual who at all times relevant to the Complaint resided in Tripoli, Greece.  Bolovis is Kabilafkas's brother-in-law.

23.     **Jack Edward Daniels**, age 71, is an individual who at all times relevant to the Complaint resided in Los Angeles County, California.  Kabilafkas installed Daniels as Airborne's CEO.  Airborne publicly identified Daniels as, at various times, a director, its President, principal executive officer, principal financial officer, and/or chief executive officer. During the Commission's investigation that preceded this action, Daniels invoked his Fifth Amendment privilege against self-incrimination, refusing to answer questions during sworn testimony and refusing to produce any documents.

24.     **Dr. Eric Scheffey**, age 71, is an individual who maintains residences in both Denver, Colorado, and Switzerland.

25.     **Moshe Rabin**, age 47, resided in Broward County, Florida at all times relevant to the Complaint.  Rabin is a Rabbi and the President of The School, a Tamarac, Florida not-for-profit corporation that operates a girls Jewish boarding school.  Rabin tried to open a brokerage account in this District in connection with his efforts, on behalf of The School, to deposit and sell Airborne S-1 Shares.

## RELIEF DEFENDANTS

26.     TKRT is a revocable trust established on July 24, 2001, by Tim Kabilafkas, who is the trustee.  Millions of dollars in Airborne stock sale proceeds were transferred from the brokerage accounts of Kabilafkas, Tim Kabilafkas, Bolovis, and at least one of Kabilafkas's nominees, to the TKRT, which used the money to purchase at least nine residential properties in Moorpark, California that the Kabilafkas family now uses to generate rental income.

27.     MKRT is a revocable trust established on May 27, 1989, by Magdaline Kabilafkas, who is the trustee of MKRT and Kabilafkas's mother.  It received about $265,000 in illicit proceeds papered as a loan from Kabilafkas that it used to fund a portion of the purchase price for one of the Kabilafkas family's residential properties in Moorpark, California.

## STATEMENT OF FACTS

### I.     Ample-Tee

28.     In or around 2011, two Canadian citizens started Ample-Tee ostensibly to pursue a patent for a crutch designed to help below-the-knee amputees.

29.     In January 2012, Ample-Tee filed with the Commission a registration statement on Form S-1, seeking to register the sale of 5,000,000 shares of common stock at $0.03 per share.  The Securities Act requires issuers to register their securities with the Commission before making a public offering of those securities.  These registration statements include a prospectus describing, *inter alia*, the terms of the offering, the securities to be issued, and the company's business.

30.     Ample-Tee's Form S-1 became effective on March 13, 2013, and, in August and September 2013, it ostensibly sold 178,346 S-1 Shares at $0.03 per share to 30 Thai Shareholders, generating $5,350 in proceeds.  Despite their reported purchase, the Thai

Shareholders did not buy, own, or control the S-1 Shares; instead, the Thai Shareholders were mere nominees.

31.    After its reported sale of the S-1 Shares, Ample-Tee's single class of common stock consisted of: (a) the Restricted Shares, reportedly held in the name of the founder of the company, and (b) the S-1 Shares, supposedly owned by the Thai Shareholders.  The S-1 Shares could be traded more easily because they did not bear restrictive legends, while the Restricted Shares were subject to regulatory requirements that made it impractical, if not impossible, to trade them freely.

32.    Although Ample-Tee's Transfer Agent issued stock certificates in the names of the Thai Shareholders, all the Ample-Tee shares—both the S-1 Shares and the Restricted Shares—remained under common ownership and control so that they could be sold in a single lot through what is commonly called a "shell broker."  The existence of the S-1 Shares, because they could trade more easily, increased Ample-Tee's value and marketability as a shell company.

33.    In December 2013, Ample-Tee effected a stock split, which increased the control block of Restricted Shares to 84.1 million shares and the S-1 Shares to 29,997,796 shares.

34.    In July 2014, the Financial Industry Regulatory Authority ("FINRA") approved a request by a broker-dealer to "make a market" in Ample-Tee stock—to quote publicly a price at which it stood ready to buy and sell Ample-Tee shares.  Ample-Tee was assigned the symbol "ATLW" and became quoted on the Over-the-Counter ("OTC") Bulletin Board and listed on OTC Link, which investors use to trade stocks with small per-share dollar values, so-called "penny stocks."  During this time, Ample-Tee was a shell company with virtually no assets or ongoing business operations.

35.     Although Ample-Tee was first quoted in July 2014, the first Ample-Tee trade did not occur until over a year later, in October 2015, just before, and in anticipation of, Kabilafkas's purchase of the Ample-Tee shell.

## II.    Kabilafkas Purchased Both The S-1 Shares And Restricted Shares of Ample-Tee But Deceptively Concealed His Activity

36.     In August 2015, Kabilafkas's lawyer contacted a shell broker company, and asked for a public company to purchase on behalf of Kabilafkas.  The shell broker proposed Ample-Tee as an acquisition target.

37.     The emails and documents used to market Ample-Tee made clear that all issued and outstanding shares were available for purchase in a single transaction, including both the Restricted Shares and the approximately 30 million purportedly "free trading" S-1 Shares supposedly owned by 30 Thai Shareholders.

38.     After negotiating the purchase, Kabilafkas and his lawyer sought to document the transaction to conceal Kabilafkas's purchase of all of Ample-Tee's outstanding shares.

39.     On August 10, 2015, to make it appear as though separate parties were purchasing the Restricted Shares and the S-1 Shares, the shell broker emailed an escrow agreement for the Restricted Shares to a named executive of another company Kabilafkas controlled, copying Kabilafkas.  Then, less than 20 minutes later, the shell broker emailed a separate escrow agreement for the S-1 Shares to Kabilafkas's lawyer.  Both the executive and the lawyer sent signed escrow agreements back to the shell broker.

40.     Kabilafkas also sought to conceal his purchase of Ample-Tee by having Chrysiliou provide the funds used to purchase the shell, funds which Kabilafkas caused to be funneled through a bank account held in the name of a charitable religious organization.

41.     Specifically, on August 17, 2015, Chrysiliou and his wife wired $475,000 to the charity's bank account, which received the funds the next day.

42.     On August 18, 2015, Kabilafkas emailed the charity's leader, notifying him of the money movements and explaining that "because of [Chrysiliou's] delay in sending [the money] we risked losing the project." That same day, two checks made out to Kabilafkas were drawn on the charity's bank account totaling just under $120,000. Kabilafkas deposited both checks the same day: one into his bank account and one into his wife's bank account.

43.     On August 19, 2015, a check in the amount of $355,000 was deposited into Kabilafkas's lawyer's account, which had, like the checks to Kabilafkas the day earlier, also been drawn from the charity's account. Kabilafkas's lawyer held the $355,000 he received from the charity in escrow as the negotiations for Ample-Tee continued.

44.     On August 26, 2015, the lawyer received a FedEx package from a sender identified on the shipping label as "Ample-Tee, Inc." The package contained the physical stock certificates for Ample-Tee's Restricted Shares and the S-1 Shares, and additional documents necessary for the shares' transfer. The certificates were numbered (*e.g.*, "Certificate No. 2," "Certificate No. 3," and so on), and each individual numbered certificate represented hundreds of thousands of Ample-Tee shares.

45.     Depositing the shares with a broker, and having them cleared for electronic trading by the DTC, was an important condition for the shell company transaction to close, because a company with electronically tradeable shares is much more valuable. Thus, on September 16, 2015, an individual representing the Ample-Tee seller emailed Kabilafkas's lawyer and the shell broker, writing, "[Broker 1] has approved deposit for certificate 9 for [a Thai Shareholder]." Several days later, the seller's representative forwarded an email to

Kabilafkas, his lawyer, and an employee of the shell broker about the deposit of certificate 9 at Broker 1.

46.     Then, on or about October 16, 2015, the shell broker employee forwarded to Kabilafkas an email that originated from Broker 1, confirming that DTC had approved Ample-Tee's shares for electronic trading, and wrote, "Look forward to our call tomorrow and closing on Monday."  The next week, the Ample-Tee transaction closed.

47.     Along with sending and receiving these emails, phone records for the period August 2015 through October 2015 show many phone calls among Kabilafkas, his lawyer, and the shell broker.

48.     Upon closing, Kabilafkas's lawyer kept $5,000 for himself and wired to Ample-Tee's seller and the shell broker a total of $350,000, which was the total purchase price of *both* the S-1 and Restricted Shares and the shell broker's commission.  Contrary to what the company later disclosed in filings with the SEC, the inventor who co-founded Ample-Tee received none of the proceeds from the sale.

49.     On October 19, 2015, Kabilafkas's lawyer sent a FedEx package to Kabilafkas containing the physical Ample-Tee share certificates and associated share transfer paperwork.

50.     Thus, Kabilafkas, without disclosing his role, obtained control of both the 84,100,000 Restricted Shares and the certificates comprising essentially all of the S-1 Shares, even though the latter remained in the Thai Shareholders' names.

**III.    After Purchasing The Ample-Tee Shell, Kabilafkas, Daniels, And The Company Began Making False Statements Regarding Who Controlled The Company**

51.     Immediately after buying the Ample-Tee shell, Kabilafkas, Daniels and the company began knowingly filing materially false and misleading documents with the

Commission, most of which Daniels signed, regarding who controlled the company and the material details of the shell company purchase.

52.    On October 21, 2015, Ample-Tee filed a periodic report with the Commission on Form 8-K ("October 8-K"), which Daniels signed in his purported capacity as Ample-Tee's "Director."   In the October 8-K, Kabilafkas, through Daniels and Ample-Tee, falsely claimed that Daniels had used $250,000 of his personal funds to purchase the Restricted Shares directly from the inventor who co-founded Ample-Tee.  The October 8-K did not mention Kabilafkas, and it did not mention that, along with the Restricted Shares, the shell transaction also involved Kabilafkas's purchase of all of the S-1 Shares.  The October 8-K contained at least the following material misrepresentations and omissions:

> On October 20, 2015, J. Edward Daniels acquired from [Ample-Tee co-founder] 84,100,000 shares of our $.001 par value common stock.  The consideration provided by Mr. Daniels to [Ample-Tee co-founder] is $250,000 cash.  The acquisition by Mr. Daniels of those shares resulted in a change in control.
>
> …
>
> The consideration for those 84,100,000 shares of the Company's $.001 par value common stock was $250,000 cash.  Mr. Daniels used his personal funds to pay that consideration.

## IV.    Ample-Tee Changed Its Name To Airborne Wireless Network And Acquired A Patent From A Private Company Kabilafkas Controlled

53.    In May 2016, Ample-Tee changed its name to "Airborne Wireless Network."

54.    Then, in June 2016, using Daniels's name, Kabilafkas signed and submitted an OTCQB Application and Agreement seeking to have Airborne's stock quoted on the OTCQB marketplace which is a part of OTC Link.  While the application bore an electronic signature with Daniels's name, Internet Protocol ("IP") data establishes that the electronic signature originated from an IP address assigned to Kabilafkas's home.

55.     Two months later, in August 2016, to begin creating the false appearance that Airborne was something other than a vehicle for Kabilafkas's fraudulent scheme, Airborne bought from another company Kabilafkas controlled ("Private Company") the patent that Airborne would use as the centerpiece of a deceptive promotional campaign.  The patent was for a high-speed, "meshed broadband" airborne wireless network supposedly operated by using transmitters to link commercial aircraft in flight.

56.     To make it appear that Airborne acquired the patent in an arm's-length transaction, in exchange for the patent, Kabilafkas had Daniels instruct Airborne's transfer agent to cancel 80 million of the Restricted Shares held in Daniels's name.  Kabilafkas then caused Airborne to issue 40 million new shares to Kabilafkas's Private Company.

57.     The patent Airborne "purchased" from Kabilafkas's Private Company was worthless, or very nearly so.  The patent was set to expire on September 20, 2018, and neither its inventor nor Kabilafkas's Private Company (which acquired the patent in April 2015) had ever succeeded in developing a commercially viable technology based on the patent.  Moreover, in October 2016, a patent valuation firm provided Daniels with a draft report opining that the patent, issued in 2001, had essentially no value.  The valuation firm noted that it would require an astronomical sum—estimated to be approximately $582 million dollars—to bring any product to market, which the valuation firm viewed as an insurmountable obstacle to Airborne's successful use of the patent:

> As of the date of valuation, ABWN had no revenues and a limited business plan.  In addition, they had no committed source of funding.  They had a limited workforce including limited officer/directors.  Their officers have limited experience developing this type of technology.  ABWN is essentially a current public shell with operating expenses to maintain a compliant SEC reporting status and limited business development.

V.     **Kabilafkas Distributed The S-1 Shares To His Associates
And Placed S-1 Shares In The Name Of A Nominee**

58.     In the buildup to and during the promotional campaign, described further below,

Kabilafkas began distributing S-1 Shares to his Associates and transferring other S-1 Shares into

the name of at least one nominee.  Kabilafkas and his Associates did so by deceiving Airborne's

Transfer Agent and their broker-dealers so that the Transfer Agent would transfer S-1 Shares into

the Defendants' and nominee's names and the broker-dealers would accept them for deposit into

the Defendants' and nominee's brokerage accounts where they could be timely liquidated during

the promotional campaign.

59.     Of the approximately 30 million S-1 Shares issued in the names of the Thai

Shareholders, Kabilafkas transferred about (i) 1.7 million shares into his own name, (ii) 2.8

million shares into the name of a nominee ("Nominee 1"), a long-time family friend of

Kabilafkas and Tim Kabilafkas, and (iii) 560,000 shares to a person who helped Kabilafkas

solicit Airborne investors ("Finder").  He also gave, directly or indirectly, about 13.6 million

shares to five Associates:  Tim Kabilakfas, Chrysiliou, Bolovis, Scheffey, and Rabin (through

The School).  Kabilafkas also benefitted financially from another about 2.8 million shares, which

were sold from brokerage accounts ostensibly opened in the names of three of the Thai

Shareholders.

A.    **Kabilafkas's dealings with the Finder and Scheffey demonstrate his ownership of the S-1 Shares, his directions to his Associates to lie to the Transfer Agent and their broker-dealers, and his intent to deceptively inflate Airborne's share price**

60.    Kabilafkas initially recruited the Finder to solicit investments in the Private Company around August 2015, and later, the Finder switched to soliciting investments in Airborne.

61.    In connection with his efforts to identify Airborne investors, the Finder connected Kabilafkas with Scheffey and, together the Finder and Kabilafkas solicited Scheffey to invest in Airborne.

62.    In October 2016, Scheffey purchased 312,500 restricted Airborne shares for $250,000 of his personal funds.

63.    Later that same month, after Scheffey's initial $250,000 investment, the Finder flew to California to meet with Kabilafkas.  While inside Kabilafkas's home, Kabilafkas showed the Finder the contents of a box that the Finder saw Daniels hand to Kabilafkas earlier that day.  The box contained many Ample-Tee S-1 Share certificates still in the Thai Shareholders' names.  The share certificates were numbered, and each represented a specified amount of shares.  Kabilafkas pulled a particular S-1 Share certificate out of the box.  The S-1 Share certificate comprised 560,779 shares, and Kabilafkas told the Finder he would give it to him in exchange for locating new Airborne investors.  But, Kabilafkas explained that the Finder had not yet earned the 560,799 shares, because the Finder had only brought in $250,000 to date.

64.    In November 2016, Scheffey received another 1.5 million restricted Airborne shares.  This time, the $1.2 million purchase price was transferred from an account in another person's name.

65.     On October 13, 2016 and again on November 22, 2016, Airborne filed periodic reports with the Commission on Form 8-K, signed by Daniels, announcing the purported details of Scheffey's restricted share transactions.  In particular, Airborne's filings announced an $0.80 per share purchase price for both transactions.  Airborne also disseminated press releases to widely read finance and market websites publicizing these transactions.

66.     As discussed further below, however, prior to Scheffey's initial $250,000 investment, Kabilafkas also agreed to lower Scheffey's cost-basis by giving Scheffey some of his S-1 Shares at no additional cost.

67.     Thus, Airborne, Daniels and Kabilafkas used the Scheffey transactions to deceive the market about the price and demand for Airborne stock.  Critically, Kabilafkas did not want the Scheffey transactions to reveal to the market that Airborne stock was worth far less than the price at which it was then trading.  He and Scheffey therefore contrived to have Scheffey, and the other person from whom the funds originated, pay a higher disclosed price for the restricted stock announced in the October and November 2016 8-Ks in exchange for Kabilafkas giving Scheffey at least 2,803,558 S-1 Shares.  In other words, Scheffey received fewer restricted Airborne shares at a higher per share price, thus creating a false impression about the value of Airborne stock.  In turn, Scheffey benefited from this bargain by receiving millions of purportedly free-trading S-1 shares, at no additional cost.

68.     As a result of this deception, Airborne's October 13, 2016, and November 22, 2016 8-Ks and related press releases were materially false and misleading because they omitted that the transaction also included at least 2.8 million S-1 Shares Kabilafkas gave to Scheffey as part of the deal.  An accurate disclosure of these transactions would have revealed an actual per share purchase price of around $0.31 (compared to the $0.80 price falsely disclosed), at a time

when Airborne shares were trading on the open market in a range of about $0.76 to $0.99 per share.

69.    To ensure that Scheffey could trade the S-1 Shares, Kabilafkas also engaged in a series of deceptive acts—conduct Kabilakfas repeated when distributing shares to other Associates and the Finder.

70.    Kabilafkas began the process of giving Scheffey a portion of the S-1 Shares described above during a November 2016 trip Scheffey and the Finder took to California. During that trip, Scheffey and the Finder met with Kabilafkas in a hotel restaurant near the Burbank, California airport.  Kabilafkas took out Ample-Tee S-1 Share certificates Nos. 10 (841,000 shares) and 29 (1,401,779 shares), still in the names of the Thai Shareholders, and instructed the Finder to complete share transfer paperwork so that the shares could be reissued in Scheffey's name.  Specifically, Kabilafkas directed the Finder to backdate and insert Scheffey's name onto share transfer paperwork, falsely making it appear as though Scheffey bought the certificates directly from the Thai Shareholders in February 2015, for about $0.001 per share. The goal of this deception was to have Airborne's Transfer Agent cancel the Ample-Tee S-1 Shares in the Thai Shareholders' names and reissue Airborne shares in Scheffey's name, without restricted legends, which made the shares easier to deposit with a broker and monetize.

71.    When Kabilafkas handed the transfer paperwork to the Finder, the portions related to the transferors—supposedly, the original Thai Shareholders—were already completed, signed, and notarized.  The portions related to the transferee, however, were blank.  The Finder filled in the blank portions of the forms using Scheffey's name and backdated them to February 5, 2015. The backdating made it appear as though Scheffey had bought the share certificates from the Thai Shareholders in bona fide transactions more than a year earlier.  Kabilafkas similarly

transferred to Scheffey another Ample-Tee S-1 Share certificate, No. 5, comprising 560,779 shares.

72.     Around March 2017, the Finder again traveled to California, where Kabilafkas finally rewarded him with Ample-Tee S-1 Share certificate, No. 6 comprising 560,779 shares, along with additional, partially completed share transfer paperwork, consistent with their discussion during the October 2016 meeting at Kabilafkas's home.  At the same time, Kabilafkas told the Finder to call him later for instructions on how to have the Transfer Agent cancel the Ample-Tee certificate in the Thai Shareholder's name, reissue an Airborne certificate in the Finder's name, and deposit that new certificate with a broker-dealer so he could monetize the shares as compensation for soliciting Scheffey.

73.     During the later call, Kabilafkas told the Finder how to complete the share transfer paperwork to make it falsely appear as though the Finder had bought the shares in a bona fide transaction directly from the original Thai Shareholder.  In sum, Kabilfakas directed the Finder to falsely fill out the paperwork in the same way he directed the Finder to fill out Scheffey's paperwork several months earlier.

74.     Kabilafkas also provided the Finder with a cover story to use if a broker asked the Finder to explain how he managed to purchase the shares from an investor ostensibly located in Thailand.  If asked how he obtained the share certificate, Kabilafkas instructed the Finder to say that one of his tennis clients knew the Thai Shareholder, who was sick and needed money, and the Finder bought the shares directly from the Thai Shareholder to help him.  Both the Finder and Kabilafkas knew this cover story to be a lie; the relevant Thai Shareholder was simply a nominee who had never owned the shares, had no contact with the Finder, and never received any money from the Finder for the purchase of the shares.

**B. The Defendants used fraudulent documents to have the S-1 Share certificates reissued into their own names the same way Kabilafkas directed the Finder**

75.     After Kabilafkas distributed the Ample-Tee S-1 Shares to his Associates, Kabilafkas and the Associates each engaged in the same fraudulent conduct Kabilafkas explained to the Finder.  They, or Kabilafkas or Daniels on their behalf, each submitted false and misleading share transfer paperwork to the Transfer Agent—including times when Kabilafkas impersonated a nominee—purporting to show that they bought the Ample-Tee S-1 Shares directly from individual Thai Shareholders in bona fide transactions.

76.     To bolster these false and misleading claims and ensure that they succeeded in deceiving the Transfer Agent, Kabilafkas had Daniels, on behalf of Airborne, waive the typical requirement for a "medallion guarantee" on the share transfer paperwork.  A medallion guarantee protects securities processors who accept requests for transfers and/or sales of securities, by guaranteeing that the signature is genuine, the signer is an appropriate person to endorse, and the signer had the legal capacity to sign.  In effect, through each waiver, Daniels, in his purported capacity as an Airborne officer, was vouching for the veracity of the transaction paperwork and the bona fide nature of the transactions the paperwork purported to document.  By agreeing to indemnify the Transfer Agent against any future claims related to the transfer of the shares, Daniels enabled the Associates' deceptive conduct.  Daniels also mailed transfer requests and other documents he received from some of the Associates, or from Kabilafkas on their behalf, to the Transfer Agent.  In doing so, Daniels instructed the Transfer Agent to charge Airborne the associated transfer fees, and return certain newly issued certificates directly to him, so that he, in turn, could deliver them to the relevant Associate.

77.    **Kabilafkas:**  On or about May 16, 2016, the Transfer Agent received a letter from Kabilafkas requesting (i) the cancellation of Ample-Tee share certificates Nos. 4 and 15, still in the names of the Thai Shareholders and representing 560,779 and 1,121,389 shares, respectively, and (ii) reissuance of an equivalent number of Airborne shares in his name.  Kabilafkas enclosed the original shares certificates, along with Third-Party Releases and Irrevocable Stock Powers that were fraudulently completed to make them appear as though Kabilafkas had bought the shares directly from the corresponding original Thai Shareholders.  The Transfer Agent contacted Airborne after receipt of the transfer request, and Daniels approved the transaction. As a result, the Transfer Agent canceled certificates Nos. 4 and 15 and issued new certificates, Nos. 33 and 34, to Kabilafkas.

78.    On August 23, 2016, Kabilafkas, directly or indirectly, mailed the Transfer Agent a letter, purporting to be from Nominee 1, requesting the cancellation of Ample-Tee certificates Nos. 25 and 30, still in the original, corresponding Thai Shareholders' names and each representing 1,401,779 shares, and the reissuance of a new Airborne certificate in Nominee 1's name.  The letter instructed the Transfer Agent to mail the new certificates to an address in Moorpark, California, where Kabilafkas's brother lives.  Kabilafkas enclosed with the letter the original Ample-Tee S-1 Share certificates, Third-Party Releases, and Irrevocable Stock Powers documents that fraudulently stated Nominee 1 had bought the shares directly from the relevant Thai Shareholders.  After Daniels approved the transfer and provided a medallion waiver, the Transfer Agent canceled Ample-Tee certificates Nos. 25 and 30 and issued a single, new certificate, No. 43, comprising over 2.8 million Airborne shares in Nominee 1's name.  The Transfer Agent mailed certificate No. 43 to Kabilafkas's brother's address.  In August 2016, Nominee 1 was in Greece, where she had been for more than six months.

79.  **Bolovis:**  On or about June 14, 2016, the Transfer Agent received a letter from Daniels enclosing a transfer request from Bolovis.  In this package was a letter, ostensibly from Bolovis, requesting that the Transfer Agent cancel Ample-Tee share certificate No. 31, still in the Thai Shareholder's name and representing 1,401,779 shares, and reissue Airborne shares in his name.  Also included were the original Ample-Tee S-1 Share certificate, along with a Third-Party Release and Irrevocable Stock Power document that were fraudulently completed to make it appear as though Bolovis bought the shares directly from the Thai Shareholder.  Daniels approved the transfer request on behalf of Airborne and instructed the Transfer Agent to bill Airborne for both the transfer fee and FedEx shipping charges.  As a result, the Transfer Agent canceled certificate No. 31 and issued a new Airborne certificate, No. 36, in Bolovis's name.

80.  **Rabin (through The School):**  On or about June 14, 2016, the Transfer Agent received a letter signed by Rabin on behalf of The School, requesting the cancellation of Ample-Tee certificate No. 14, still in the Thai Shareholder's name and representing 841,000 shares, and the reissuance of a corresponding number of Airborne shares into The School's name.  Like the other defendants, Rabin enclosed the original S-1 Share certificate and a Third-Party Release and Irrevocable Stock Power document that was fraudulently completed to make it appear as though The School bought the stock directly from the original Thai Shareholder.

81.  The paperwork Rabin submitted for The School was completed using the date June 9, 2016 (*i.e.*, to make it appear as though The School bought certificate No. 14 on that date), but the Thai notary stamp showed that the notary's commission expired almost a year earlier, in June 2015.

82.  After receiving The School's transfer request, the Transfer Agent contacted Daniels, who provided an indemnification letter, vouching for the transaction.  As instructed, the

Transfer Agent canceled Ample-Tee certificate No. 14 and issued a new Airborne certificate, No. 35, in The School's name.

83.     Then, on or about August 4, 2016, the Transfer Agent received another letter from Rabin on behalf of The School, requesting that the Transfer Agent cancel Ample-Tee certificate No. 20, likewise still in the original Thai Shareholder's name and representing 1,121,389 shares, and reissue an Airborne certificate in The School's name.  Again, Rabin enclosed the Ample-Tee S-1 Share certificate and a Third-Party Release and Irrevocable Stock Power document fraudulently claiming that The School bought the shares directly from the relevant Thai Shareholder.  Daniels then provided another indemnification letter, and the Transfer Agent canceled Ample-Tee certificate No. 20, and issued a new Airborne certificate, No. 40, to The School.

84.     **Chrysiliou:**  On or about September 14, 2016, the Transfer Agent received a letter from Chrysiliou requesting the cancellation of Ample-Tee S-1 Share certificates Nos. 12, 26, and 27, still in the original Thai Shareholders' names and representing 841,000, 1,401,779, and 1,401,779 shares, respectively, and the reissuance of corresponding Airborne certificates in his name.  Chrysiliou enclosed the Ample-Tee S-1 Share certificates, Third-Party Releases, and Irrevocable Stock Powers documents that fraudulently stated he bought the certificates directly from the original Thai Shareholders.  After Daniels approved the transfer, the Transfer Agent canceled Ample-Tee certificates Nos. 12, 26, and 27 and issued a single, new Airborne certificate, No. 54, in Chrysilios's name comprising over 3.6 million shares.

85.     **Scheffey:**  On or about November 25, 2016, the Transfer Agent received a letter from Daniels stating that Scheffey had sent Ample-Tee S-1 Share certificate Nos. 5 (560,779 shares), 10 (841,000 shares), and 29 (1,401,779 shares), still in the original Thai Shareholders'

names, to Airborne, asking that they be cancelled and reissued as Airborne certificates in his name.  Two of these certificates (Nos. 10 and 29) were the certificates Kabilafkas transferred to Scheffey in November 2016 with help from the Finder.

86.    In his letter, Daniels instructed the Transfer Agent to reissue the Airborne shares into Scheffey's name, mail them to Scheffey at an address in Denver, Colorado, and bill Airborne for the transfer fees.  The package to the Transfer Agent included the original Ample-Tee share certificates in the names of the original Thai Shareholders, along with Third-Party Releases and Irrevocable Stock Powers documents purportedly signed by each of the corresponding Thai Shareholders.  At least two of the purported transactions documented by the papers Daniels sent were those that had been backdated by the Finder at Kabilafkas's direction during the meeting in the hotel restaurant across from the Burbank airport earlier that month.  Ultimately, the Transfer Agent canceled Ample-Tee certificates Nos. 5, 10, and 29 and issued new Airborne certificates Nos. 84, 85, and 86 in Scheffey's name.

87.    **Tim Kabilafkas:**  On or about January 19, 2017, the Transfer Agent received another letter from Daniels enclosing a transfer request he purportedly received from Tim Kabilafkas.  In the package was a letter from Tim Kabilafkas requesting that the Transfer Agent cancel Ample-Tee S-1 Share certificates Nos. 18, 21, and 23, still in the original Thai Shareholders' names and each representing 1,121,383 shares, and reissue a corresponding number of Airborne shares in his name.  Also included were the original Ample-Tee share certificates, Third-Party Releases, and Irrevocable Stock Powers documents that falsely stated Tim Kabilafkas bought the shares directly from the corresponding Thai Shareholders.  After Daniels approved the transfer request and agreed to pay the transfer fees, the Transfer Agent

canceled Ample-Tee certificates Nos. 18, 21, and 23 and issued new Airborne certificates Nos.

95, 96, and 97, in Tim Kabilafkas's name.

88.    The following table shows the share transfers described above in paragraphs 75

through 87:

| Name | Relationship to Kabilafkas | Number of S-1 Shares | Certificate No(s). (old → new) | Claimed Purchase Date from Thai Shareholder |
|---|---|---|---|---|
| Kelly Kabilafkas | Self | 560,779 | 4 → 33 | 4/25/2016 |
| Kelly Kabilafkas | Self | 1,121,389 | 15 → 34 | 5/8/2016 |
| Tim Kabilafkas | Father | 1,121,389 | 19 → 95 | 5/14/2015 |
| Tim Kabilafkas | Father | 1,121,389 | 21 → 96 | 5/14/2015 |
| Tim Kabilafkas | Father | 1,121,389 | 23 → 97 | 5/14/2015 |
| Nominee 1 | Self | 2,803,558 | 25, 30 → 43 | 2/27/2015 |
| Panagiotis Bolovis | Brother-in-law | 1,401,779 | 31 → 36 | 5/20/2016 |
| Chrysilios Chrysiliou | Friend | 3,644,558 | 12, 26, 27 → 54 | 6/9/2015 |
| Eric Scheffey | Finder's tennis student | 560,779 | 5 → 84 | 2/5/2015 |
| Eric Scheffey | Finder's tennis student | 1,401,779 | 29 → 85 | 2/5/2015 |
| Eric Scheffey | Finder's tennis student | 841,000 | 10 → 86 | 2/5/2015 |
| The School (Moshe Rabin) | Not Applicable | 841,000 | 14 → 35 | 6/4/2016 |

| Name | Relationship to Kabilafkas | Number of S-1 Shares | Certificate No(s). (old → new) | Claimed Purchase Date from Thai Shareholder |
|---|---|---|---|---|
| The School (Moshe Rabin) | Not Applicable | 1,121,389 | 20 → 40 | 6/30/2016 |

89.     For each of the share transfers described above, the Transfer Agent reissued new Airborne certificates in the Defendants' names relying on both (i) the fraudulent documentation they, or someone acting on their behalf, submitted purporting to show a bona fide transaction with a Thai Shareholder; and (ii) Daniels's approvals.   In reality, however, Kabilafkas had bought all of the S-1 Shares at issue as part of his October 2015 purchase of the Ample-Tee shell, and, in many instances, Kabilafkas continued to control the S-1 Shares after their reissuance as Airborne shares.

90.     Kabilafkas, Tim Kabilafkas, Bolovis, Chrysiliou, Scheffey, and Rabin (through The School) all knew, or were reckless in not knowing, that (i) they did not obtain their S-1 Shares through bona fide transactions with any of the Thai Shareholders; and (ii) the documentation they provided, and statements they made, to the Transfer Agent to the contrary were materially false and misleading.

**C.     Just as Kabilafkas directed the Finder, the Defendants continued their fraudulent scheme, using misrepresentations and fraudulent documents to induce their broker-dealers to accept their Airborne shares for deposit and sale**

91.     After the Defendants fraudulently persuaded the Transfer Agent to reissue Airborne certificates in their names, they began depositing them into their brokerage accounts so that they could monetize the shares by selling them to the public.

92.     In doing so, Kabilafkas and his Associates continued to lie and use fraudulent documentation.  On top of the false third party releases and irrevocable stock powers documents, Kabilafkas and his Associates also produced additional fraudulent documentation to brokers, including falsified stock purchase agreements and fake evidence of payments made to the purported Thai Shareholders.  Many of the Defendants also completed and signed stock deposit questionnaires that included multiple false and misleading statements about how they obtained their shares and their status as affiliates of Airborne.  Although some brokers rejected deposits, Kabilafkas and his Associates each persuaded certain brokers to accept their S-1 Shares for deposit based on their fraudulent misrepresentations and documentation, which ultimately allowed the Defendants to sell their Airborne shares to unsuspecting investors, in conjunction with a coordinated promotional campaign, and reap substantial profits.

93.     **Kabilafkas and Nominee 1:**  In September 2015, while he was negotiating his purchase of the Ample-Tee shell, Kabilafkas opened an account at Broker 1.  No activity occurred in Kabilafkas's account with Broker 1 until August 2016, when Kabilafkas persuaded Broker 1 to accept his Airborne certificate No. 34, comprising 1,121,389 shares, for deposit using false and misleading statements and documentation.  Through the account forms and documents Kabilafkas submitted as part of his deposit, he falsely claimed to Broker 1, among other things, that he (i) acquired the shares on May 8, 2016, in a "private party purchase" from the original Thai Shareholder for $980, and (ii) was only a shareholder with no other relationship with Airborne.  To bolster his false claims, Kabilafkas provided Broker 1 with a May 10, 2016 customer receipt for a $980 U.S. Postal Service money order payable to the original Thai Shareholder.  That money order, however, was a domestic money order with a legend explaining that it was "Negotiable Only in the U.S. and Possessions," and it was cashed on May 20, 2016, at

the U.S. Post Office in Moorpark, California, where Kabilafkas resides.  No one bearing the name of the Thai Shareholder entered or exited the United States between January 1, 2015, and July 21, 2020.  Broker 1 accepted the deposit and later allowed Kabilafkas to sell the Airborne shares from his account as described further below.

94.     After depositing the Airborne shares issued in his own name, Kabilafkas then turned to the shares in Nominee 1's name, which he also controlled.  In particular, on August 28, 2016, Kabilafkas sent Broker 1 an email from an email address Kabilafkas created in Nominee 1's name just several days before.  The email sought to open a brokerage account at the firm in Nominee 1's name.  Kabilafkas's email attached account forms purportedly completed and signed by Nominee 1, as well as a photocopy of Nominee 1's driver's license.  The account forms Kabilafkas submitted to Broker 1 stated that Kabilafkas recommended Broker 1 to Nominee 1, listed Kabilafkas as Nominee 1's referrer, and noted that Nominee 1 is "friends with referrer's parents."  Soon after, Broker 1 opened an account in Nominee 1's name.

95.     Then, still using the email address he created using Nominee 1's name, Kabilafkas persuaded Broker 1 to accept Nominee 1's Airborne certificate No. 43 (comprising 2,803,558 shares) for deposit.  In doing so, Kabilafkas falsely claimed, through account forms and share transfer documentation, among other things, that (i) Nominee 1 acquired her shares in a "private party cash purchase;" (ii) Nominee 1 acquired the shares directly from the original Thai Shareholder; and (iii) Nominee 1's contact with the seller was by telephone, claiming "[Nominee 1's] housekeeper spoke Thai with seller."  Broker 1 accepted the deposit and allowed Nominee 1 to sell her Airborne shares.  Unbeknownst to Broker 1, Kabilafkas, not Nominee 1, sold Nominee 1's Airborne shares as described further below.  Again, at the times of these

emails and deposits, Nominee 1 was in Greece, but the IP addresses associated with the emails to Broker 1 show that they were sent from a device located in California.

96.     Then, in mid-January 2018, again using false and misleading documentation, Kabilafkas caused Broker 2 to accept another Airborne certificate he held in his own name for deposit, certificate No. 33 comprising 560,779 shares.  Through account forms and documents Kabilafkas submitted as part of his deposit, he falsely claimed that he bought the shares directly from the Thai Shareholder for $490 in April 2016.  To bolster these false claims, Kabilafkas provided Broker 2 with a copy of a $490 U.S. Postal Service money order payable to the Thai Shareholder.  That money order, however, was also a domestic money order with a legend explaining that it was "Negotiable Only in the U.S. and Possessions," and it, too, was cashed on May 20, 2016, at the U.S. Post Office in Moorpark, California.  No one with the name of the Thai Shareholder entered or exited the United States between January 1, 2015 and July 21, 2020. Broker 2 accepted the deposit and allowed Kabilafkas to sell the Airborne shares from his account as described further below.

97.     **Rabin and The School:**  *Certificate No. 35*.  In June 2016, Rabin opened a brokerage account in The School's name at Broker 3, which is located within this District.

98.     Rabin then tried to deposit Airborne certificate No. 35, comprising 841,000 shares, at Broker 3.  Through account forms and documents he submitted as part of the attempted deposit, Rabin falsely claimed that The School bought the shares directly from the original Thai Shareholder for $600.

99.     On June 8, 2016, Broker 3 emailed Rabin with a request for more documentation. Later that day, Rabin emailed Broker 3 an "Agreement for the Purchase of Common Stock," a "Payment Receipt," a copy of a Cashier's Check for $600 made out to the original Thai

Shareholder, Broker 3's "Incoming Security Questionnaire," and several other documents that Broker 3 had requested in its June 8, 2016 email.

100.    On June 29, 2016, Broker 3 emailed Rabin, informing him, among other things, "I'm very sorry but I don't think this deposit would ever get approved by my firm."

101.    In July 2016, Rabin opened another brokerage account in The School's name, this time at Broker 4.  Rabin then tried to deposit The School's Airborne certificate No. 35 in its account at Broker 4.  In doing so, Rabin again falsely claimed, using falsified share transfer paperwork and other misleading documents, that The School bought the shares directly from the Thai Shareholder for $600.  To support his false claims and deceive Broker 4, Rabin sent a copy of the $600 cashier's check purportedly used to buy the shares—a cashier's check that had, as of June 1, 2018, not been cashed.  Ultimately, Broker 4 accepted the deposit and allowed Rabin to sell The School's shares from the account as described below.

102.    *Certificate No. 40.*  In August 2016, Rabin went back to Broker 3 and attempted to deposit The School's Airborne certificate No. 40, comprising 1,121,389 shares, into The School's account there.  In doing so, Rabin falsely claimed, again using falsified share transfer paperwork and other misleading documents, that The School had bought the shares directly from the original Thai Shareholder for $175,000.  To deceive Broker 3 into believing that a bona fide transaction had occurred, Rabin provided copies of The School's bank records that showed a $175,000 wire transfer to a lawyer's trust account.  But, the lawyer is one of The School's largest donors, its campus is named after him, and the funds never left the lawyer's account to pay the original Thai Shareholder.  Ultimately, Broker 3 rejected this attempted deposit.

103.    Rabin then went back to Broker 4 and attempted to deposit Airborne certificate No. 40 in The School's account there, relying on the same false documentation he provided to Broker 3.  Broker 4 also rejected the deposit.

104.    Undeterred, on or about August 23, 2016, Rabin opened a brokerage account in The School's name at Broker 5 and again tried to deposit certificate No. 40.

105.    This time, however, Rabin changed his story.  Despite having told Brokers 3 and 4 that The School paid $175,000 for certificate No. 40, Rabin now told Broker 5 that the original Thai Shareholder had *donated* the shares to The School.  To convince Broker 5 that this new story was true, Rabin gave Broker 5 different false documents, including a purported letter from the Thai Shareholder to The School stating, among other things, that he was donating the shares. Rabin also provided Broker 5 with a medallion waiver and a third-party authorization that Rabin claimed the donor sent to him after having them notarized, documents he did not provide to Brokers 3 and 4.  Broker 5 accepted the deposit and later allowed Rabin to sell The School's shares from the account as described below.

106.    **Bolovis:**  In May 2016, Bolovis opened a brokerage account at Broker 3, claiming Kabilafkas referred him.  Under instructions provided by Bolovis, the Transfer Agent mailed certificate No. 36 to Broker 3, which is located within this District.  While Broker 3 maintained possession of certificate No. 36 on behalf of Bolovis, Bolovis ultimately did not sell any Airborne stock through Broker 3.

107.    Instead, on September 6, 2016, Daniels emailed the Transfer Agent an "Affidavit As To Lost Stock Certificate," signed by Bolovis, which falsely claimed that certificate No. 36 was lost or destroyed.  Daniels approved the affidavit, and the Transfer Agent issued a new certificate No. 36, which it shipped overnight to Airborne's office per Daniels's instruction.

108.    Later that same month, Bolovis opened a brokerage account at Broker 1.

109.    Bolovis then deceived Broker 1 into accepting his new, reissued Airborne certificate No. 36, comprising 1,401,779 shares, for deposit—even though the original certificate No. 36 had been deposited with and was then being held by Broker 3.  In doing so, Bolovis falsely claimed, through account forms and share transfer documentation, that he, among other things, bought the Airborne stock from the original Thai Shareholder.  Broker 1 accepted Bolovis's deposit and allowed him to sell the Airborne shares as described further below.

110.    **Chrysiliou:** In October 2016, Chrysiliou opened a brokerage account at Broker 1.

111.    Chrysiliou then tried to deposit Airborne certificate No. 54, comprising 3,644,558 shares, in his account.  In doing so, Chrysiliou falsely claimed, through account forms and share transfer documentation, that, among other things, he bought the shares directly from the original Thai Shareholders for $3,600.  Several weeks later, Broker 1 rejected the deposit.

112.    In February 2017, Chrysiliou again tried to deposit Airborne certificate No. 54, this time with Broker 6.  In connection with his attempt to deposit these shares, Chrysiliou retained an attorney, who submitted a letter to Broker 6 opining that Chrysiliou's shares were freely tradeable.  Chrysiliou's lawyer supported his opinion letter through several documents he enclosed with his letter to Broker 6, including the same false and backdated purchase agreements that Chrysiliou had provided to Broker 1.  Broker 6 ultimately accepted the deposit and allowed Chrysiliou to sell Airborne shares from his account as described below.

113.    **Tim Kabilafkas:**  In January 2017, Tim Kabilafkas, and/or Kabilafkas using his father as a nominee, opened a brokerage account at Broker 2.  Thereafter, Tim Kabilafkas persuaded Broker 2 to accept Airborne certificate Nos. 95, 96, and 97, comprising 3,364,167 total shares, for deposit.

114.    In doing so, Tim Kabilafkas, and/or Kabilafkas using his father as a nominee, falsely claimed, through account forms, other documents, and false statements, that he, among other things, (i) bought his Airborne stock in a private party transaction, (ii) heard about Airborne through a stock advertisement on a business channel, and (iii) knew no one at Airborne.

115.    In particular, on January 25, 2017, Kabilafkas, pretending to be his father, called Broker 2 on a recorded line, stated that his name was Tim Kabilafkas, and asked questions about opening an account so that he could deposit some Airborne stock certificates.  Kabilafkas, who does not speak with the same accent as his Greek immigrant father, stated that his strategy was to sell slowly his shares, which were then worth in excess of $5 million.

116.    On January 30, 2017, after Broker 2 accepted the deposit, a representative of Broker 2 called Tim Kabilafkas, again on a recorded line, seeking information regarding his purchase of the shares.  The person who answered identified himself as Tim Kabilafkas.  This individual spoke in heavily accented English and stated: "I got to talk to my guy who transferred them to me.  I don't know exactly how he did it, but we paid some money for it."  He also incorrectly believed that he only had "a little more than a million" shares, despite the Transfer Agent receiving a request, purportedly from him, to transfer over 3 million shares into his name less than two weeks before.

117.    On February 10, 2017, a representative from Broker 2 called Tim Kabilafkas, again on a recorded line.  The person who answered identified himself as Tim Kabilafkas, and again spoke in heavily accented English.  He then tried to answer questions posed by Broker 2's representative, but he was unable to explain how he had acquired the shares other than to say, falsely, that it was a "private party" transaction and a "private buy."  He also stated that he heard about the company through a stock advertisement, which was untrue.

118.    In July 2017, after Tim Kabilafkas had sold about 1.3 million Airborne shares from his account at Broker 2, he opened another brokerage account, this time at Broker 7.

119.    Tim Kabilafkas then transferred his remaining approximately 2.07 million shares of Airborne stock to the account in his name at Broker 7.  As he had done with Broker 2, to persuade Broker 7 to accept the deposit, Tim Kabilafkas falsely claimed that he acquired his Airborne shares "in 2015 from the shareholder who originally purchased" them from Ample-Tee.  As part of its review, Broker 7 requested purchase documentation that Tim Kabilafkas now claimed he could not provide.  In response, Airborne's law firm provided the broker with a letter from Airborne, signed by Daniels, and a letter from Airborne's law firm, signed by a partner of that firm; both letters repeated the false narrative that Tim Kabilafkas had obtained the shares directly from the original Thai Shareholders.

120.     To obtain the opinion letter from Airborne's law firm, Tim Kabilafkas provided a materially false and misleading attestation.  Even though his son was Airborne's undisclosed control person, Tim Kabilafkas falsely attested that as of September 18, 2017 he (i) was not an affiliate of Airborne; (ii) had no material, non-public information about Airborne; and (iii) had beneficially owned his shares for at least a year.

121.    **Scheffey:**  In December 2016, Scheffey tried to deposit Airborne certificates Nos. 84, 85, and 86, comprising 2,803,558 total shares, in an account in his name at Broker 8.  In doing so, Scheffey falsely claimed, through account forms and other misleading documents, that, among other things, he (i) had no connection with Airborne; and (ii) obtained his Airborne shares through a private placement from the issuer.  Broker 8 rejected the deposit in February 2017 after it determined that Scheffey's representations were false, noting that the paperwork he submitted

showed he bought the shares from the Thai Shareholders in private transactions, not in a private placement from Airborne.

122.     On May 31, 2017, Scheffey opened a brokerage account at Broker 2.

123.     Scheffey then deposited Airborne certificates Nos. 84 and 86, comprising 1,401,779 total shares, in his account there.  In June 2017, Broker 2 notified Scheffey it would be closing his account.  But, as described further below, Broker 2 allowed Scheffey to sell some of his Airborne shares from his account before it was closed.

124.     In July 2017, Scheffey opened a brokerage account at Broker 7 and transferred into it the 1,181,965 Airborne shares he had not yet sold, as well as the proceeds he generated from the Airborne shares he managed to sell from his account at Broker 2.  Despite previously providing Broker 8 with documents falsely stating he had bought the shares from the original Thai Shareholders in February 2015, Scheffey now falsely told Broker 7 that he had bought the shares directly from Airborne in November 2016.

125.     Broker 7 only accepted Scheffey's deposit after receiving a September 14, 2017, opinion letter from Airborne's law firm, which incorrectly stated that Scheffey was an original purchaser under Ample-Tee's March 2013 Form S-1.  To obtain the opinion letter, Scheffey provided the law firm with a signed representation letter, dated September 14, 2017, falsely attesting that he (i) had beneficially owned his Airborne shares for at least one year, and (ii) had no material, non-public information about Airborne.  Both representations were untrue, as Scheffey knew, because Scheffey had obtained ownership of the shares from Kabilafkas, Airborne's secret control person, in November 2016.

126.    Kabilafkas, Tim Kabilafkas, Bolovis, Chrysiliou, Rabin (through The School), and Scheffey all knew, or were reckless in not knowing, that the statements they made, and the documents they submitted, to the brokers were materially false and misleading.

## VI.    Kabilafkas, Daniels, And Airborne Orchestrated A Multi-Million Dollar Promotional Campaign

127.    While taking the above steps to ensure that Kabilafkas and his Associates' and nominee's millions of shares of Airborne stock could be deposited and sold, Kabilafkas, Daniels, and Airborne orchestrated a misleading, multi-year promotional campaign designed to generate demand and inflate Airborne's stock price.

128.    The promotional campaign involved, among other things, mass emails from stock promoters, television and print advertisements, press releases, and an electronic billboard in New York City's Times Square.  The promotional materials concealed that Airborne was a vehicle for Kabilafkas's fraudulent scheme and overstated the prospects of a company that had no commercially viable product or revenues and received a "going concern" warning from its independent auditors.

129.    In particular, between August 11, 2016, and August 29, 2016, stock promoters sent over forty (40) separate emails touting Airborne with subject headings such as:

- "Airborne Wireless Network - another Winner for the Runway. Blue skies ahead!"

- "Airborne Wireless Network is our new pick. Profit immensely from Airborne Wireless Network Technology! [Read this Now]"

- "This U.S. Military Airborne Wireless Network Technology is about to go Commercial! [New Trade Alert]"

130.    Disclaimers in these promotional emails identified two companies, "Promoter A" and "Promoter B," who paid for the email blasts.  Promoter A was paid around $130,000 through the following "counter credit" deposits made into its bank account:

| Date | Amount |
|------|--------|
| August 3, 2016 | $8,000 |
| August 3, 2016 | $9,000 |
| August 4, 2016 | $7,000 |
| August 4, 2016 | $5,000 |
| August 8, 2016 | $8,000 |
| August 9, 2016 | $6,000 |
| August 16, 2016 | $9,500 |
| August 16, 2016 | $9,500 |
| August 23, 2016 | $9,500 |
| August 23, 2016 | $9,000 |
| August 23, 2016 | $21,500 |
| August 25, 2016 | $9,500 |
| August 25, 2016 | $9,500 |

131.    Kabilafkas orchestrated the payments to Promoter A through a third party to conceal his and Airborne's role in the promotional campaign.  For example, between August 1, 2016, and August 28, 2016, the time-period of the email promotional campaign and counter deposits to Promoter A, phone records show that Kabilafkas and the third party called each other around 258 times.  In contrast, between August 29, 2016, and January 9, 2017, when the email portion of the promotional campaign was not ongoing, phone records show that Kabilafkas only communicated with this third party 10 times.

132.    Once this initial promotional campaign got underway, Airborne's share price more than doubled from $0.45 to $0.94, by the end of August 2016.  The promotional campaign also had a demonstrable effect on the trading volume in Airborne stock, as shown in the chart below:



133.    In or around September 2016, Kabilafkas spoke with a media and production company ("Promoter C") about performing work for Airborne.

134.    On October 25, 2016, Airborne entered into a media buying and representation agreement with Promoter C.  Although Daniels signed the agreement, Kabilafkas negotiated its terms before instructing Promoter C to email it to Daniels to sign.

135.    Thereafter, Promoter C assisted Airborne with filming several television commercials that aired on Fox News, Fox Business, and CNBC.  Some of the commercials were also posted on the Internet and were publicly available as recently as September 2020. Kabilafkas remained in regular contact with Promoter C and dictated (i) when to air the commercials, (ii) on what networks to air the commercials, and (iii) how often to air the commercials.

136.    Between December 2016 and February 2018, Airborne, directly and indirectly, paid Fox News and Fox Business about $2.05 million to air 1,491 30-second commercials.

Between December 2016, and February 2018, Airborne, directly and indirectly, paid CNBC about $711,000 to air 150 30-second commercials. The first installment of television commercials started December 5, 2016, and ran for a period of three weeks, ending December 23, 2016.

137.    During the time these materially misleading commercials aired, Airborne's trading volume and share price increased dramatically. During the three weeks in December 2016 that the commercials aired, Airborne's daily trading volume increased from 10,522 shares on December 1, 2016 to an average daily volume of 140,937 shares for the rest of the month. During this same time, Airborne's share price more than doubled, rising steadily from around $0.73 per share on December 1, 2016 to $1.69 on December 28, 2016. Similarly, from January 1, 2017 through June 1, 2018, Airborne's average daily trading volume rose sharply to 223,206 shares per day and its share price averaged $1.79 per share, peaking at $3.89 on February 22, 2017.

138.    Besides the television commercials discussed above, Airborne spent hundreds of thousands of dollars to advertise its securities in in-flight magazines for United Airlines and American Airlines. Between February 1, 2017 and April 30, 2017, Airborne also spent another approximately $50,000 to run a 30-second commercial, at least three times per hour, 20 hours per day, on an electronic billboard in New York City's Times Square, across the street from the NASDAQ exchange.

139.    Despite never generating any revenue, in its Form 10-K for the fiscal years ending August 31, 2017 and 2018, Airborne reported spending about $11.1 million on "marketing and branding" expenses during that same time. By contrast, despite never bringing a successful

product to market, during the same period Airborne reported spending only approximately $3 million on "research and development."

## VII.   Kabilafkas And His Associates Liquidated Their Airborne Shares During The Promotional Campaign

140.   During the promotional campaigns, Kabilafkas and his Associates dumped their Airborne shares on unsuspecting investors, as described in the following table:

| Account Name | Brokerage Account | Period of Selling | S-1 Shares Sold | S-1 Share Sale Proceeds |
|---|---|---|---|---|
| Kelly Kabilafkas | Broker 1 | 01/19/17 to 01/08/18 | 1,121,389 | $1,973,002.60 |
| | Broker 2 | 01/19/18 to 04/20/18 | 349,500 | $691,362.70 |
| Nominee 1 | Broker 1 | 10/20/16 to 11/15/17 | 2,803,558 | $5,587,336.58 |
| Panagiotis Bolovis | Broker 1 | 12/23/16 to 12/26/17 | 1,401,779 | $3,819,958.61 |
| Timoleon Kabilafkas | Broker 2 | 02/01/17 to 06/26/17 | 1,292,822 | $3,177,919.68 |
| | Broker 7 | 10/11/17 to 04/27/18 | 1,227,341 | $2,585,627.30 |
| Chrysilios Chrysiliou | Broker 6 | 06/05/17 to 05/22/18 | 635,065 | $1,256,130.16 |
| Eric Scheffey | Broker 2 | 07/03/17 to 07/14/17 | 219,814 | $509,640.29 |

| Account Name | Brokerage Account | Period of Selling | S-1 Shares Sold | S-1 Share Sale Proceeds |
|---|---|---|---|---|
| | Broker 7 | 09/25/17 to 04/04/18 | 804,647 | $1,051,683.82 |
| The School (Moshe Rabin) | Broker 4 | 07/26/16 to 09/14/16 | 841,000 | $465,237.61 |
| | Broker 5 | 10/13/16 to 11/15/16 | 1,121,389 | $2,124,202.24 |
| **Grand Totals** | | | **11,818,304** | **$23,242,101.59** |

141.     Accordingly, through their fraudulent scheme, Kabilafkas and his Associates sold around 11.8 million Airborne shares for proceeds of about $23 million.

142.     While selling their Airborne shares, the Associates sometimes acted at Kabilafkas's direction and other times acted on their own.  Kabilafkas also directed selling from certain of his Associates' accounts and his nominee's account, including accounts ostensibly owned by Tim Kabilafkas, Bolovis, and Nominee 1.

143.     For example, from February 18, 2017, to May 7, 2017, Tim Kabilafkas was traveling outside the United States.  During the same period, Kabilafkas logged into Tim Kabilafkas's account at Broker 2 using an IP address assigned to a residential address in the United States.  Kabilafkas used the same IP address to conduct other online activity, including sending emails in 2015 and 2016 from his personal email accounts.

144.     Similarly, Nominee 1 was traveling outside the United States between February 10, 2016, and January 16, 2017.  During this time, Kabilafkas created the email account in Nominee 1's name, and sent multiple emails, in her name, again using an IP address assigned to a physical address in the United States that he used to conduct other online activity.  Many of

these emails included instructions from Kabilafkas, impersonating Nominee 1, for Broker 1 to sell Airborne shares from Nominee 1's account.

145.    Bolovis resides in Greece and did not enter or exit the United States between January 1, 2015, and July 22, 2020.  During this time, Kabilafkas impersonated Bolovis using a Gmail address in Bolovis's name to send emails and documents to Brokers 1 and 3.  Many of these emails, which originated from U.S.-based IP addresses, included instructions from Kabilafkas, impersonating Bolovis, for Broker 1 to sell Airborne shares from Bolovis's account.

146.    The emails Kabilafkas sent in Nominee 1's and Bolovis's names used sophisticated trading terminology that belies Nominee 1's experience as a cook in a family restaurant and was remarkably similar to the language used by Kabilafkas to direct the trading from accounts held in his own name.  For example:

• **Bolovis email to Broker 1 (December 29, 2016):** "Please sell 50,000 shares of my ABWN shares at $1.42 or higher.  Order is not held and good for the entire day."

• **Nominee 1 email to Broker 1 (February 21, 2017):** "Please cancel previous order sent and please place new order to sell up to 100,000 shares of my ABWN at $3.65 or better.  Looks like price has moved up pre-market.  Order is not held and good for the day."

• **Kabilafkas email to Broker 1 (December 21, 2017):** "Please sell up to 50,000 shares of my ABWN at $2.14 or better.  This is good for the day and not held."

## VIII.  Bolovis And Others Funneled Illicit Airborne Proceeds Back To Kabilafkas, Tim Kabilafkas, And Their Family

147.    On top of the approximately $8.4 million they generated selling S-1 Shares in their own accounts, Kabilafkas and Tim Kabilafkas also benefited from about $9.4 million in illicit proceeds generated from the sale of S-1 Shares in nominees' and Bolovis's accounts that were funneled back to the Kabilafkas family.

148.    For example, Bolovis transferred to a bank account in his name in the Cayman Islands nearly all of the $3,819,958.61 in proceeds he generated selling Airborne stock.  From there, the proceeds were transferred to accounts controlled by Kabilafkas and his family in the United States and abroad, and to escrow companies to fund the purchase of real property in the TKRT's name.  These transfers were for the benefit of Kabilafkas and his family.

149.    Similarly, Kabilafkas generated proceeds of about $5.6 million selling S-1 Shares from Nominee 1's account, wiring essentially all the funds to a bank account held jointly by Nominee 1 and Tim Kabilafkas.  Notably, Tim Kabilafkas was added as a joint account holder on Nominee 1's bank account the same month that Kabilafkas began wiring the illicit proceeds into the account.  Once the Airborne proceeds hit Nominee 1's account, Kabilafkas and Tim Kabilafkas, among other things, (i) transferred about $2.3 million to accounts owned by the TKRT; (ii) disbursed about $1.7 million to escrow companies to purchase real estate held in Kabilafkas's or the TKRT's name; (iii) paid about $1.8 million to federal, state, and local taxing authorities in Nominee 1's name; (iv) disbursed $185,000 to Kabilafkas's sister; and (v) withdrew about $93,000 in cash from bank locations in the United States and Greece.

150.    Kabilafkas and his family also benefited from about $2.27 million in illicit proceeds generated in two additional offshore nominee accounts that were funneled back to the United States using Cayman Islands bank accounts and a U.S. lawyer's IOLTA account.  Once the funds landed in the lawyer's IOLTA account, they comingled with funds the lawyer received from Airborne and other sources, including money from investors who bought Airborne securities.  In total, the lawyer received around $3.5 million in funds related to Airborne and disbursed essentially all of it, including disbursements of around $2.6 million that benefitted Kabilafkas, his Associates, and his family.  For example, the lawyer's IOLTA account made

payments of $450,000 for improvements to Kabilafkas's home, $562,000 directly to Tim

Kabilafkas, $265,000 to pay a portion of the purchase price for a residential property owned by

the MKRT, and at least $240,000 for legal fees for several witnesses involved in the SEC's

investigation.

     151.    In total, between January 2017 and February 2018, Kabilafkas and Tim

Kabilafkas used at least $9.2 million in proceeds from the sale of Airborne stock to purchase 12

pieces of real property in Southern California titled as follows:

| Purchase Date (by check/wire date) | Purchase Price | Portion of Purchase Price Linked to Airborne Proceeds | Purchaser |
|---|---|---|---|
| 1/20/2017 | $660,000 | $401,508 | TKRT |
| 1/24/2017 | $730,000 | $725,298 | TKRT |
| 2/14/2017 | $1,340,000 | $1,340,000 | TKRT |
| 2/25/2017 | $1,577,394 | $1,541,904 | TKRT |
| 3/14/2017 | $735,000 | $735,000 | TKRT |
| 3/16/2017 | $705,000 | $705,000 | TKRT |
| 3/23/2017 | $700,000 | $700,000 | TKRT |
| 4/3/2017 | $800,000 | $800,000 | TKRT |
| 11/15/2017 | $710,000 | $692,000 | TKRT |
| 1/16/2018 | $715,000 | $265,000 | MKRT |
| 2/5/2018 | $705,000 | $665,000 | Kabilafkas |
| 2/5/2018 | $715,000 | $710,000 | Kabilafkas |

     152.    Kabilafkas now resides in one of these properties.  Kabilafkas and Tim Kabilafkas

rent out the rest of the properties and generate several hundred thousand dollars per year in net

rental revenue.

     153.    Kabilafkas and Tim Kabilafkas also spent about $4.3 million to pay federal, state,

and local tax liabilities in their names, and at least $350,000 on luxury automobiles.

IX.   **Airborne Fraudulently Raised Approximately $23 Million From Investors During
The Promotional Campaign While Materially False And Misleading Statements
Regarding The Identity Of Its Control Person Were Publicly Available**

154.   Between 2017 and 2018, during the deceptive promotional campaign outlined

above and while Airborne's undisclosed control person and his Associates were dumping

millions of Airborne shares, Airborne raised about $23 million dollars from unsuspecting

investors in both public and private transactions.

155.   During this period, Airborne's materially false and misleading Commission

filings on Forms 8-K, 10-Q, 10-K, and S-1, many of which Daniels signed personally and which

falsely described Daniels as Airborne's control person, remained available to the public.

156.   Neither Airborne, Daniels, nor Kabilafkas have ever corrected these false

statements.

157.   Airborne's fraudulent securities sales are described in the following table:

| Fiscal Year | Offering Description | Amount Raised |
|---|---|---|
| 2017<br>(For the Year<br>Ended 8/31/2017) | Common Stock Issued From Exercise of Warrants | $1,440,000 |
| | Common Stock and Warrants | $4,719,373 |
| 2018<br>(For the Year<br>Ended 8/31/2018) | Convertible Notes | $5,662,750 |
| | Common Stock Units | $1,174,999 |
| | Common Stock Issued From Exercise of Warrants | $1,657,125 |
| | Preferred Stock Units Issued From Exercise of Warrants | $600,000 |
| | Preferred Stock Units | $6,714,487 |
| 2019<br>(For the Year<br>Ended 8/31/2019) | Preferred Stock Issued From Exercise of Warrants | $800,000 |
| **Grand Total** | | **$22,768,734** |

**X.**     **Kabilafkas Operated As An Undisclosed Controlled Person Of Airborne**

158.     Throughout the scheme, Kabilafkas acted as an undisclosed control person of Airborne.  More specifically, after financing the purchase of the shell, Kabilafkas owned the shares and controlled their distribution, while ensuring that Airborne's public filings did not disclose that fact.

159.     Kabilafkas also helped direct Airborne's promotional campaign, including how much Airborne spent on that campaign and when, where, and how often its television commercials ran, and deceptively impersonated Daniels in connection with Airborne-related business.  Kabilafkas also arranged to have Airborne acquire its patent from The Private Company that he also controlled.

160.     For example, throughout the scheme, IP data shows that Kabilafkas used email addresses bearing Daniels's name—danielsatlw1@gmail.com and j.edward@airbornewirelessnetwork.com—and engaged in other conduct to conceal the actions he took.  As discussed, in June 2016 Kabilafkas submitted Airborne's OTCQB Application and Agreement using Daniels's name.  IP data also shows that Kabilafkas regularly logged into Airborne's Wells Fargo bank account and American Express credit card account.

161.     Kabilafkas also filled out various checks drawn on Airborne's Wells Fargo Bank account, including one check dated June 8, 2016, two checks dated June 9, 2016, and one check dated June 11, 2016.  Daniels was in Israel between June 1, 2016 and June 13, 2016.

162.      Cell phone records show that Kabilafkas was in regular communication with Airborne's employees, including Daniels, its Chief Technology Officer, and others.

163.     Airborne's credit cards and other financial accounts were also used to pay personal expenses for Kabilafkas, Tim Kabilafkas, and other members of the Kabilafkas family.

For example, in August 2017, Airborne's American Express credit card was used to purchase

Kabilafkas a flight from Los Angeles, California to Greece. In December 2017, Airborne's

American Express credit card was used to purchase over $16,000 in flights for Tim Kabilafkas,

and Magdaline Kabilafkas (Kabilafkas's mother) to travel to Greece. In February 2018,

Airborne's American Express card was used to purchase over $10,000 in flights for Kabilafkas,

Tim Kabilafkas, and three other family members to travel to Greece. Airborne's American

Express card was also used to pay for several hotel rooms for Kabilafkas, including three nights

in Dubai in September 2016, and several nights in Greece in November 2017.

## CLAIMS FOR RELIEF

### COUNT I
**Violations of Section 17(a)(1) and (3) of the Securities Act**
**(All Defendants)**

164.    The SEC realleges and incorporates by reference each allegation in paragraphs 1

through 163, inclusive, as if they were fully set forth herein.

165.    By engaging in the conduct that is described above, the Defendants knowingly,

recklessly, or negligently in connection with the offer or sale of securities, by the use of the

means or instruments of transportation, or communication in interstate commerce or by use of

the mails, directly or indirectly:

      a.    employed devices, schemes, or artifices to defraud; and/or

      b.    engaged in transactions, practices, or courses of business which operated

or would operate as a fraud or deceit upon the purchaser.

166.    By engaging in the foregoing conduct, the Defendants violated, and unless

enjoined will continue to violate, Securities Act Sections 17(a)(1) and (3) [15 U.S.C. § 77q(a)].

## COUNT II
### Violations of Section 17(a)(2) of the Securities Act
### (Airborne Wireless Network, Kabilafkas,
### Tim Kabilafkas, Chrysiliou, Bolovis, and Scheffey)

167.    The SEC realleges and incorporates by reference each allegation in paragraphs 1

through 163, inclusive, as if they were fully set forth herein.

168.    By engaging in the conduct that is described above, Defendants Airborne

Wireless Network, Kabilafkas, Tim Kabilafkas, Chrysiliou, Bolovis, and Scheffey knowingly,

recklessly, or negligently in connection with the offer or sale of securities, by the use of the

means or instruments of transportation, or communication in interstate commerce or by use of

the mails, directly or indirectly obtained money or property by means of untrue statements of

material facts, or omissions to state material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading.

169.    By engaging in the foregoing conduct, Defendants Airborne Wireless Network,

Kabilafkas, Tim Kabilafkas, Chrysiliou, Bolovis, and Scheffey violated, and unless enjoined will

continue to violate, Securities Act Sections 17(a)(1) and (3) [15 U.S.C. § 77q(a)].

## COUNT III
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (All Defendants)

170.    The SEC realleges and incorporates by reference each allegation in paragraphs 1

through 163, inclusive, as if they were fully set forth herein.

171.    By engaging in the conduct described above, the Defendants knowingly or

recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use the

means or instrumentalities of interstate commerce, or the mails, or the facilities of a national

securities exchange:

a.      employed devices, schemes or artifices to defraud; and

b.      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c.      engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

172.    By engaging in the foregoing conduct the Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

## COUNT IV
**Control Person Liability Under Exchange Act Section 20(A) for Violations of Exchange Act Section 10(B) and Rule 10B-5 Thereunder**
**(Defendant Kalistratos Kabilafkas)**

173.    The SEC realleges and incorporates by reference each allegation in paragraphs 1 through 163, inclusive, as if they were fully set forth herein.

174.    Through the conduct described above, Airborne directly or indirectly, by use the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange: (a) employed devices, schemes or artifices to defraud; and (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security in

violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

175.    When Airborne violated Section 10(b) of the Exchange Act and Rule 10b-5, Defendant Kabilafkas directly or indirectly controlled Airborne.  Defendant Kabilafkas was therefore a "controlling person" within the meaning of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] with regard to Airborne.

176.    As alleged above, Defendant Kabilafkas was a culpable participant in, and directly or indirectly induced the acts constituting Airborne's violations of the Exchange Act, and did not act in good faith.

177.    By reason of the foregoing, Defendant Kabilafkas is jointly and severally liable with and to the same extent as Airborne for its violations of Section 10(b) of the Exchange Act and Rule 10b-5 and, unless enjoined, will again act as a "controlling person" in connection with such violations.

## COUNT V
### Unjust Enrichment Liability
### (Relief Defendants)

178.    The SEC realleges and incorporates by reference each allegation in paragraphs 1 through 163, inclusive, as if they were fully set forth herein.

179.    Relief Defendants Timoleon Kabilafkas in his capacity as the trustee of the Tim Kabilafkas Revocable Trust Dated July 24, 2001 and Magdaline Kabilafkas in her capacity as trustee of the Magdaline Kabilafkas 1989 Trust Dated May 27, 1989, also known as the Magdaline Kabilafkas Revocable Trust have obtained funds as part, and in furtherance of the securities violations alleged above, did not have a legitimate claim to the funds, and under the

circumstances it is not just, equitable, or conscionable for these parties to retain the funds.  As a consequence, these Relief Defendants have been unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter Final Judgments:

A.    Finding Defendants liable for the violations alleged herein;

B.    Permanently restraining and enjoining Defendants from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

C.    Permanently restraining and enjoining Defendants from, directly or indirectly, engaging in conduct in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

D.    Permanently restraining and enjoining Kalistratos Kabilafkas from violating Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)];

E.    Barring Defendants from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)];

F.    Permanently barring Defendant J. Edward Daniels from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] and that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 78t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

G.    Ordering Defendants to jointly and severally disgorge, with prejudgment interest, all ill-gotten gains received by any person or entity as a result of the conduct alleged in this Complaint;

H.    Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

I.    Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

J.    Granting such other and further relief as the Court deems just, equitable, or proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: March 2, 2021                Respectfully submitted,

                            _____*S/ David Misler*_____
                            Daniel Maher*
                            David Misler*
                            U.S. SECURITIES AND
                            EXCHANGE COMMISSION
                            Division of Enforcement
                            100 F Street, N.E.
                            Washington, DC  20549
                            (202) 551-4737 (Maher)
                            (202) 551-2210 (Misler)
                            MaherD@sec.gov
                            MislerD@sec.gov

                            *Counsel for Plaintiff*
                            *U.S. Securities and Exchange Commission*

*Pending admission pro hac vice*

<u>Of counsel:</u>
George Bagnall
Paul Bohr
Jennie Krasner
Drew Dorman
100 F Street NE
Washington, DC 20549