**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE
COMMISSION,

                     Plaintiff,

   -against-

AIRBORNE WIRELESS NETWORK, et al.,

                    Defendants,

   -and-

TIM KABILAFKAS, in his capacity as trustee of the
TIM KABILAFKAS REVOCABLE TRUST
DATED JULY 24, 2001, AND MAGDALINE
KABILAFKAS, in her capacity as trustee of the
MAGDALINE KABILAFKAS 1989 TRUST
DATED MAY 27, 1989,

               Relief Defendants.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/12/2023

No. 21 Civ. 01772 (CM)

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S *DAUBERT* MOTION

McMahon, J.:

This is an SEC enforcement action brought against Kalistratos Kabilafkas and related parties, including his father Timoleon Kabilafkas, for orchestrating and carrying out a scheme to take undisclosed control of a public company, Airborne Wireless Network ("Airborne," formerly known as Ample-Tee, Inc.), and profit by engaging in a "pump and dump."

Currently before the Court is a motion to exclude the testimony of Defendants' expert witnesses: Armand Musey. The motion is GRANTED in part and DENIED in part.

**BACKGROUND**

The SEC brings this enforcement action alleging that, from August 2015 until May 2018, Kabilafkas executed a fraudulent scheme pursuant to which he acquired control of Ample-Tee (later known as Airborne) and parked millions of shares with his associates and nominees. Kabilafkas then caused the company to purchase a patent relating to wireless internet technology (the "Infinitus Patent") in order to give Airborne a veneer of actually doing business in a popular startup industry. Between 2016 and 2018, Kabilafkas orchestrated the expenditure of massive amounts of corporate funds on promotional schemes designed to "pump" the price of the stock. During these campaigns Kabilafkas, his nominees and associates proceeded to "dump" their shares into the artificially inflated market.

The SEC alleges that, throughout the course of the scheme, Kabilafkas and his associates submitted documents containing false statements to Airborne's transfer agent, brokers, and investors. Moreover, Kabilafkas and his associates allegedly caused Airborne to file numerous false reports with the SEC – reports that failed to disclose who truly owned stock in and controlled Airborne and that made misrepresentations about certain transactions in which Airborne engaged. For example, Airborne allegedly did not disclose that it gave an investor, Eric Scheffey, nearly three million more Airborne S-1 Shares (common stock) than disclosed for no additional consideration. In addition, Airborne discussed at length the business potential of the Infinitus patent and trademark in its filings but did not plainly disclose that the patent allegedly had no value.

In March 2021, the Commission sued Airborne, Kalistratos Kabilafkas, Timoleon Kabilafkas (Kabilafkas' father), Jack Edward Daniels (Airborne's nominal CEO), and four other individuals, as well as Relief Defendants the Tim Kabilafkas Revocable Trust ("TKRT") and the Magdaline Kabilafkas Revocable Trust ("MKRT"). Complaint ("Compl."), Dkt. No. 1 ¶¶ 17-27.

The SEC alleges that Defendants (i) engaged in "scheme liability," in violation of to Section 17(a)(1) and (3) of the Securities Act of 1933, Section 10(b) of the Securities and Exchange Act of 1934 and Rules 10b-5(a) and (c) thereunder; and (ii) made material misrepresentations and omissions in their filings, in violation of Securities Act Section 17(a)(2), Sections 10(b) of the Exchange Act and Rule 10(b)-5 thereunder. The SEC alleges that Kabilafkas is liable as a control person under Exchange Act 20(a).

The Court denied Defendants' motions to dismiss the Complaint on October 7, 2021. Dkt. No. 103. The SEC then reached settlements with four of the individual Defendants – Rabin, Bolovis, Chrysiliou, and Scheffey. Dkt. No. 22, 147-148, 174.

The parties filed cross-motions for summary judgment on November 8, 2022. Dkt. No. 184, 188. On the same day, the SEC moved to exclude the opinion and proposed testimony of Armand Musey (Dkt. No. 193-28, Musey Rpt.) and asked the court to disregard any purported evidence or argument drawn from the report and submitted in connection with Kabilafkas' motion for summary judgment or his opposition to the SEC's motion for summary judgment. Dkt. No. 186. Defendants use Musey's report to support their argument that the alleged misstatements identified by the SEC were immaterial as a matter of law.

Because "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment . . . it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). "The resolution of evidentiary questions on summary judgment conserves the resources of the parties, the court, and the jury." *Ibid.*

# DISCUSSION

## I.  *Daubert* Standard

Under the standard set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579

(1993) and Rule 702 of the Federal Rules of Evidence, the district court serves a "gatekeeping"

function in determining whether an "expert" witness really qualifies as one. Rule 702 provides

that:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable principles and
> methods; and (d) the expert has reliably applied the principles and methods to the
> facts of the case.

"The Second Circuit has 'distilled Rule 702's requirements into three broad criteria: (1)

qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact.'" *In re*

*Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 27 (S.D.N.Y. 2020) (quoting *In re*

*LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 466 (S.D.N.Y. 2018)).

The party proffering the expert's opinions "has the burden to establish the [Rule 702]

admissibility requirements, with the district court acting as a 'gatekeeper' to ensure that the

'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re*

*Pfizer Inc. Secs. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (quoting *United States v. Williams*, 506

F.3d 151, 160 (2d Cir. 2017)). The court need not "admit opinion evidence that is connected to

the existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply

too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*,

522 U.S. 136, 146 (1997). In its evaluation, "the district court must focus on the principles and

methodology employed by the expert, without regard to the conclusions the expert has reached

or the district court's belief as to the correctness of those conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

Ultimately, the *Daubert* standard is a "flexible one," *Daubert*, 509 U.S. at 594, "and will necessarily vary from case to case," *Amorgianos*, 303 F.3d at 266. District courts have "broad discretion in the matter of the admission or exclusion of expert evidence." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962)). Even if an expert is qualified, the court must still consider whether the probative value of the testimony is "substantially outweighed by a danger of . . . unfair prejudice" or likelihood of confusing or misleading the jury. Fed. R. Evid. 403; *see also United States v. Dukagjini*, 326 F.3d 45, 55 (2d Cir. 2002).

**II.     The SEC's Motion to Exclude the Opinion of Armand Musey is Granted in Part**

Musey's report begins by describing his qualifications. Musey is the President and founder of Summit Ridge Group, LLC, a leading provider of business valuation and financial consulting services in the telecommunications, media, and satellite industries. Musey Rpt. p. 4. Musey's expert skills include financial analysis, business strategy analysis, market analysis, and valuation. *Id.* pp. 5, 52. Prior to founding Summit Ridge Group in 2007, Musey held various roles across the financial services industry, including at Salomon Smith Barney and Banc of America Securities, where he led the satellite communications research teams and specialized in research and investments in the mobile wireless tower industry. *Id.* p. 5. Musey has received several awards and accolades, including the Institutional Investor "All American" ranking and the Wall Street Journal "Best on the Street" ranking. He has published numerous academic publications and periodical contributions, and has participated in dozens of speaking engagements. *Id.* p. 54-60. He also has been retained to serve as an expert witness in other complex securities litigations involving public companies. *Id.* pp. 60-66; Dkt. No. 213-2 at 222.

5

Musey holds a B.A. from the University of Chicago, an M.B.A. and J.D. from Northwestern University, and an M.A. from Columbia University. Musey Rpt. at 5.

Defendants asked Musey to opine about: (1) the general state of the broadband industry in the 2015 – 2020 timeframe; (2) the success rate of startup companies; (3) information and statements that would be important to an ordinary or reasonable investor in this type of stock; (4) the importance, from an ordinary or reasonable investors' perspective, of the SEC's various allegations against Defendants in this litigation with respect to Airborne; (5) assuming that Airborne's stock traded efficiently, whether the SEC's various allegations against Defendants with respect to Airborne affected the stock value; and (6) the impact of the shareholder selling related to the May 2018 financing on Airborne's stock price and related trading data. Musey Rpt., p. 7.

The substance of Musey's Report begins in Section 4 by providing an overview of the general state of the broadband industry in the 2015 – 2020 timeframe. Musey Rpt., at 10. He notes that the industry was highly competitive and asserts that industry dynamics were unfavorable for Airborne. *Id.* at 15. This testimony is admissible.

Next, in Section 5, Musey discusses the success rate of startup companies, noting that most startups fail, and that Airborne, as a pre-revenue startup entering the highly competitive broadband market, was more likely to fail. *Id.* at 18-19. This testimony is likewise admissible.

In Section 6, Musey's Report begins its discussion of materiality, which continues through Sections 7-11 and 13. This testimony will not be admitted.

In Section 6, Musey states that he will "make certain conclusions regarding materiality of information to investors." *Id.* at 20. He states that "it is necessary to consider the plain language of statutes and case law to develop an understanding of the term [material]" and that it is

6

"essential to consider the [legal] definition of materiality to evaluate the type of information investors are likely to consider material." Musey offers definitions of materiality both under the Securities Act and within the Second Circuit and states that these definitions "largely rest[] on the perspective of the 'reasonable investor.'" *Id.*

I will not allow any expert to define materiality for the trier of fact. "Expert testimony may not usurp the province of the judge to instruct on the law." *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 251 (S.D.N.Y. 2014), aff'd sub nom. *Querub v. Hong Kong*, 649 F. App'x 55 (2d Cir. 2016) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)). The Court and the Court alone will instruct the jury on the definition of materiality, and expert testimony that does not conform to the court's definition will not be allowed. The definitional testimony offered in Section 6 is excluded.

In Section 7, Musey opines on the types of information and statements that would be important to an ordinary or reasonable investor. *Id.* at 21. Musey asserts, with citations to publications on valuation theory, that an ordinary or reasonable investor is *primarily* concerned with factors that will impact the profitability of their investment – more specifically, factors that impact cash flows. *Id.* at 21-22. Musey states that contracts, technical development, and regulatory approvals effect cash flows of start-up companies, while the mechanics of how a company was founded, prior ownership changes, and how shares were deposited in an account do not. The factors that Musey opines do not impact cash flows notably correspond to the alleged misstatements in this case. For example, the SEC alleges that Kabilafkas and other defendants misled brokers to induce the brokers to deposit their Airborne shares into brokerage accounts.

7

Musey then opines that the factors that do not affect cash flows are not important from a reasonable investor's perspective. *Id.* at 22.[1]

Musey can of course testify that the literature indicates that reasonable investors are as a rule *primarily* concerned with factors that impact cash flows. But "primarily" does not rule out the possibility that particular factors not related to cash flow could not be material to a reasonable investor. Musey' opinion that a reasonable investor would not be concerned about factors that do not impact cash flow is simply his *ipse dixit*; it is supported neither by professional literature nor by any other evidence or analysis. Moreover, it is counterintuitive to think that, if a pump and dump scheme like the one here alleged were proved, the facts underpinning that scheme would not be material to a reasonable investor. After all, the fact that a company is being used as a front for such a scheme, while not necessarily impacting cash flows, most certainly has the potential to impact the profitability of an investment. Musey's opinions fail to account for the fact that the factors he identifies as not being relevant to cash flow could be relevant to a reasonable investor if those things were proved to be part of a scheme to profit from the illicit pumping of the price of a company's stock. By completely divorcing his "cash flow" analysis from the facts of this case, Musey renders his ultimate opinion that such factors are not important to a reasonable investor unhelpful to the jury. Therefore, Musey may not testify to the ultimate conclusion that reasonable investors would not find matters that, while not impacting cash flow, are pertinent to a scheme to defraud to be material.[2]

---

[1]    Musey notes that some factors that do not relate to cash flow, such as merger discussions, need not be disclosed. (*Id.* at 22). That opinion – which is not entirely correct as a matter of law -- has nothing to do with this case and is excluded as irrelevant.

[2]    As will become apparent, at later points in his testimony Musey contradicts himself on this issue. *See infra*, pp. 16.

In Sections 8 through 11, and 13, Musey examines specific allegations against Defendants in this litigation and opines whether they would be material to a reasonable investor.

Musey opined that the SEC's allegations concerning the background of the Ample-Tee shell company and how it came to be Airborne would not have been relevant to Airborne investors, as the SEC does not argue that Ample-Tee had hidden liabilities or other adverse factors that impacted the value of Airborne shares. As an example, Musey states that the SEC's allegation that Chenard (Ample-Tee's co-founder) did not receive any proceeds from the sale of Ample-Tee would have been "entirely irrelevant from the perspective of Airborne investors." *Id.* at 23.

Musey examined the SEC's allegation that Kabilafkas "made false and misleading statements and engaged in additional deceptive conduct to conceal his involvement with and controlling interest in Ample-Tee. Among other things, Kabilafkas funneled the funds he used to purchase Ample-Tee's shares through a bank account in the name of a charitable, religious organization, and he placed the Restricted Shares in the name of his nominee CEO, Daniels." Musey concluded that, assuming these allegations were correct, none would be important to investors or material as they "do not bear on the operations of Airborne Wireless or its valuation." *Id.* at 24.

Musey stated that he did not believe the SEC's allegation that Kabilafkas hid his involvement and control of Airborne would be material to investors as neither he nor Daniels is a known person, either in the telecom industry or more generally. Therefore, he argued that there is no reason to believe investors' perception of Airborne would have been different if they understood that Kabilafkas was controlling the company versus Daniels. *Id.* at 25.[3]

---

[3]     Musey opined on the materiality of Kabilafkas' alleged concealment of his ownership stake in Airborne in the following manner: "I understand from counsel that Airborne's securities were not registered under Section 12(g)

Musey asserts that the precise purchase price for the S-1 shares is immaterial – so whether Kabilafkas "paid $250,000 or $300,000 for the purchase of [the] shares in Airborne would not be important to investors."[4] *Id.* at 27. Musey states that this is because the money went to the existing owner of the shares and not to the company and therefore had no impact on cash flow or company prospects. *Id.*

Musey opines that, regardless of whether Kabilafkas or Daniels purchased the Ample-Tee shares, it was "irrelevant to shareholders," as the company did not benefit financially from the purchase. *Id.* at 27.

Musey asserts that, with respect to the SEC's allegations that Kabilafkas misled brokers and others to induce them to deposit Airborne shares into his account, "the shares were Kabilafkas', and he had the rights to them, including the right to deposit them in a brokerage account." *Id.* at 31. Musey further asserts that, at most, Kabilafkas "is accused of taking some liberties to do something that a shareholder in his position is allowed to do and typically does." *Id.* Therefore, he states that "this information would not be important to a reasonable investor and it is not material." *Id.*

Musey states that investors would have been indifferent to the fact that Kabilafkas gave nearly three million additional shares to Scheffey (an Airborne investor). This is because, having received the shares from Kabilafkas (as opposed to from the company), Scheffey's shares did not increase the number of shares outstanding. As a result, investors' expected cash flow for each share remained unchanged. *Id.* at 34-35. In addition, Musey states that the backdating and

---

of the Exchange Act . . . and therefore Kalistratos Kabilafkas was not required to disclose his shareholdings in Airborne. If this is the case, the materiality of his holdings is irrelevant." Musey Rpt. at 26.

[4]      The SEC asserts in its 56.1 Statement that Kabilafkas paid $350,000 for the S-1 and Restricted Ample-Tee Shares. SEC 56.1 ¶ 34. However, Ample-Tee's and Airborne's public filings stated that Daniels had spent $250,000 to purchase the Restricted Shares. SEC 56.1 ¶ 52.

inserting of Scheffey's name onto the share transfer paperwork would not be material to investors because "[a] shareholder, such as Dr Scheffey, is allowed to deposit shares in a brokerage account and monetize them." *Id.* at 35.

Musey may not offer his opinion on whether these matters would or would not be material to reasonable investors. "Although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." *Bilzerian*, 926 F.2d at 1294. Specifically, "An expert cannot testify as to whether the specific information at issue in a case is or is not "material." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013). While Musey asserts in his report that he does not "render conclusions about materiality from a legal perspective," that is nonsense. Musey Rpt. at 20. Musey himself points out exactly what he is doing when he states that, "it is necessary to consider the plain language of statutes and case law to develop an understanding of the term [material]" and that it is "essential to consider the [legal] definition of materiality to evaluate the type of information investors are likely to consider material." Musey's assessment of the materiality of specific statements in Sections 8 through 11 and 13 of his Report is excluded.

In Section 12 of his Report, Musey opines on the value of the Infinitus patent and the SEC's assertion that Daniels and Kabilafkas knew the patent was worthless. Musey notes that the SEC's allegation is based on a draft valuation report that Daniels received in 2016 (the year of the Infinitus patent purchase), which stated that (1) "the fair value of the [Infinitus Patent] is $0;" (2) "it would require $582,800,000 in capital to bring the proposed products/services [based on the Infinitus patent] to market;" and (3) future cash flows of the Infinitus Patent could not be predicted. SEC 56.1 Reply ¶ 59; Musey Rpt. at 28. Musey opines that this valuation did not necessarily mean that the patent was worthless; for example, the report did not consider the value

of potential patent infringement claims. He also opines that the $582 million number is misleading, because that was the amount management estimated Airborne needed to complete its entire business plan. Therefore, it reflected, not just the value of the patent itself, but also the amount estimated for Airborne to practice the patent, which would require the company to fit complex electronic communications equipment on planes, to advertise the patent, and to pay for ground equipment. Musey Rpt. at 29. Finally, Musey notes that Airborne disclosed the downside potential of the patent to investors by disclosing the draft valuation report in its financials; he observes that such a disclosure "is not consistent with attempting to artificially inflate the stock price." *Id.*

Musey is a valuation specialist, but he does not offer any opinion about the actual value of the patent. He does not try to quantify the amount of value that prospective litigation (net of legal expenses, of course) would add to an otherwise valueless and unpracticed patent. He simply speculates that there would be some value to asserting the patent against others. That is worthless testimony. And while Musey believes that the $582 million cost of bringing the patent to market (actually practicing the patent) is "inflated," he does not opine that bringing the now-worthless patent to market could be done for no cost, or even just a modest cost; Musey does not estimate how much it would actually cost to do everything needed to practice the patent, which is what the $582 million number purports to be. His *ipse dixit* critique of the draft valuation report is, therefore, unlikely to help the jury, – indeed, it is quintessentially "junk science" – and so is inadmissible.

In Section 14, Musey' opines about Airborne's promotional efforts. He states that "in my experience, it is common for startup companies to deploy significant resources towards

marketing" and that "Airborne's promotional activities were fully disclosed." Musey Rpt. at 32. This testimony is admissible.

In Section 15, Musey opines that the SEC's allegation that Airborne falsely disclosed that Scheffey paid an inflated price of $0.80 per share, rather than a true price of $0.31 per share, to purchase his Airborne shares in 2016 does not make sense. Musey Rpt. at 33. The SEC states that, in two Forms 8-K (and in additional filings with the SEC), Airborne announced that it had sold common stock to Scheffey: (1) in its October 2016 8-K it stated that it had sold 312,500 shares at a purchase price of $0.80 per share, for a total of $250,000; and (2) in its November 2016 8-K it stated that it had sold 1,500,000 shares at a purchase price of $0.80 per share, for a total of $1,200,000. SEC 56.1 ¶ 60. However, the SEC asserts that, in connection with these transactions, Kabilafkas also gave Scheffey nearly three million S-1 Shares for no additional consideration as a means to lower Scheffey's overall investment cost while misleading the public about what Scheffey paid. SAC 56.1 ¶¶ 60. This allegation is supported by Scheffey's share certificates and paperwork for 2,803,558 S-1 shares, which were submitted to Airborne's transfer agent, as well as by Niko Kabylafkas' testimony that Kabilafkas gave Scheffey these additional shares to lower Scheffey's cost basis and that Niko filled out this paperwork on Scheffey's behalf. SAC 56.1 ¶¶ 60, 65.[5] The SEC asserts that had the Form 8-Ks accounted for these nearly 3 million additional shares that Scheffey received, a true disclosure of Scheffey's investment cost would have been $0.31.

Musey opines that this analysis does not make sense because Airborne did disclose in both of these two 8-Ks that Scheffey had also purchased an equal number of warrants, which had

---

[5]      The S-1 Share certificates represented that Scheffey had purchased the shares directly from a Thai shareholder for $0.01 per share in 2015, which was prior to Kabilafkas' purchase of the Ample-Tee stock. SAC 56.1 ¶¶ 65, 35.

value. Musey states that he used a Black-Scholes option pricing model to estimate the precise value of these warrants and found them "to be $0.49 per warrant, for a total value of $888,125, leaving the disclosed price of the shares to be $0.31 per share." Thus, he argues that the Forms 8-K were not false or misleading. *Id.* at 34.

This analysis of the Scheffey transaction is right in Musey's wheelhouse. A valuation of the warrants that Scheffey purchased is precisely the type of analysis that Musey – a valuation specialist – is qualified to conduct. However, Musey's testimony regarding the warrants does not controvert the SEC's evidence that Scheffey received an additional 2.8 million S-1 shares from Kabilafkas around the same time as making his public investment in Airborne, which aspect of the transaction was not disclosed in Airborne's Forms 8-K. As a result, irrespective of the value of the warrants, by not disclosing the nearly 3 million additional shares that Scheffey received, the 8-Ks were misleading. Musey's analysis of the warrants does not rectify that. Section 15 is therefore is excluded as not relevant.

In Section 16, Musey analyzes how Airborne's stock price reacted following certain disclosures – what Defendants call an "event study." Musey Rpt. at 36. A classic securities fraud "event study" looks at what happens to the price of a company's stock following the "curative" disclosure by the company of the matters alleged to have been material but not previously disclosed. Musey could not have conducted such a study, because there was no "curative" disclosure by Airborne. The allegedly material information in this case was not known to the market until the SEC filed their complaint in this matter, and Musey does not analyze what happened to Airborne stock in the wake of the commencement of this lawsuit in March 2021.[6]

---

[6]     Musey notes that Airborne's share price had already fallen to $0.0001 in November 2018, and remained at that price through at least May 2019. Musey Rpt. at 49.

Instead, Musey examined what happened to the price of Airborne's stock following five specific disclosures made by Airborne during the course of the alleged fraud. In each instance, Musey examined whether the price of Airborne's stock moved significantly – or at all – following the disclosure. This, theoretically, is information that might help the jury draw a conclusion about the materiality of the information that was disclosed. In fact, Musey concludes that the "alleged false statements were not important to investors because the stock price did not react to them." Musey Rpt. at 36.

But there are problems with all of Musey's "events" that render his analysis unhelpful or just plain wrong.

Musey notes that there was no movement in the stock price following Airborne's announcement, in an October 2015 8K, that Daniels purchased $250K worth of stock using his personal funds. However, the SEC alleges that this disclosure was false, because Kabilafkas actually purchased the stock. SEC 56.1 ¶ 52. The SEC's allegation is admitted for purposes of this motion because Defendants failed to cite to any record evidence in support of its purported "counter-statements" to the SEC's facts in its 56.1 Statement regarding Kabilafkas' purchase of the shares. Kabilafkas Counter to SEC 56.1, Dkt. No. 203, ¶¶ 24-32. Therefore, the fact that investors did not react to the "fake news" that Daniels used his own money to purchase Airborne stock says absolutely nothing about how reasonable investors would have reacted to learning that Daniels actually did not use his own money, but was simply being used as a front by Kabilafkas. Musey's study of the impact of what was actually disclosed will not help the jury decide whether the Daniels disclosure was true or false; neither will it help a trier of act decide whether, if false, a reasonable investor would have found either (i) the true information or (ii) the fact of the lie to be material.

Musey next notes that there was no outsized price or volume movement in Airborne stock following Airborne's announcement, in an October 2016 8K, that it had sold in a private placement transaction 312,500 shares of its common stock to Scheffey at a purchase price of $0.80 per share. Musey also notes that there was a price decrease in Airborne stock following Airborne's announcement, in a November 2016 8K, that it had sold to Scheffey in a private placement transaction 1,500,000 shares of its common stock at a purchase price of $0.80 per share, but observes that this movement was consistent with the direction of Airborne's stock price movement in the two preceding trading days.

But the SEC alleges that Airborne failed to disclose, in connection with both of these transactions, that Kabilafkas gave Scheffey nearly three million S-1 shares for no additional consideration. SEC 56.1 ¶ 60. As noted above, this allegation is supported by substantial evidence and is uncontroverted by Musey's testimony or any other evidence. *See supra* pp. 13-14. Therefore, the fact that there was a minimal investor reaction to the incomplete information regarding Scheffey's investment says nothing about how reasonable investors would have reacted to learning that Scheffey received an additional three million shares, which is what rendered the disclosed purchase price per share inaccurate.

Next, Musey notes that there was a significant daily volume and price increase in Airborne stock following Airborne's October 2016 disclosure that it had filed with the Federal Aviation Administration ("FAA") for initial FAA certification. Musey opines that this indicates that Airborne investors were paying attention to company news and that this was the type of information Airborne investors considered important. However, the fact that investors reacted to the truthful news of Airborne's FAA filing does not at all indicate how reasonable investors would have reacted to the disclosure of the information that the SEC alleges was either false or

16

omitted. Furthermore, since making a filing with the FAA has no impact on cash flow, this particular opinion actually appears to undercut Musey's pronouncement that matters not associated with cash flow are irrelevant to reasonable investors.

Musey notes that Airborne's stock price increased after Airborne filed its February 2017 8-K disclosing that it had hired Michael Warren to be the new CEO. Musey opines that the share price increase following this disclosure could demonstrate that "investors may have found the news that Airborne had hired a new executive with a technology and project management background as a potentially positive development." Again, this analysis of investor reaction following the disclosure of a truthful statement will not help the jury decide whether an alleged misrepresentation by Airborne was material or not. And again, the fact that this non-cash-flow related disclosure appears to have been important to the investing public undercuts Musey's statement that only information relating to cash flow is material to investors.

Therefore, Musey's five purported "event studies" in fact do nothing to help the jury decide whether a reasonable investor would have found the SEC's alleged misstatements or omissions in this case material. As a result, Section 16 of Musey's Report is excluded.

In the final two sections of Musey's Report, Musey offers an explanation for Airborne's early 2018 share price decline that is not related to Kabilafkas' sales of S-1 shares. First, Musey noted that Airborne made various negative disclosures in 2018, including that it experienced a dramatic drop in working capital and an increase in operating expenses, as well as that it had not generated any revenues. Musey Rpt. at 44. He concluded that, "The combination of deteriorating financial data and management's explanatory text would likely make investors question Airborne's ability to generate future positive cash flows, which . . . is how a stock's value is ultimately determined." *Id.* at 45.

17

Musey also examined Airborne's financing and its impact on the company's stock price. Specifically, Musey analyzed the terms of an $8 million financing via convertible securities with warrants, which Airborne completed in 2018. *Id.* at 46. He concluded that this type of security issuance is often referred to as "toxic financing," as it leads to stock price falls. *Id.* at 46-47. Musey further concluded that investors sold short Airborne shares during this time which also drove the share price lower. *Id.* at 47. Musey concludes that this type of financing, together with the short selling, led to a massive increase in shares which caused each Airborne share to fall dramatically in value. *Id.* at 48-49.

Musey is qualified to offer the opinions in these final sections, which pertain to the financial markets and business strategy. Therefore, Musey may testify to the matters discussed in Sections 17 and 18 of his report.

## CONCLUSION

In the final analysis, Musey may not testify to very much of what appears in his report. The impact of what he is permitted to say will be discussed in the court's decision on the motions for summary judgment.

The motions to exclude the opinions and potential testimony of Armand Musey is GRANTED in part and DENIED in part. The Clerk of Court is respectfully directed to close Dkt. No. 186.

Dated: September 12, 2023
New York, New York

U.S.D.J.

BY ECF TO ALL PARTIES