UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



SECURITIES AND EXCHANGE
COMMISSION,

                                        Plaintiff,

    -against-

AIRBORNE WIRELESS NETWORK, et al.,

                                        Defendants,                     No. 21 Civ. 01772 (CM)

    -and-

TIM KABILAFKAS, in his capacity as trustee of the
TIM KABILAFKAS REVOCABLE TRUST
DATED JULY 24, 2001, AND MAGDALINE
KABILAFKAS, in her capacity as trustee of the
MAGDALINE KABILAFKAS 1989 TRUST
DATED MAY 27, 1989,

                                        Relief Defendants.

**DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

McMahon, J.:

This is an SEC enforcement action brought against Kalistratos Kabilafkas (referred tp

herein as Kabilafkas)[1] and related parties, including his father Timoleon Kabilafkas, for

orchestrating and carrying out a scheme to take undisclosed control of a public company and

profit by engaging in a "pump and dump." The SEC alleges that Kabilafkas acquired control of

Airborne Wireless Network ("Airborne," formerly known as Ample-Tee, Inc.) and gave millions

of Airborne shares to his associates and nominees. Kabilafkas then caused the company to

---

[1] Other members of the extened Kabilafkas (or Kabylafkas) family will be referred to by their first names; all
references to "Kabilafkas" mean the principal defendant in this case, Kalistratos Kabilafkas.

purchase a patent relating to wireless internet technology in order to give Airborne a veneer of actually doing business in a popular startup industry. Between 2016 and 2018, Kabilafkas orchestrated the expenditure of massive amounts of corporate funds on promotional schemes designed to "pump" the price of the stock. During these campaigns Kabilafkas, his nominees and associates proceeded to "dump" their shares into the artificially inflated market.

Throughout the course of the scheme, which lasted from August 2015 until May 2018, Kabilafkas and his associates submitted documents containing false statements to Airborne's transfer agent, brokers, and investors. Moreover, Kabilafkas and his associates caused Airborne to file numerous false reports with the SEC – reports that failed to disclose who truly owned stock in and controlled Airborne and that made misrepresentations about certain transactions in which Airborne engaged.

In March 2021, the Commission sued Airborne, Kalistratos Kabilafkas, Timoleon Kabilafkas, Jack Edward Daniels, and four other individuals, as well as Relief Defendants the Tim Kabilafkas Revocable Trust ("TKRT") and the Magdaline Kabilafkas Revocable Trust ("MKRT"). Complaint ("Compl."), Dkt. No. 1 ¶¶ 17-27.

Both sides have moved for summary judgment. The SEC alleges that Defendants (i) engaged in "scheme liability" in violation of Section 17(a)(1) and (3) of the Securities Act of 1933, Section 10(b) of the Securities and Exchange Act of 1934 and Rules 10b-5(a) and (c) thereunder; and (ii) made material misrepresentations and omissions in their filings in violation of Securities Act Section 17(a)(2), Sections 10(b) of the Exchange Act and Rule 10(b)-5 thereunder. The SEC alleges that Kabilafkas is liable as a control person under Exchange Act 20(a). Dkt. No. 184.

2

Kabilafkas cross-moves for summary judgment on the ground that any misstatements that might have been made were not material, that Kabilafkas did not in fact control Airborne, and that the SEC's scheme liability claim is fatally flawed because it is impermissibly based on the same misrepresentations and omissions that form the basis of its 10(b)-5 claims. Dkt. No. 188.[2]

For the reasons set forth below, the SEC's motion for summary judgment is GRANTED and Defendants' cross-motion for summary judgment is DENIED.

## I. The Record Evidence and Resolution of Evidentiary Issues

In support of its motion, the SEC has filed a Rule 56.1 statement in compliance with Local Rule 56.1. Local Rule 56.1(a) requires a party filing a summary judgment motion to annex a short, concise statement, in numbered paragraphs, setting forth each material fact in the case, together with citations to the evidence that proves that specific fact. A party opposing a motion for summary judgment must then serve a counter-statement of material facts, again with each entry supported by citations to admissible record evidence. The purpose of the local rule is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties. *See Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000).

Under the law of this Circuit, "[W]here there are no [ ] citations or where the cited materials do not support the factual assertions in the Statements, the court is free to disregard the assertion." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted); *see also Epstein v. Kemper Ins. Co.*, 210 F.Supp.2d 308, 314 (S.D.N.Y. 2002); *Fernandez v. DeLeno*, 71 F.Supp.2d 224, 227-28 (S.D.N.Y. 1999).

---

[2]     Defendants Jack Edward Daniels and Timoleon Kabilafkas, as well as Relief Defendants the TKRT and the MKRT have joined in Kabilafkas' Motion. *See* Dkt. Nos. 191-192, 194-198, 217.

3

The SEC's Rule 56.1 statement (Dkt. No. 185-1) contains 120 separate assertions of material fact. Each entry is supported by citation to record evidence.[3] That evidence includes 290 documentary and audio exhibits, as well as summary and expert witness testimony, and declarations of fact. The exhibits also include filings submitted to the SEC, submissions and emails to brokers, share transfer paperwork submitted by Defendants to Airborne's transfer agent; bank records showing wire transfers; extensive email communications (including emails between Kabilafkas and his associates regarding the purchase of Ample-Tee share certificates, emails between Kabilafkas and Daniels and other senior leaders of Airborne, and emails between Kabilafkas' associates to brokerages); extensive text messages between Kabilafkas and George Gabriel (principle of Zapzorn, Inc. ("Zapzorn") with whom Airborne negotiated a media buying and representation agreement) regarding the promotional campaign; and even tape recorded conversations in which Kabilafkas impersonated his father while speaking with representatives of Merrill Lynch. *See generally* SEC 56.1. The SEC also offers evidence from an expert Donald Justin Price, who was asked to analyze IP data to opine on whether Kabilafkas accessed and utilized the bank and email accounts of his associates. Dkt. No. 185-2.

The court has reviewed every evidentiary citation in the SEC's Rule 56.1 Statement and concludes that the Commission does indeed support the factual assertions made in those 120 statements of material fact. I thus turn to whether any of those statements is controverted by a counter-statement of material fact that is supported by admissible evidence.

---

[3]     Actually, 118 out of 120 of the SEC's statements of fact in its Rule 56.1 statement cited to record evidence. The remaining two relied only on Defendants' assertion of their Fifth Amendment privilege against self-incrimination. SEC 56.1 ¶¶ 70, 75. However, in the SEC's 56.1 Reply, it added citations to other evidence in the record to support these two statements. SEC 56.1 Reply ¶¶ 70, 75, Dkt. No. 225-1.

## *1. Admitted Facts (Facts Not Controverted At All)*

Kabilafkas' Counter-Statement of Undisputed Material Facts (Dkt. No. 203, "Kabilafkas' 56.1 Counter") in which the other moving defendants joined, does not controvert 33 of the SEC's 120 material facts.[4] These assertions of fact are deemed admitted for purposes of deciding the summary judgment motions. They will be referred to in this decision as "AF," for "Admitted Facts."

## *2. Effectively Admitted Facts (Facts "Controverted" But Without Evidentiary Support)*

While Defendants' Rule 56.1 Counter-Statement purports to controvert 87 of the SEC's assertions of fact, it fails to cite any evidence in support of 61 of those "counter-statements."[5] The "conclusory allegations or denials" in the Defendants' Rule 56.1 Statement ". . . cannot by themselves create a genuine issue of material fact where none would otherwise exist, nor can mere speculation or conjecture as to the true nature of the facts." *Est. of Keenan v. Hoffman-Rosenfeld*, 833 F. App'x 489, 491 (2d Cir. 2020) (citing *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)).

All of these 61 "counter-statements" are "supported" only by "conclusory allegations or denials" – in effect, by statements that the SEC's version of events is not supported by the evidence. This argument is not true; every factual assertion made by the SEC is supported by evidence.

Alternatively, Defendants argue in their briefs that the SEC's evidence merely presents a "conflicting version of events," which the jury might choose to believe or not. Dkt. No. 202 at 31-33. However, having taken the Fifth Amendment at their depositions, Defendants offer no

---

4    Kabilafkas' 56.1 Counter ¶¶ 1-5, 10-26, 31, 79, 80, 90, 97, 99, 101, 103, 106-107, 115.

5    Kabilafkas' 56.1 Counter ¶¶ 6-9, 27-30, 32-39, 52-56, 59, 67-78, 81-89, 91-94, 96, 100, 108-114, 116-120.

contrary version of those events. And while the court may not, when deciding the SEC's motion for summary judgment, draw an adverse inference against them for taking the Fifth, *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 93 n.25 (2d Cir. 2016),[6] taking the Fifth does not create "evidence" that raises a genuine issue of fact. *Id.* at n.25; *see also Amusement Indus., Inc. v. Stern*, 721 F. App'x 9, 11 (2d Cir. 2018); *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 98 (2d Cir. 2012).

Therefore, these 61 assertions of material fact must also be deemed admitted. To distinguish them from the Admitted Facts that were not controverted at all, they will be referenced as "Effectively Admitted Facts" or "EAF."

These uncontroverted facts – whether Admitted Facts or Effectively Admitted Facts – will still be viewed in a light most favorable to the non-moving party, per the standard of review on a motion for summary judgment. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### 3. Facts Controverted with Evidence

Finally, Kabilafkas' Rule 56.1 Counter controverts 26 of the SEC's assertions of material fact with citations to evidence. These counterstatements fall into two groups, which I will call the "Niko" group and the "control" group.[7]

#### (i) The Niko Group of Counterstatements

Niko Kabylafkas' (Kabilafkas' cousin) entered into a consent judgment in the related action, *SEC v. Nicholas Kabylafkas*, Case No. 21-cv-2110 (S.D.N.Y.) (the "Related Action"). As

---

[6] The court however may draw an adverse inference against Defendants when considering their motion for summary judgment.

[7] A 27th counterstatement of fact – SEC 56.1 ¶ 104 – is "controverted" in two ways: with argument about the credibility of Niko Kabylafkas' SEC investigative testimony (see infra.) and with evidence that allegedly demonstrates that Defendant Kabilafkis did not control Airborne.

part of that settlement, Kabylafkas entered into a cooperation agreement with the SEC. Dkt. No.
206-4 at 51.

Niko (as I will refer to him) has given two depositions – one in connection with the

SEC's investigation (the "investigative testimony") and one in connection with this lawsuit.

The SEC supports 10 of its 120 statements of material fact with citations to Niko's investigative

testimony. Defendants argue that 9 of these 10 statements are disputed because testimony from

the deposition Niko gave in this lawsuit casts doubt on the veracity of his SEC investigative

testimony. [8]

The nine facts that are supported by Niko's investigative testimony, but that are

supposedly controverted statements he made at his deposition in this lawsuit, are as follows:

1. Kabilafkas gave Eric Scheffey ("Scheffey"), an Airborne investor, nearly three million
   Airborne S-1 Shares for no additional consideration, which Airborne did not disclose in
   its public filings or elsewhere. SEC 56.1 ¶ 60.[9]

2. Kabilafkas showed Niko a box with the S-1 Share certificates that were still in the names
   of the Thai Shareholders and said that he would give Niko shares if he located new
   investors for Airborne. SEC 56.1 ¶ 62.

3. Kabilafkas instructed Niko on how to fill out the share transfer paperwork before
   presenting it to Ample-Tee's transfer agent Columbia Stock Transfer Company
   ("CSTC"). Specifically, that Niko should state that he had purchased the shares directly
   from a Thai Shareholder and at a false purchase date. SEC 56.1 ¶ 63.

4. Kabilafkas instructed Niko to claim that Niko bought the S-1 Share certificate for $0.01
   per share. SEC 56.1 ¶ 64.

5. Kabilafkas directed Niko to fill out Scheffey's share transfer paperwork, including
   claiming that Scheffey purchased the shares directly from a Thai Shareholder and at a
   false purchase date. SEC 56.1 ¶ 65.

---

[8]     Kabilafkas' 56.1 Counter ¶¶ 60, 62-66, 95, 104-105. The SEC also cites to Niko Kabylafkas' testimony to
support their statement of material fact 102, which Defendants also purport to controvert with evidence regarding
control. *See infra* p. 12.

[9]     Defendants also purported to controvert this fact with the testimony of their expert Armand Musey. *See*
Musey Rpt., Dkt. No. 193-28 at 15-16; Kabilafkas 56.1 Counter ¶ 60. For the reasons outlined in the court's
*Daubert* decision, Musey's testimony has been excluded.

6. Kabilafkas told Niko that, in attempting to deposit his S-1 Shares at a brokerage firm, Niko would have to tell a white lie about where Niko acquired the stock. Specifically, Kabilafkas urged Niko to tell brokers that he bought the stock from one of his tennis students. SEC 56.1 ¶ 66.

7. Kabilafkas knew where his nominees and associates had their shares deposited, at one point urging Niko not to go to Merrill, since Tim Kabilafkas, Chrysiliou, and Scheffey had already deposited their S-1 Shares there. SEC 56.1 ¶ 95.

8. At one meeting in the Fall of 2016, Gabriel brought a laptop to a meeting with Kabilafkas, Daniels, Niko Kabylafkas, Chrysiliou, and De Mos to show them Airborne commercials that Gabriel had produced. During the meeting, Kabilafkas gave Gabriel instructions about what Airborne wanted in the commercials. SEC 56.1 ¶ 104.

9. Kabilafkas described Airborne's promotional efforts as adding "chemical" to Airborne's stock price. He also likened the stock market to a coliseum because the purpose of the promotional efforts was to "entertain[] the crowd." SEC 56.1 ¶ 105.

Defendants offer no countervailing evidence to contradict any of these asserted facts.

Instead, they argue that Niko's testimony is sufficiently unreliable to support these assertions of material fact. But Defendants point to no inconsistency whatsoever between Niko's investigative testimony about these nine asserted facts and any testimony he gave at his deposition in this lawsuit. In fact, to the (limited) extent that Niko was asked about his substantive investigative testimony when he was deposed in this lawsuit, he gave testimony that was completely consistent with his prior testimony. In his investigative testimony, Niko said that he filled out and backdated share transfer paperwork for Scheffey at Kabilafkas' direction; he said exactly the same thing at his deposition (*compare* Dkt. No. 185-14, Att. 132 at 55-63 with Dkt. No. 225-5, Att. 298 at 218-19).

Niko was not asked any other questions about the substance of his prior investigative testimony at his deposition in this case. However, he was asked if his investigative testimony was truthful, and he swore that it was. Dkt. No. 225-5, Att. 298 at 210. He was also asked to identify any inaccuracies in the complaint the SEC filed against him, but said "there's nothing I can think of at the moment." *Id.* at 211.

8

Defendants try to raise a genuine issue of fact about the reliability of Niko's investigative testimony by pointing to certain remarks he made at his trial deposition – remarks about his being "coerced" into entering the consent judgment (*id.* at 84, 93, 197, 215) and being "abused" by the SEC (*id.* at 68, 70, 74, 99). They also note that, while Niko swore at his deposition that his investigative testimony was true, he denied that this meant he had actually committed securities fraud. Dkt. No. 206-8 at 48-49.

Defendants' non-evidentiary argument raises no genuine issue of material fact. Niko adopted as truthful his investigative testimony when he was deposed, and there is no inconsistency in his new deposition that would cast doubt on his earlier statements under oath. While Niko may well have felt "coerced" into cooperating with the SEC so that he could save his own skin – people often do – his discomfort did not cause him to shade or falsify his testimony. He did not correct anything in his investigative testimony or try to void his cooperation agreement with the SEC. Niko's unhappiness about the pressure he felt to cooperate does not in and of itself raise any genuine issue of material fact.

Nor does the fact that Niko signed a cooperation agreement with the SEC automatically preclude summary judgment on credibility grounds. In *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 472 F. App'x 19, 22 (2d Cir. 2012), the Second Circuit affirmed a district court's grant of summary judgment that was based on the testimony of a cooperating witness, the absence of any testimony contradicting the cooperating witness, and on its own examination of additional evidence. On appeal, defendants challenged the district court's ruling, asserting that the cooperating witness was biased. However, the Second Circuit held, "Broad, conclusory attacks on the credibility of a witness" without more were insufficient to raise a genuine issue of material fact that would defeat a motion for summary judgment. *Id.* (*citing Island Software &*

9

*Comp. Serv., Inc. v. Microsoft Corp.,* 413 F.3d 257, 261 (2d Cir.2005)); *see also Cnty. of Orange v. Sullivan Highway Prod., Inc.,* 752 F. Supp. 643, 647 (S.D.N.Y. 1990) (declining to find an issue of fact based solely upon plaintiff's challenge to cooperating witnesses' credibility). "Broad conclusory attacks" on Niko's credibility is all we have here.

Additionally, and significantly, seven of the nine asserted facts that are allegedly "controverted" by Niko's credibility issues (all but Numbers 6 and 9 (SEC 56.1 ¶¶ 66; 105)) are supported by other uncontroverted evidence in addition to Niko's investigative testimony. This evidence includes (1) Scheffey's S-1 Share certificates and other paperwork submitted to the CSTC, which demonstrates that Scheffey received nearly three million more S-1 Shares than Airborne disclosed, and that his paperwork contained false representations; (2) Niko's own share transfer paperwork corroborating what he said Kabilafkas gave him and the false statements made therein; (3) recordings of telephone calls demonstrating that Kabilafkas assisted his father Tim in depositing his shares at Merrill (and so knew his shares were deposited there); and (4) text messages between Kabilafkas and Gabriel setting up a meeting between them and others at Airborne in the Fall of 2016.

Therefore, there are no genuine issues of material fact insofar as Controverted SEC Facts number 1, 2, 3, 4, 5, 7 and 8 are concerned. They are deemed uncontroverted.

As for SEC alleged facts 6 and 9 in the list printed above, the Commission, supported only by Niko's investigative testimony, asserts (1) that Kabilafkas told Niko that he would have to tell a white lie when depositing his stock; specifically, that Niko should say he bought the stock from one of his tennis students; and (2) that Kabilafkas described Airborne's promotional efforts as adding "chemical" to Airborne's stock price and that the purpose of the promotional efforts was to "entertain[] the crowd." Since Niko's testimony on this point is both

10

uncontroverted and consistent as between his investigative testimony and his adoption of the

same at his deposition, these two facts are also effectively undisputed. However, if there were

any genuine issue as to these asserted facts, I note that neither is a material fact that is necessary

to a decision on the motion for summary judgment.

## 2. The Control Group of Counterstatements

The second category of controverted facts with citations to evidence concerns Kabilafkas'

control of Airborne. They are summarized as follows:

1. Kabilafkas had ultimate control of the use and disposition of the Restricted and S-1 Shares. He installed Daniels as Ample-Tee's, and eventually Airborne's, President and CEO. Daniels was president in name only, functioning as the public face of Airborne, while Kabilafkas hid his control over Ample-Tee and Airborne. SEC 56.1 ¶ 40.

2. Kabilafkas retained Stepp as Ample-Tee's outside counsel. SEC 56.1 ¶ 41.

3. Even though Kabilafkas' control over, and roles at, Ample-Tee and Airborne, were not disclosed, Stepp and Daniels consulted with and deferred to him on the content of Ample-Tee's and Airborne's public filings and corporate actions. SEC 56.1 ¶ 42.

4. To obtain his approval, Daniels and others provided Kabilafkas with drafts of documents to be filed by Airborne. Kabilafkas also had a set of keys to Airborne's corporate office. SEC 56.1 ¶ 43.

5. Kabilafkas was directly involved in the hiring at Airborne. He personally sent a draft employment agreement to Airborne's future CEO, Mike Warren. SEC 56.1 ¶ 44.

6. Kabilafkas provided advice and direction to Airborne's officers and others regarding recruiting and pacifying Airborne investors, including by editing emails that would go to prospective or dissatisfied investors. Sometimes, Kabilafkas would communicate directly with prospective investors to solicit them to invest in Airborne. SEC 56.1 ¶ 45.

7. Daniels routinely referred questions about Ample-Tee's and Airborne's accounting and public statements to Kabilafkas. The information provided to Kabilafkas in connection with responding to these questions included material nonpublic information about Airborne's finances. SEC 56.1 ¶ 46.

8. When Airborne and Daniels did not know the answers to questions from Ample-Tee's or Airborne's auditors and EDGAR filing agent, Daniels forwarded the questions to Kabilafkas or blind copied him on Daniels' communications with the company's auditors and filing agent. SEC 56.1 ¶ 47.

9. Kabilafkas selected the password for, and had unrestricted access to, Ample-Tee's and Airborne's bank account, payroll provider, and other accounts. SEC 56.1 ¶ 48.

10. On several occasions, Kabilafkas filled out and presented checks written from Ample-Tee and Airborne bank accounts. Kabilafkas and his family also took funds directly from Airborne accounts for their personal expenses. In at least some situations, Kabilafkas informed Daniels when he wrote himself a check drawn on Airborne's bank account for supposed reimbursements. SEC 56.1 ¶ 49.

11. Kabilafkas also had access to Daniels' email accounts and, from time to time, sent Airborne related emails from those accounts while falsely signing the emails as Daniels, and also impersonating Daniels in submissions to third parties. SEC 56.1 ¶ 50.

12. Airborne's eventual CEO, Mike Warren, obtained his job through his relationship with Kabilafkas, who determined the scope of Warren's employment and reserved the right to terminate him. SEC 56.1 ¶ 51.

13. Kabilafkas instructed Daniels to sign the Airborne director's consent that authorized Airborne to purchase the patent from Apcentive. SEC 56.1 ¶ 57.

14. To make the transaction between Airborne and Apcentive appear to be arm's-length, Kabilafkas directed Daniels to give Apcentive 40,000,000 Restricted Airborne shares in exchange for the Apcentive patent. In effect, Kabilafkas arranged for one company he secretly controlled (Apcentive) to engage in a transaction with another company he secretly controlled (Airborne), but concealed these facts underlying this transaction from the public. SEC 56.1 ¶ 58.

15. At Kabilafkas' direction, Airborne made, and Daniels knowingly signed public filings with false and misleading statements concerning Scheffey's Airborne investment. SEC 56.1 ¶ 61.

16. Kabilafkas arranged to pay the stock promoters involved in the promotional scheme. SEC 56.1 ¶ 98.

17. In October 2016, Kabilafkas, acting on behalf of Airborne, negotiated a media buying and representation agreement with Zapzorn. Kabilafkas instructed Zapzorn, through texts to Gabriel to send the agreement to Daniels to sign on Airborne's behalf. Beginning on August 6, 2016, Gabriel and Kabilafkas exchanged hundreds of texts concerning their negotiations, and the content, cost, and placement of Airborne advertisements. SEC 56.1 ¶ 102.

18. Kabilafkas directed the content and placement of Airborne's advertisements. He communicated frequently with Gabriel, both in person and through emails. SEC 56.1 ¶ 104.

Again, 14 of these 18 SEC factual assertions are not controverted with evidence tending

to show that the asserted facts are false. Instead, Defendants offer evidence that they argue tends

to show that the conclusion reached by the SEC from these undisputed facts – namely, that Kabilafkas controlled Airborne – is either wrong or at the very least disputed.[10] This evidence includes principally the testimony of Marius De Mos, an Apcentive and then Airborne executive. Dkt. No. 206-9. De Mos' title was vice president of technical affairs and development at Airborne and his responsibilities were to oversee the development of the wireless internet product. Dkt. No. 193-30 at 17.

To establish Kabilafkas' lack of control, De Mos testified that Kabilafkas had no role at the company, did not have signing authority on Airborne bank accounts, did not sign Airborne financial statements, and could not enter into contracts on behalf of Airborne. Kabilafkas 56.1 ¶ 34. De Mos testified that Jack Daniels and later Mike Warren, as CEOs of the company, were the executives who had final executive authority at Airborne. *Id.*; Dkt. No. 193-30 at 113-14, 138-139. While De Mos conceded that Kabilafkas was an "adviser to Mr. Daniels from time to time," Defendants note that influence is not the same as control. *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 645 (S.D.N.Y. 2004); *In re Blech Sec. Litig.*, 961 F. Supp. 569, 586 (S.D.N.Y. 1997).

To buttress De Mos' testimony, Defendants cite interrogatory responses that are based on De Mos' testimony (*see* Dkt. No. 193-29 at 1) as well as a declaration stating that only 309 of over 20,000 Airborne emails produced to the SEC were sent, received, or contain forwarded messages from Kabilafkas' email address (Dkt. No. 207 ¶¶ 4-5). Defendants also identify five Airborne emails on which Kabilafkas is not copied -- three of which discuss SEC filings, one of which discusses firing an employee, and one of which comes from a business consultant who cautions that because Kabilafkas "is not an officer or director or consultant, . . . he should not be

---

10        Kabilafkas' 56.1 Counter ¶¶ 40-51; 57-58; 61; 98; 102; 104.

involved in these discussions or communications." Dkt. No. 206-3-7.(Kabilafkas was on the

email chain until the consultant weighed in).

Because nothing in any of that "evidence" (including De Mos' testimony) controverts any

of the following statements of fact, they must be deemed Effectively Admitted:

1. Kabilafkas had ultimate control of the use and disposition of the Restricted and S-1 Shares. (Evidenced through EAF ¶¶ 28-30). He installed Daniels as Ample-Tee's, and eventually Airborne's, President and CEO. (Admitted in Daniels' Answer to the SEC's Complaint. Dkt. No. 119, ¶ 23). SEC 56.1 ¶ 40.

2. Stepp and Daniels consulted with and deferred to Kabilafkas on the content of Ample-Tee's and Airborne's public filings and corporate actions. (Evidenced through an email from Stepp to Kabilafkas with a draft SEC filing for his "review and comment"; Kabilafkas emailing Daniels draft SEC filings; Kabilafkas emailing Daniels with a Director Consent and the subject line "sign"). SEC 56.1 ¶ 42.

3. To obtain his approval, Daniels and others provided Kabilafkas with drafts of documents to be filed by Airborne. Kabilafkas also had a set of keys to Airborne's corporate office. (Evidenced through emails to and from Kabilafkas with draft Airborne press releases; email from De Mos requesting office keys for Kabilafkas). SEC 56.1 ¶ 43.

4. Kabilafkas was directly involved in the hiring at Airborne. He personally sent a draft employment agreement to Airborne's future CEO, Mike Warren. (Evidenced through emails Kabilafkas sent to future employees, including Warren, with draft contracts, negotiating terms of employment, and discussing compensation). SEC 56.1 ¶ 44.

5. Kabilafkas provided advice and direction to Airborne's officers and others regarding recruiting and pacifying Airborne investors. Kabilafkas would communicate directly with prospective investors to solicit them to invest in Airborne. (Evidenced through Kabilafkas' emails directing Niko Kabylafkas how to solicit investors and emails to Scheffey soliciting his investment). SEC 56.1 ¶ 45.

6. Daniels routinely referred questions about Ample-Tee's and Airborne's accounting and public statements to Kabilafkas. The information provided to Kabilafkas in connection with responding to these questions included material nonpublic information about Airborne's finances. (Evidenced through emails to and from Daniels and Kabilafkas about questions from Ample-Tee's accountant and auditors, including emails with material non-public information about Ample-Tee's finances). SEC 56.1 ¶ 46.

7. When Airborne and Daniels did not know the answers to questions from Ample-Tee's or Airborne's auditors and EDGAR filing agent, Daniels forwarded the questions to Kabilafkas or blind copied him on Daniels' communications with the company's auditors and filing agent. (Evidenced through emails to and from Daniels and Kabilafkas discussing questions from Ample-Tee's accountant and auditors). SEC 56.1 ¶ 47.

8. On several occasions, Kabilafkas filled out and presented checks written from Ample-Tee and Airborne bank accounts. (Evidenced through an email from Kabilafkas to Daniels with an image of a check drafted from Airborne's account; texts between Kabilafkas and Gabriel regarding exchanging an Airborne check). SEC 56.1 ¶ 49.

9. Kabilafkas had access to Daniels' email accounts and sent Airborne related emails from those accounts while falsely signing the emails as Daniels, and also impersonated Daniels in submissions to third parties. (Evidenced through IP data demonstrating that Kabilafkas used Daniels' email address and electronically signed an agreement on behalf of Airborne). SEC 56.1 ¶ 50.

10. Airborne's eventual CEO, Mike Warren, obtained his job through his relationship with Kabilafkas, who determined the scope of Warren's employment and reserved the right to terminate him. (Evidenced through an email from Kabilafkas to Warren informing him of his duties; Kabilafkas emails to De Mos suggesting he could direct and terminate Warren; De Mos' testimony that Warren was hired because he and Kabilafkas were friends). SEC 56.1 ¶ 51.

11. Kabilafkas instructed Daniels to sign the Airborne director's consent that authorized Airborne to purchase the patent from Apcentive. (Evidenced through an email from Kabilafkas to Daniels with the director's consent attached and with a subject line of "sign"). SEC 56.1 ¶ 57.

12. To make the transaction between Airborne and Apcentive appear to be arm's-length, Kabilafkas directed Daniels to give Apcentive 40,000,000 Restricted Airborne shares in exchange for the Apcentive patent. (Evidenced through the uncontroverted fact that Kabilafkas purchased the Restricted Shares. EAF ¶¶ 24-35). SEC 56.1 ¶ 58.

13. Kabilafkas, acting on behalf of Airborne, negotiated a media buying and representation agreement with Zapzorn. Kabilafkas instructed Zapzorn, through texts to Gabriel to send the agreement to Daniels to sign on Airborne's behalf. Gabriel and Kabilafkas exchanged hundreds of texts concerning their negotiations, and the content, cost, and placement of Airborne advertisements. (Evidenced through extensive text messages and emails between Gabriel and Kabilafkas). SEC 56.1 ¶ 102.

14. Kabilafkas directed the content and placement of Airborne's advertisements. He communicated frequently with Gabriel, both in person and through emails. (Evidenced through extensive text messages and emails between Gabriel and Kabilafkas). SEC 56.1 ¶ 104.

De Mos' general testimony that Kabilafkas lacked any formal role at Airborne not only

fails to controvert any of these asserted facts, it fails to address the SEC's theory of the case,

which is that Kabilafkas hid his controlling interest in the company. The SEC theorizes that

Kabilafkas "controlled" the people who did these things – that he asserted his control indirectly.

As a result, the fact that he did not possess formal indicia of control (the ability to sign financial statements or having signing authority over bank accounts, for example) actually supports the SEC's position, rather than controverts it. *See Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 63 (S.D.N.Y. 2017).

De Mos' testimony does not raise any genuine issue of fact about whether Kabilafkas exerted control over Airborne indirectly, because De Mos testified that he "would not know" about such matters. Dkt. No. 201-3 at 26-27. De Mos also testified that he had no personal knowledge about whether Kabilafkas ever helped draft or weighed in on the contents of Airborne's SEC filings (Dkt. No. 201-3 at 52); that he did not know whether Kabilafkas was involved in the Infinitus patent transaction (*id.* at 33); that he did not know whether Kabilafkas had access to the Airborne financial accounts (*id.* at 31); that he did not know if Daniels or Warren ever received directions or directives regarding Airborne's business from Kabilafkas (*id.* at 28); and that most corporate matters outside of the technical area of overseeing development of the wireless internet technology product were outside his wheelhouse. *Id.* at 24.

Even De Mos' testimony about Kabilafkas' lack of any formal role at the company – the very testimony cited by Defendants in support of their counter-statement of material facts – was hedged. For example, De Mos did not testify that Kabilafkas had no role at Airborne; rather, he said "*I have no knowledge* of Mr. Kabilafkas having a serious role within the company." *Id.* (emphasis added). De Mos also said only that that he was "not aware" of Kabilafkas' having any involvement in Airborne aside from being an investor; he did not testify definitively that Kabilafkas had no such involvement. *Id.* at 26. Similarly, he said only that "from a personal experience, *I believe it* to be not true" that Kabilafkas had signatory authority on any bank account of Airborne. *Id.* at 29 (emphasis added).

16

The De Mos testimony cited by Defendants thus does not controvert the evidence cited by the SEC, or raise any genuine issue of material fact about the specific items that the SEC asserts as evidence tending to demonstrate Kabilafkas' control over Airborne. "The nonmoving party may not rely on 'mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Sec. & Exch. Comm'n v. Mattessich*, 523 F. Supp. 3d 624, 634 (S.D.N.Y. 2021) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). In addition, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks*, 593 F.3d at 166.

Finally, De Mos' testimony does not address Kabilafkas' share ownership or his ability to control those who also owned shares. As noted above, it is uncontroverted that Kabilafkas had ultimate control of the use and disposition of the Restricted and S-1 Shares. EAF ¶¶ 28-30. The parties do not dispute that Ample-Tee's 2015 marketing materials stated that the company had 114,097,796 deliverable shares (Restricted and S-1 Shares) (AF ¶ 26) and that Kabilafkas bought all these Ample-Tee Shares is uncontroverted. EAF ¶¶ 24-35. Moreover, it is uncontroverted that Kabilafkas gave S-1 Share certificates representing "millions of Airborne shares," not only to his associates (for example, his father and his brother in law), but also to himself under his own name (1.7 million shares), through an assumed identity ("Mark McKinney"; 1.1 million shares) and to his nominees (for example, his cook Zernos; 2.8 million shares). EAF ¶ 67. Courts have consistently found that owning most or all of a company's stock will support a finding of control. *In re: EZCorp, Inc. Sec. Litigations*, 181 F. Supp. 3d 197, 214 (S.D.N.Y. 2016); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 332 (S.D.N.Y. 2001). Nothing in De Mos' testimony and the interrogatory answers based thereon – or in the five Airborne emails, or in the fact that

Kabilafkas was copied on just a fraction of company email communications – casts doubt on Kabilafkas' control of a huge bloc of Airborne stock.

The 14 facts listed above must, therefore, be deemed EAFs.[11]

Only four facts (SEC 56.1 ¶¶ 41, 48, 61, 98) are supported by more general and circumstantial evidence of Kabilafkas' control. I am prepared to find that these four facts are controverted. However, in light of the substantial non-controverted evidence establishing Kabilafkas' control of Airborne, resolution of the genuine issue of fact presented by these four SEC assertions is neither material nor necessary to a decision on the motion for summary judgment.

## II.    Factual Background

In light of the preceding discussion, all of the facts set forth below are undisputed.

### 1. The Defendants

Airborne is a Nevada corporation headquartered in Simi Valley, California. It was originally incorporated in January 2011 as Ample-Tee, Inc. ("Ample-Tee"). On or around May 24, 2016, the company announced its name change to Airborne Wireless Network. AF ¶ 1.

Kalistratos Kabilafkas ("Kabilafkas") resides in Moorpark, California. AF ¶ 4.

Timoleon Kabilafkas ("Tim Kabilafkas") is Kabilafkas' father and also resides in Moorpark, California. AF ¶ 4.

Jack Edward Daniels ("Daniels") resided at all relevant times in Los Angeles County, California. Airborne publicly identified Daniels as, at various times, a director, its President, principal executive officer, principal financial officer, and/or chief executive officer. EAF ¶ 6.

---

11      SEC 56.1 ¶¶ 40, 42-47, 49-51, 57-58, 102, 104.

The TKRT is a revocable trust established on July 24, 2001, with Tim Kabilafkas as the trustee. EAF ¶ 7.

The MKRT is a revocable trust established on May 27, 1989, with Magdaline Kabilafkas, Kabilafkas' mother, as the trustee. EAF ¶ 8.

### 2. Ample-Tee and the S-1 Shares

In or around January 2011, Lawrence Chenard ("Chenard") and another individual started Ample-Tee to pursue a patent for a crutch designed to help below-the-knee amputees. AF ¶ 10. Other than paying for an email account, Chenard had no involvement in the business, which never created a product or hired employees. Chenard's co-founder died in 2013. *Id.*

In January 2012, Ample-Tee filed with the SEC a registration statement on Form S-1, seeking to register the sale of common stock (the "S-1 Shares"). AF ¶ 11. In August and September 2013, Ample-Tee purportedly sold 178,346 S-1 Shares at $0.03 per share to 30 shareholders residing in Thailand (the "Thai Shareholders"). The S-1 Share certificates that were later issued did not bear restrictive legends limiting their resale. *Id.*

After its reported sale of the S-1 Shares, Ample-Tee's single class of common stock consisted of: (a) a set of "Founder's Shares" (the "Restricted Shares"), purportedly held in the name of Chenard and (b) the S-1 Shares, supposedly owned by the Thai Shareholders. AF ¶ 13. Ample-Tee supposedly issued the Restricted Shares to Chenard, but did not at any time file a registration statement for them and Chenard did not know about the Restricted Shares.[12] AF ¶ 13-14. No money from the Thai Shareholders ever appeared on Ample-Tee's books. AF ¶ 23.

In 2015, Kabilafkas' attorney, Thomas Stepp ("Stepp"), contacted a broker and told him that his client Kabilafkas wanted to purchase a "fully reporting" public company. AF ¶ 24.

---

[12]     Chenard also knew nothing about sales of Ample-Tee stock to any Thai Shareholders or others. AF ¶ 19.

Marketing materials about Ample-Tee, which the broker had received earlier in 2015, made clear that all of the Restricted Shares and S-1 Shares were in fact available for purchase in a single transaction. AF ¶ 26. Kabilafkas instructed the broker to create separate stock purchase and escrow agreements for the Restricted Shares and S-1 Shares, despite the fact that Kabilafkas would be purchasing both the Restricted Shares and S-1 Shares. EAF ¶ 28. Kabilafkas then arranged with the broker to have Stepp purport to purchase the S-1 Shares and to have R. Bruce Harris ("Harris"), an officer of another company Kabilafkas controlled, purport to purchase the Restricted Shares. *Id.*

Kabilafkas used an associate named Chrysilios Chrysiliou ("Chrysiliou") to fund the purchase of the Ample-Tee Restricted and S-1 Shares by providing money from a brokerage account of a foundation Chrysiliou's family controlled. EAF ¶ 32. Chrysiliou's funds were wired to a bank account belonging to a religious charity, whose head granted Kabilafkas access to the account. *Id.* Kabilafkas then wrote a $355,000 check, representing the combined purchase price for both the S-1 and Restricted shares, from the charity's bank account to Stepp, who placed it in escrow until the deal closed. EAF ¶ 38. In October 2015, the deal closed and Kabilafkas received a FedEx box containing the S-1 Share certificates and related documentation the next business day. EAF ¶ 38.[13] After acquiring Ample-Tee, Kabilafkas gave Chrysiliou over 3.6 million S-1 Shares, which Chrysiliou later sold for profit. EAF ¶ 32.

On October 21, 2015, Ample-Tee filed a Form 8-K with the SEC in which it stated that Daniels – Ample-Tee's CEO – had used $ 250,000 of personal funds to purchase the restricted shares directly from Chenard. EAF ¶ 52.

---

[13]     The SEC does not explain how Kabilafkas received the documentation for the Restricted Shares.

20

### 3. Distribution of S-1 Shares

After acquiring Ample-Tee and taking possession of the S-1 Shares certificates,

Kabilafkas distributed the S-1 Share certificates to his associates, co-Defendants, and nominees, who – along with Kabilafkas – submitted false transfer paperwork to CSTC so that CSTC would reissue the S-1 Share certificates in their names. EAF ¶¶ 62-76.

Kabilafkas' cousin Niko Kabylafkas testified that, during a meeting in Kabilafkas' home, Kabilafkas showed him a box containing numerous S-1 Share certificates that were still in the names of the Thai Shareholders. EAF ¶ 62. Kabilafkas offered one certificate to Niko Kabylafkas if he located new investors for Airborne. *Id.* The following March, Niko was given the certificate. Kabilafkas showed Niko how to fill out the share transfer paperwork before presenting it to CSTC so that CSTC would reissue the shares in Nikos' name. EAF ¶ 63. Kabilafkas also directed Niko Kabylafkas to fill out the share transfer paperwork of Eric Scheffey, an investor in Airborne. EAF ¶ 65.

In addition to Niko and Scheffey, Kabilafkas gave S-1 Share certificates that were still in the names of the Thai Shareholders to himself – under his own name and an assumed name, "Mark McKinney" – and to his nominees, as well as Tim Kabilafkas, Chrysiliou, Panagiotis Bolovis ("Bolovis"), and a religious school affiliated with Moshe Rabin ("Rabin"). EAF ¶ 67.

All of the paperwork associated with these transfers claimed that the individuals purchased the shares directly from the Thai Shareholders for $0.01 per share, on a date prior to the date of the purported Thai Shareholder's signature. EAF ¶ 68. Daniels, on behalf of Airborne, submitted the completed paperwork to CSTC on Tim Kabilafkas', Scheffey's, and others' behalf. *Id.* ¶ 68.

Kabilafkas sought to create the appearance that he had paid the Thai Shareholders for the S-1 shares directly by fabricating, as proof of payment, U.S. postal money orders for $490 and

21

$980. EAF ¶ 71. Kabilafkas then inserted into the two money orders two purported sellers' names and addresses in Thailand. *Id.* However, the money orders bore a legend expressly stating that they could not be cashed outside of the United States – *i.e.*, could not be cashed out by the purported Thai shareholders in Thailand. *Id.*

The CSTC reissued new Airborne S-1 Share certificates to Kabilafkas, "Mark McKinney," Tim Kabilafkas, and the other individuals. EAF ¶ 76.

### 4. Interactions With Brokerage Firms

Kabilafkas and his associates repeatedly deceived their brokerage firms so that their S-1 shares could be deposited and sold. EAF/AF ¶¶ 77-96.

#### 1. Kabilafkas

In August 2016, Kabilafkas submitted to Glendale Securities ("Glendale") the same false share transfer paperwork he had submitted to CSTC, so Glendale would accept his shares for deposit and clear them for trading. EAF ¶ 77. Kabilafkas filled out an August 2016 submission to Glendale in which he claimed: (1) he was not an affiliate of Airborne; (2) he bought the S-1 Shares directly from a Thai Shareholder on May 17, 2016; (3) he paid the Thai Shareholder $980; (4) he was only a shareholder of Airborne, with "no other relationship with company;" (5) he had no relationship with any Airborne executive; (6) he had used his own funds to purchase the shares; (7) he was not aware of any promotional activity by Airborne; (8) he controlled only 1,600,000 shares; and (9) he was not aware of any material nonpublic information about Airborne. EAF ¶ 78. As part of his submission to Glendale, Kabilafkas also submitted the receipt for the $980 money order purporting to show that he had paid that amount to the Thai Shareholders. AF ¶ 79. Kabilafkas also provided Glendale an "Agreement for the Purchase of Common Stock" purportedly executed by Kabilafkas and the Thai Shareholder. AF ¶ 80.

2.  Kabilafkas Impersonates Zernos

Kabilafkas also deposited Airborne stock in brokerage accounts at Glendale and other

brokerages in the names of various nominees and aliases. EAF ¶ 82. For example, Kabilafkas

repeatedly communicated with Glendale while purporting to be Zernos, who was a close friend

of Kabilafkas' family and a cook at their Greek restaurant. *Id.* In October, 2016, Kabilafkas sent

a package to Glendale containing the S-1 Share certificates in Zernos' name and the related stock

transfer paperwork. EAF ¶ 83. On the Federal Express Airbill, it stated that the package was sent

by "E. Zernos," but the package was sent from Kabilafkas' address. *Id.* Kabilafkas also used

Zernos' email while Zernos was traveling outside of the United States to conduct trading in

Zernos' Glendale brokerage account. EAF ¶ 84.

3.  Tim Kabilafkas

In January 2017, Tim Kabilafkas opened a brokerage account at Merrill. EAF ¶ 85.

Kabilafkas shipped to Merrill the S-1 Share certificates in Tim Kabilafkas' name. *Id.*

Kabilafkas impersonated Tim Kabilafkas in a series of recorded phone calls with Merrill

in connection with his and his father's attempts to deposit and trade his father's stock. EAF ¶ 86.

Tim Kabilafkas, unlike his son, speaks in accented English and so is harder to impersonate. EAF

¶ 87. In one call, Kabilafkas, pretending to be his father and using an accent, instructed Merrill to

transfer $379,000 in trading proceeds into a Bank of America account. *Id.*

Merrill also called Tim Kabilafkas directly. On these recorded calls, Tim Kabilafkas

claimed that he purchased the shares in a "private party" transaction, and that he had heard about

Airborne through a stock advertisement. *Id.* When Tim Kabilafkas did not know the answer to

Merrill's questions, he told Merrill to contact his son. EAF ¶ 88. For example, in a January 2017

call, Tim Kabilafkas said that someone would call Merrill back with better answers to its

23

questions about how he acquired his shares or how many shares he had deposited. Kabilafkas then called Merrill back on the same day to answer the questions. *Id.* In a February 2017 call, Tim Kabilafkas asked Merrill to email its questions about his Airborne shares to his email address, to which Kabilafkas had access. When Merrill informed him it could not do so, he asked Merrill to call him back at Kabilafkas' phone number. EAF ¶ 89.

Merrill closed Tim Kabilafkas' brokerage account in late June 2017. AF ¶ 90. In July 2017, Tim Kabilafkas transferred his shares from Merrill to Interactive Brokers LLC ("Interactive"). EAF ¶ 91. In a July 20, 2017 email thread, an Interactive compliance specialist asked Tim Kabilafkas to provide "documents that show how you acquired the shares, when you acquired the shares and any other documents that speak about the shares that have come to [Interactive]." EAF ¶ 92. Tim Kabilafkas responded that he "acquired the shares in a private transaction in 2015 from the shareholder who originally purchased the shares directly from the issuer" and that he had signed a purchase agreement with the Thai Shareholder at the time. *Id.* In addition, Kabilafkas directed Airborne's outside law firm to send Interactive a letter asserting that there should be no trading restrictions on Tim Kabilafkas' shares. EAF ¶ 93.  Tim Kabilafkas provided a signed letter to Airborne's outside law firm in which he represented that (1) he is not related to anyone who holds more than 10% of Airborne's stock; (2) he has owned the shares for over a year; and (3) he does not know any material nonpublic information about the company. EAF ¶ 94. Upon receiving the letter, Airborne's law firm provided an opinion letter to Interactive, following which Interactive lifted its restriction and permitted Tim Kabilafkas' shares to be traded. *Id.*

### 5. *Acquisition of Apcentive*

In August 2016, Airborne acquired from a company called Apcentive, Inc. ("Apcentive") a patent for a high-speed meshed broadband airborne wireless network technology, referred to as

"Infinitus." Kabilafkas 56.1 ¶ 4. Airborne's 2016 Form 10-K stated that Daniels "[n]egotiated the acquisition from Apcentive, Inc.," pursuant to which Airborne paid "40,000,000 shares of our common stock." EAF ¶ 56.

However, Kabilafkas controlled Apcentive, although Apcentive's public filings omitted to refer to that fact. EAF ¶ 56. Contrary to the statement in Airborne's 2016 Form 10-K, Kabilafkas, not Daniels, arranged for the Infinitus patent transaction, after which he instructed Daniels to sign the director's consent authorizing Airborne to purchase the patent from Apcentive. EAF ¶¶ 56-57.

Kabilafkas and Daniels knew that the patent Airborne acquired from Apcentive had no value. EAF ¶ 59. However, in both its August 2016 Form 8-K announcing the patent's acquisition and in its 2016 Form 10-K, Airborne described at length the business potential of the Infinitus patent and trademark. *Id.* The Form 10-K stated elsewhere – but without making any reference to the Infinitus – that certain unspecified "intangible assets" and "intellectual property" owned by Airborne had "no value." *Id.* In fact Airborne owned no other intellectual property or intangible assets – the Infinitus patent was the sole foundation of Airborne's business – so the "no value" reference could only have referred to the patent. *Id.*

### 6.  Scheffey Investment

In two Form 8-Ks and in subsequent filings, Airborne stated that it had sold Restricted Shares to Scheffey at $0.80 per share, for a total investment of $1.45 million. EAF ¶ 60. However, Kabilafkas also gave Scheffey nearly three million additional S-1 Shares for no additional consideration. *Id.* The SEC asserts that, had Airborne accurately disclosed the true investment cost of Scheffey's acquisition of Restricted Shares combined with the additional S-1 Shares, Airborne would have disclosed that Scheffey's total investment, inclusive of the additional 3 million shares, came to $0.31 per share.

### 7. *Airborne Promotional Campaigns*

Kabilafkas, Daniels, and Airborne used millions of dollars in Airborne funds to carry out various promotional campaigns.

Between August 11, 2016 and August 29, 2016, stock promoters sent over 40 separate blast emails touting Airborne. AF ¶ 97. During the August 2016 promotional campaign, Airborne's share price doubled, going from a closing price of $0.46 on August 10, 2016, just before the promotional campaign began, to $0.92 by the end of that month. AF ¶ 101. With respect to trading volume, between August 11 and 31, 2016, Airborne's daily trading volume averaged 357,883 shares. Prior to July 2016, the stock of Airborne (including its predecessor, Ample-Tee) had only been traded once. *Id.*

The SEC maintains that, in October 2016, Kabilafkas, acting on behalf of Airborne, negotiated a media buying and representation agreement with Zapzorn. EAF ¶ 102. Kabilafkas instructed Zapzorn, through texts to Gabriel (its principal and longtime associate of Kabilafkas) to send the agreement to Daniels to sign on Airborne's behalf. *Id.*

Beginning on August 6, 2016, Gabriel and Kabilafkas exchanged hundreds of texts about their negotiations, and the content, cost, and placement of Airborne advertisements, including 85 texts during the week of October 20 to October 26, 2016. EAF ¶ 102. Between November 2016 and February 2018, often through Zapzorn, Airborne spent over $11 million advertising on various media. In contrast, Airborne spent approximately $3 million during this time on research and development for its product. AF ¶ 103.

After learning that Airborne was engaged in a promotion, Glendale required Kabilafkas to complete and sign a "Stock Promotion Affidavit." In the affidavit, Kabilafkas claimed that he was unaware of Airborne's promotional efforts. He further claimed that he did not know the

26

"people or entities engaged in sponsoring the campaign." EAF ¶ 81. As the evidence just discussed demonstrates, this was a bald-faced lie.

As a result of the promotional efforts that were coordinated by Kabilafkas, between December 2016 and February 2018, Airborne's trading volume and share price increased dramatically. AF ¶ 106. During the same period (2017-18), Airborne raised approximately $22.8 million from investors via various securities offerings. EAF ¶ 120.

### 8. Sale of Airborne Stock

Bbetween January 19, 2017 and January 18, 2018 (i.e., while the promotional campaigns pumping Airborne's stock were under way), Kabilafkas sold 1,121,389 Airborne shares from his Glendale brokerage account, for proceeds of $1,973,002. Likewise, between January 19, 2018 and April 20, 2018, he sold 349,500 Airborne shares from his Merrill brokerage account for proceeds of $691,362. AF ¶ 107.

Kabilafkas also sold Airborne shares from accounts held in the names of Zernos, Bolovis, and Tim Kabilafkas while these promotional campaigns were ongoing by impersonating them in emails to brokerages. For example, between October 2016 and November 2017 Kabilafkas used a Gmail account he had created to impersonate Zernos to sell his shares (EAF ¶ 108-09) and he also used an email address bearing Bolovis' name to sell Airborne shares deposited in Bolovis' brokerage account in December 2016. EAF ¶ 110. In addition, between February 1, 2017 and June 26, 2017, Kabilafkas sold shares from his father's Merrill brokerage account and, between October 11, 2017 and April 27, 2018, he sold shares from his father's Interactive account. EAF ¶ 111.

After liquidating the Airborne shares in his account and the accounts of his father, Zernos, Bolovis and other nominees, Kabilafkas transferred the trading proceeds in his and the other brokerage accounts he controlled to bank accounts he and his family controlled. EAF

¶ 113. For example, he arranged to have trading proceeds transferred from Zernos' Glendale brokerage account to accounts at Bank of America and JP Morgan Chase held jointly in the name of his father and Zernos. *Id.* The trading proceeds from the sales of Airborne shares in Tim Kabilafkas' brokerage accounts at Merrill and Interactive were transferred, at least in part, to the TKRT. AF ¶ 115. The Bolovis trading proceeds were used to purchase two properties that Kabilafkas and Tim Kabilafkas control and to send funds to a Greek bank account in Tim Kabilafkas' name. EAF ¶ 116.

Finally, Kabilafkas directed the wiring of money from other nominees' S-1 Share sales to benefit himself, his family and his associates, either directly or indirectly. EAF ¶ 117-18. Funds were sent to Zernos, Tim Kabilafkas and Kabilafkas' brother Konstantine; they were also used used to pay the interior design firm that refurbished Kabilafkas' house, to make a down payment on a home controlled by the MKRT, and to cover legal fees incurred in connection with this litigation. EAF ¶ 118.

In total, Kabilafkas carried out or directed nearly $18 million in sales of Airborne S-1 Shares between October 2016 and June 2018. EAF ¶ 119. Those proceeds were ultimately directed to accounts controlled in whole or in part by Kabilafkas and/or Tim Kabilafkas. *Id.*

### III. Procedural Background

This case was filed on March 2, 2021. Dkt. No. 1. The SEC filed its complaint against eight defendants – Airborne, Kabilafkas, Tim Kabilafkas, Daniels, Rabin, Bolovis, Chrysiliou, Scheffey – and relief defendants TKRT and MKRT.

Defendants Airborne, Kabilafkas, Tim Kabilafkas, Daniels, Bolovis, Scheffey, and Chrysiliou all filed separate motions to dismiss the complaint, which were denied. Dkt. No. 103.

The SEC reached settlements with four of the individual Defendants – Rabin, Bolovis, Chrysiliou, and Scheffey. Dkt. No. 22, 147-148, 174.

28

On November 8, 2022, the SEC filed its motion for summary judgment, together with a *Daubert* motion to strike the report and declaration of Defendants' expert witness Armand Musey. Dkt. Nos. 184, 186. On the same day Kabilafkas filed his cross-motion for summary judgment. Defendants Daniels and Tim Kabilafkas, and Relief Defendants the TKRT and the MKRT have joined in Kabilafkas' motion. Dkt. Nos. 191-192, 194-198, 217.

The court is granting in part and denying in part the SEC's *Daubert* motion in a separate opinion that is being filed simultaneously with this one.

## SUMMARY JUDGMENT MOTION

### I.    Legal Standard

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" "if it might affect the outcome of the suit under the governing law." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020). The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *Westinghouse Elec. Corp. v. N.Y.C. Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). "Uncertainty as to the true state of any material fact

29

defeats the motion." *U.S. v. One Tintoretto Painting Entitled The Holy Fam. With Saint Catherine & Honored Donor*, 691 F.2d 603, 606 (2d Cir. 1982).

The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1). "Courts must construe the evidence and draw all reasonable inferences in the non-moving party's favor." *United Specialty Ins. Co. v. JD Com. Builders Inc.*, No. 18-cv-6735 (CM), 2020 WL 49017661, at *3 (S.D.N.Y. Aug. 20, 2020).

**II.     The SEC is Entitled to Summary Judgment on its 10(b), 10b-5(b) and 17(a) Claims**

> *A.  Airborne, Kabilafkas, Daniels, and Tim Kabilafkas Made Material Misrepresentations and Omissions in Violation of Exchange Act Section 10(b) and Rule 10b-5 and Securities Act Section 17(a)(2)*

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b-5, which implements the statute, prohibits making "any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To recover for a violation of Section 10(b) and Rule 10b-5, the SEC must prove that each defendant: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). Unlike a private plaintiff, the SEC need not allege or prove reliance, causation, or damages in an action under Section 10(b) or Rule 10b–5. *SEC v. Credit Bancorp, Ltd.*, 195 F.Supp.2d 475, 490–91 (S.D.N.Y.2002). Claims under Section 17(a)(2) are essentially the same except that a "showing of negligence is sufficient" to satisfy the element of scienter. *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).

The SEC states that Airborne, Kabilafkas, Daniels, and Tim Kabilafkas made material misrepresentations and omissions in violation of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. In addition, the SEC states that Airborne, Kabilafkas, and Tim Kabilafkas made material misstatements and omissions in violation of Section 17(a)(2) of the Securities Act.[14]

To prove a material misrepresentation or omission, a plaintiff must show that the defendant either made an untrue statement of a material fact or omitted to state a material fact necessary to make whatever statements it made not misleading. 17 C.F.R. § 240.10b-5(b).

1.   Airborne Made False and Misleading Statements

The SEC maintains that Ample-Tee and Airborne's public filings contain numerous false statements concerning (i) the control of the company; and (ii) acquisition of the patent from Apcentive.

First, Airborne repeatedly stated in its public filings (October 2015 8-K, 2016 10-K, 2017 10-K, 2018 10-K) that Daniels paid for and owned the Restricted Shares. EAF ¶¶ 52-53. However, the record evidence demonstrates that Kabilafkas bought the Restricted Shares, together with almost all of the S-1 Shares. EAF/AF ¶¶ 28-32.

Next, Airborne stated in its 2016 10-K that no person who owns more than 5% of Airborne's stock "ha[s] had any material interest, direct or indirect, in any transaction with us or in any presently proposed transaction." EAF ¶ 52. However, Kabilafkas owned or controlled more than 5% of Airborne's stock (EAF/AF ¶¶ 28-32) and both the 2016 10-K and Airborne's

---

[14]   While the elements of a Rule 10b-5(b) and Section 17(a)(2) claim are essentially the same, *Genovese*, 553 F. Supp. 3d at 40-41, Section 17(a)(2) specifically requires that a defendant "obtain money or property" by means of a material misrepresentation or omission. *SEC v. Hurgin*, No. 19-cv-5705, 2022 WL 4448561, at *8 (S.D.N.Y. Sept. 23, 2022). The SEC has not alleged that Daniels obtained money or property as a result of his misrepresentations, so he has not been charged with a violation of Section 17(a)(2).

August Form 8-K disclosed that Airborne acquired a patent and related trademark from Apcentive, which Kabilafkas controlled. EAF ¶ 56.

The SEC also points to statements that were made misleading because they omitted to disclose Kabilafkas' control of the company.

Airborne's 2016 10-K stated that as of "December 6, 2016 [Airborne] had 31 shareholders," which included Daniels and the 30 Thai Shareholders. Kabilafkas' name does not appear in the filing, despite the fact that the record evidence shows that he controlled virtually all of the Restricted and S-1 shares at this point in time. EAF ¶ 54.

Airborne's public filings often included lists of beneficial shareholders, none of which included Kabilafkas. EAF ¶ 55.

Finally, Airborne's October and November 2016 8-K, as well as its 2016 10-K, stated that Airborne sold Restricted Shares to Scheffey at $0.80 per share for a total investment of $ 1.45 million. EAF ¶ 60. However, Airborne did not disclose in these public filings or elsewhere that Kabilafkas also gave Scheffey nearly three million S-1 Shares for no additional consideration. *Id.*

### 2. Kabilafkas Made False and Misleading Statements

The record evidence demonstrates that Kabilafkas made a false and misleading statement when he submitted paperwork to the CSTC claiming that he purchased his S-1 shares directly from a Thai Shareholder. EAF ¶ 60. In fact, Kabilafkas acquired the shares from Crimeni. EAF/AF ¶¶ 27-32.

Kabilafkas also made misrepresentations to Glendale and Interactive when he claimed that he bought S-1 shares directly from a Thai Shareholder, that he had no affiliation with Airborne, and that he had no knowledge of its promotional efforts. EAF ¶¶ 78, 92, 94. In fact, as

noted, the record evidence demonstrates that Kabilafkas acquired the Airborne shares from Crimeni and that he effectively controlled Airborne. In addition, Kabilafkas was involved in directing the content of Airborne's advertising campaigns. EAF ¶¶ 102, 104. He exchanged hundreds of texts with the principal of Zapzorn about the content, cost, and placement of Airborne advertisements. EAF ¶ 102.

Kabilafkas also sent numerous emails to brokerages that included trading instructions, claiming to be his father or Zernos. EAF ¶¶ 108-09.

### 3. Daniels Made False and Misleading Statements

As Airborne's nominal CEO, Daniels repeatedly signed and filed Airborne's public disclosures, including the filings claiming that he had purchased the Restricted Shares. EAF ¶¶ 52-53. Courts "consistently hold that signatories of misleading documents 'made' the statements in those documents." *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 164 (S.D.N.Y. 2012) (quoting *Janus*, 564 U.S. at 142-43). Therefore, both Daniels and Airborne are deemed to have made the misstatements in the company filings that were signed by Daniels.

### 4. Tim Kabilafkas Made False and Misleading Statements

The record evidence demonstrates that Tim Kabilafkas made false and misleading statements to CSTC, Merrill and Interactive by stating that he had acquired his shares directly from a Thai Shareholder (EAF ¶ 92), that he heard about Airborne through a stock advertisement (EAF ¶ 87); and that he did not know anyone involved with Airborne. EAF ¶ 89. In fact, the record evidence shows that Tim Kabilafkas received his shares from his son (EAF ¶¶ 67, 73; SEC 56.1 Reply ¶ 30), and his son controlled Airborne. *See supra* p. 17.

*B. Defendants' Misrepresentations Were Material*

Both sides move for summary judgment on the issue of materiality.

"An alleged misrepresentation is material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." *Singh*, 918 F.3d at 63 (internal quotation marks and citation omitted); *accord TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Materiality turns on whether the statement "significantly altered the 'total mix' of information made available." *Id.* (internal quotation marks and citation omitted); *accord Basic*, 485 U.S. at 231–32.

"Only if the established omissions [or misrepresentations] are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law by summary judgment." *TSC Indus.*, 426 U.S. at 450 (internal quotation marks omitted).

Defendants assert that Musey's expert testimony demonstrates that the misstatements and omissions were not material. Defendants cite to Musey's conclusions that specific allegations would not be important to an "ordinary investor" and so are not material. Musey Rpt. at 25, 27, 31. Defendants also cite Musey's event study for the proposition that the alleged misrepresentations did not have any impact on the company's stock price. *Id.* at 36.

But Musey's opinions about the materiality of specific misrepresentations to investors were stricken as inadmissible in the court's Daubert ruling. And because his event study does not raise any genuine issue of material fact relating to the SEC's allegations, that testimony, too, is inadmissible. As a result, Musey's testimony (or what is left of it) fails to raise any genuine issue of fact as to materiality.

Defendants additionally assert that the misstatements and omissions here would not have significantly altered the total mix of information made available to investors. Defendants note that Airborne consistently disclosed to the investing public that the company was unprofitable

and doubtful to continue as a going concern, had zero revenue, and was generating tens of millions of dollars in accumulated losses and had insufficient funds to support operations. For example, in Airborne's January 2017 Form 10-Q, it stated that:

> There is substantial doubt if we can fully develop our business plan and continue as an on-going business for the next 12 months, unless we obtain additional cash. Our only source for cash to be used to implement our business plan at this time is investments or loans by others. We must raise cash to implement our strategy. If we cannot raise additional proceeds by private placements of our common stock or debt financing, we would be required to cease business operations. As a result, investors would lose all of their investments.

Dkt. No. 193-10.

Defendants thus assert that, from the outset, Airborne disclosed, and potential investors were aware, that investing in Airborne was exceedingly risky. As a result, Defendants argue that the disclosure of the misstatements and omissions regarding Kabilafkas' role, conduct, and intent would not have significantly altered the total mix of information available to investors.

It is indeed ironic that Defendants would point to this particular disclosure to buttress their claim that they were honest with the investing public. That very disclosure statement was filed while Kabilafkas' promotional scheme – a scheme that was inflating the price of Airborne's stock, thereby easing the company's ability to raise additional funds via private placements – was under way. It hardly undercuts the SEC's position.

Moreover, Airborne's disclosures about potential future risks with respect to its profitability do not raise any issue of fact concerning misrepresentations or omissions made about historical or current facts. "Misrepresentation of present or historical facts cannot be cured by cautionary language." *P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 96–97 (2d Cir. 2004); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir.2004) ("[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.") Here, disclosing the risk that the company might go broke is entirely distinct from failing to disclose Kabilafkas'

scheme – a scheme that was well underway – to inflate the price of Airborne stock so that he could sell ("dump") his and his co-Defendants' shares while the price was "pumped."

Finally, Defendants assert that the misstatements and omissions in this case were immaterial because Airborne was not required to disclose Kabilafkas' beneficial ownership of the company. Specifically, Defendants assert that the disclosure requirements under Sections 13(d) and 16 of the Exchange Act do not apply unless the shares at issue are registered under Section 12 of the Exchange Act. *See* 15 U.S.C. § 78m(d)(1); 15 U.S.C. § 78p(a)(1).

This argument was already rejected in the court's decision denying the motion to dismiss. *See* Dkt. No. 51 at 19; Dkt. No. 103. The basis for Airborne's duty to disclose Kabilafkas' status arises, not from Section 13(d), but because, "Once a company speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information on the issue or topic." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (internal quotations and citations omitted). Airborne repeatedly made statements in its public filings about its management, who owned its stock, the lack of any related party transactions, and operating risks. It was required to provide complete and accurate information when making such disclosures. On the undisputed facts of this case, it did not do so.

The SEC argues that summary judgment in its favor on the issue of materiality is appropriate because the misstatements and omissions in this case are material as a matter of law. It argues that no rational jury could find that the fact that Kabilafkas secretly controlled Airborne and its stock – which he intended to dump, or was dumping, on investors after pumping up the price – would not have significantly altered the total mix of available information.

The SEC notes that courts have determined that misrepresentations regarding company control persons are material. For example, the Fifth Circuit in *Sec. & Exch. Comm'n v.*

*Blackburn*, 15 F.4th 676, 681 (5th Cir. 2021) affirmed the district court's grant of summary judgment and stated that omissions about the operator of a fraudulent scheme involving a penny stock company were material because, "Investors make decisions about whether to invest their money in a company, in part, based on the company's leadership" and that there is "'little doubt that a reasonable investor would have wanted to know the true identity' of who was leading the company." (citing *SEC v. Husain*, 2017 WL 810269, at *8 (C.D. Cal. Mar. 1, 2017)). Defendants assert that the district court only found the omissions to be material in *Blackburn* because the control person had a criminal background, but the Fifth Circuit explicitly stated that "Disclosure of [defendant's] key role with [the company] might have mattered to investors for a number of reasons, including but not limited to his criminal convictions, the lawsuit he settled . . . or just his general reputation." *Blackburn*, 15 F.4th at 681.

Similarly, the SEC cites *S.E.C. v. Farmer*, No. 4:14-CV-2345, 2015 WL 5838867, at *9 (S.D. Tex. Oct. 7, 2015), in which the court held that misrepresentations about the defendant's role in a company and relationship to the CEO were material "because the persons relying on [the company's] statements—including brokers, regulators, and investors—consider[ ] such relationships important given the ease and frequency with which microcap companies . . . can and are manipulated by undisclosed control persons." (citing *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (en banc) (material facts include those "which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities")). Defendants assert that this case is also not applicable as it concerned a wash trade conducted as part of an IPO, whereas here Defendants maintain that the Airborne technology was not fake – rather, the company failed before it could be brought to market. Dkt. No. 202 at 29. That does not, however, affect the court's holding that those relying on company

statements consider misrepresentations regarding control persons important. Furthermore, the *Farmer* court specifically noted that the false statements concealing the control person's relationship with the company were made "during the critical period in which [the company's] inflated stock was being dumped on the public market" thereby helping the defendant obtain money. *Farmer*, 2015 WL 5838867, at *9. So too here, the omissions about Kabilafkas' control were made while Kabilafkas and his associates were inflating the price of the stock and then beginning to dump their shares and profit off the scheme. EAF ¶ 109 (Kabilafkas began to sell shares in October 2016).

Most significantly, in *Sec. & Exch. Comm'n v. Carrillo Huettel LLP*, No. 13 Civ. 1735(GBD)(JCF), 2017 WL 213067, at *4 (S.D.N.Y. Jan. 17, 2017), report and recommendation adopted, No. 13 CIV. 1735 (GBD), 2017 WL 1162199 (S.D.N.Y. Mar. 28, 2017), my colleague Judge Daniels adopted the Report and Recommendation of our former colleague, Magistrate Judge James Francis. Judge Francis ruled that SEC filings concealing the defendant's control over the company were material because they were "integral to the scheme to falsely inflate the price of the shares to enrich their owners." Defendants highlight that the SEC in that case also provided evidence to support materiality by showing that the share price fell by 40% once the truth was disclosed. However, the court determined that the filings were material even without regard to the stock price decline because, by falsely reporting the ownership of the shares, the defendants were able to deposit and sell their shares without registering them – all part of their scheme. *Carrillo Huettel LLP*, 2017 WL 213067, at *4. Likewise here, the omissions and misrepresentations concerning the true provenance of Kabilafkas' and his associates' Airborne shares enabled Kabilafkas and his co-defendants to deposit their stock at brokerages and then sell their shares as part of the scheme alleged here. *See, e.g.*, EAF ¶ 91-96.

Therefore, all of Defendants' misrepresentations and omissions concerning Kabilafkas' control over Ample-Tee and Airborne are material.

This encompasses all of Airborne's – and therefore Daniels' -- statements. *See supra* pp. 31-32, 33. Airborne's statement misrepresenting the number of shares Scheffey received relates to Kabilafkas' control because it was Kabilafkas that gave Scheffey three million more shares than disclosed for no additional consideration. EAF ¶ 60.

It also includes Kabilafkas' statements, as all of these misrepresentations and omissions were for the purpose of concealing his role at Airborne. *See supra* pp. 32-33. For example, Kabilafkas represented to Glendale, (among other things) that he was not an affiliate of Airborne; that he was only a shareholder with "no other relationship with the company;" and that he had no relationship with any Airborne executive. EAF ¶ 78. Finally, Tim Kabilafkas' statements were also concerning Kabilafkas' role in Airborne; he represented to Merrill Lynch that he had heard about Airborne through a stock transaction (EAF ¶ 87) and that he did not know anyone at Airborne (EAF ¶ 89). *See supra* pp. 33-34.

In addition, courts have held that misrepresentations to transfer agents and brokers in furtherance of efforts to have shares issued, transferred, or deposited for trading are material. *See e.g.*, *Sec. & Exch. Comm'n v. Sourlis*, 851 F.3d 139, 145-146 (2d Cir. 2016); *S.E.C. v. Jean-Pierre*, No. 12 CIV. 8886 LGS, 2015 WL 1054905, at *9 (S.D.N.Y. Mar. 9, 2015); *Carrillo Huettel LLP*, 2017 WL 213067, at *4.[15] Defendants argue that these cases concerned the purchase and sale of *unregistered* securities (which Airborne was not) and so "without the misrepresentations made to the transfer agents and brokers, defendants would not have been able to sell the securities on the open market." Dkt. No. 202 at 30. However, the undisputed evidence

---

[15]     Misrepresentations to industry gatekeepers can be material, "even if the statement is not directly made to an investor." *U.S. S.E.C. v. Czarnik*, No. 10 CIV. 745 PKC, 2010 WL 4860678, at *5 (S.D.N.Y. Nov. 29, 2010).

in this case demonstrates that Airborne's transfer agent relied on the false statements and documentation provided to her when she issued new Airborne S-1 Share certificates in the names of Kabilafkas and others. Dkt. No. 185-4 at ¶¶ 19-23. Additionally, brokerages sought clarification and assurances from Kabilafkas and his associates when they attempted to deposit their Airborne shares, which indicates that the brokerages would not have permitted trading in these shares had they known the truth about what was going on at Airborne. AF ¶ 80; EAF ¶¶ 81, 88, 89, 90, 92, 93, 96.

Therefore, all of Kabilafkas and Tim Kabilafkas' false and misleading statements were material -- not simply because they misrepresented or omitted Kabilafkas' control of Airborne, but because they were made to the CSTC and brokers as part of their efforts to deposit and trade their Airborne shares.

Defendants have not presented any evidence to show that the misstatements and omissions in this case were immaterial. In contrast, the SEC has demonstrated that the misrepresentations and omissions made by Kabilafkas, Daniels, Tim Kabilafkas, and Airborne were of such a kind as to be inherently important to investors and so material. The SEC's motion for summary judgment on the issue of materiality is granted, and Defendants' cross motion is denied.

### C. *Summary Judgment is Granted Against Airborne, Kabilafkas, Daniels, and Tim Kabilafkas on the Scheme Liability Claims*

Together, Exchange Act § 10(b), Rule 10b-5(a) and (c), and Securities Act § 17(a)(1) and (3) "create what courts have called 'scheme liability' for those who, with scienter, engage in deceitful conduct." *Jean-Pierre*, 2015 WL 1054905, at *8. To prove a scheme liability claim, the SEC must show "that defendants: (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter." *Sec. & Exch. Comm'n v. Sason*,

433 F. Supp. 3d 496, 508–09 (S.D.N.Y. 2020). "To prove liability under Securities Act Section 17(a)(3), however, the SEC only has to prove negligence rather than scienter." *Sec. & Exch. Comm'n v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016) (internal citation omitted). Unlike for misstatement liability, scheme liability does not require a showing of materiality.

Scheme liability hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement. *See, e.g.*, *SEC v. Lee*, 720 F.Supp.2d 305 (S.D.N.Y.2010). Courts have not allowed subsections (a) and (c) of Rule 10b–5 to be used as a "back door into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b–5." *In re Parmalat Sec. Litig.*, 376 F.Supp.2d 472, 503 (S.D.N.Y.2005).

Defendants argue that the SEC has failed to allege scheme liability because it has not shown that the Defendants engaged in a deceptive scheme or course of conduct that went beyond misstatements and omissions. Specifically, Defendants assert that the fraud alleged by the SEC is merely concerned with Defendants' alleged omission of Kabilafkas' role as a control person of Airborne and misstatements made to Airborne's transfer agent and various broker dealers.

That argument is errant nonsense. The scheme alleged in this case consisted of Kabilafkas' assuming secret control over Airborne and then engineering a "pump and dump" scheme that enriched him and his family members. Taking control of a company secretly and engaging in a pump and dump scheme are inherently deception conduct, separate and apart from whatever misstatements were made about what was going on. It cannot be seriously argued that these facts present a situation "where the primary purpose and effect of [the] purported scheme [was] to make a public misrepresentation or omission." *SEC v. Kelly*, 817 F.Supp.2d 340, 343 (S.D.N.Y.2011).

1.  Kabilafkas Engaged in Deceptive Conduct

Both Kabilafkas' overarching scheme and the acts that propelled the scheme entailed deceptive conduct.

Courts have determined that those playing a leading role in the larger scheme as a whole – and in particular a pump-and-dump scheme – are liable for that scheme. For example, in *Farmer*, 2015 WL 5838867, at *16, the court held that, even beyond particular instances of conduct that created scheme liability, summary judgment was also proper because the defendant "played a leading role in every aspect of [the company's] affairs that were pertinent to setting up and executing a pump-and-dump scheme." Likewise, in *Sec. & Exch. Comm'n v. DeFrancesco*, No. 23-CV-131 (JSR), 2023 WL 4631449, at *5 (S.D.N.Y. July 20, 2023), the court held that the SEC alleged deceptive conduct by a defendant who personally orchestrated a pump-and-dump scheme by secretly amassing a majority of a company's stock, lying to auditors about his control of the company, orchestrating a fraudulent promotional campaign, and arranging for the unregistered sale of his stock. *See also Husain*, 2017 WL 810269, at *9. Likewise here, Kabilafkas conceived of and was the primary executor of the pump-and-dump scheme and he engaged in all aspects of the fraud.

In addition, Kabilafkas' individual acts support a finding of scheme liability. First, Kabilafkas' concealment of his purchase and control of Airborne and its stock demonstrate scheme liability. In *Sec. & Exch. Comm'n v. Zwebner*, 2016 WL 9526398, at *4 (S.D. Cal. Nov. 29, 2016), the court held that scheme liability existed when a defendant hid his ownership and control of [issuer] and its shares, placed free trading shares with his nominees, appointed a nominal CEO, and had the company file false documents with the SEC that failed to disclose his control. *See also Sec. & Exch. Comm'n v. Stubos*, 634 F. Supp. 3d 174, 201 (S.D.N.Y. 2022)

(finding that using nominees to conceal a company's true control supported scheme liability). Here, the undisputed evidence establishes that Kabilafkas purchased the Ample-Tee shares in a manner that hid his control (EAF ¶ 28); installed Daniels as Airborne's CEO (EAF ¶ 40); gave Airborne shares to his nominees (EAF ¶ 67); and Airborne's public filings did not disclose that Kabilafkas controlled Airborne (EAF ¶ 53).

It is also undisputed that Kabilafkas sought to hide the fact that he was the beneficiary of his scheme by impersonating his nominees and issuing sell orders to brokers in which he would be the recipient of the funds. For example, Kabilafkas set up Zernos' Gmail account and used it to communicate with Glendale. EAF ¶¶ 82, 84, 108-09. The trading proceeds from Zernos' brokerage account were then transferred to brokerage accounts Kabilafkas controlled. EAF ¶ 113. In *Sec. & Exch. Comm'n v. Penn*, 225 F. Supp. 3d 225, 236 (S.D.N.Y. 2016), the court held that "By disguising the ultimate recipient of the funds . . . [defendant] engaged in an inherently deceptive act." *See also In re Smith Barney Transfer Agent Litig.*, 884 F.Supp.2d at 161; *SEC v. Credit Bancorp, Ltd.*, 738 F.Supp.2d 376, 384 (S.D.N.Y. 2010).

Kabilafkas also submitted to Airborne's transfer agent and brokerages forms claiming that he bought S-1 shares directly from a Thai Shareholder, that he had no affiliation with Airborne, and that he had no knowledge of its promotional efforts. EAF ¶¶ 78, 81. All of these were lies – deceptive conduct. He also instructed Niko Kabylafkas to make misrepresentations in his share transfer paperwork for the CSTC, including by having Niko state that he had purchased his S-1 Shares directly from a Thai Shareholder on a false purchase date. EAF ¶ 63. Courts have held that such conduct is "deceptive" and can give rise to scheme liability. *See, e.g.*, *Jean-Pierre*, 2015 WL 1054905, at \*9; *Sec. & Exch. Comm'n v. Sayid*, No. 17 CIV. 2630 (JFK), 2018 WL 357320, at \*7 (S.D.N.Y. Jan. 10, 2018).

In all, Kabilafkas engaged in deceptive conduct in furtherance of a fraudulent scheme.

2.  Daniels Engaged in Deceptive Conduct

Daniels submitted fraudulent paperwork to the CSTC and authorized the CSTC to re-issue S-1 shares to Kabilafkas, Tim Kabilafkas, and others without restrictive legends. EAF ¶ 75. As noted, this creates scheme liability. *Jean-Pierre*, 2015 WL 1054905, at *9.

In addition, Daniels hid that Kabilafkas in fact controlled Airborne. Kabilafkas installed Daniels as Airborne's CEO (EAF ¶ 40); he took direction from Kabilafkas (EAF ¶ 42); and he forwarded questions about Airborne's business to Kabilafkas (EAF ¶¶ 42-3). Nonetheless, Daniels signed paperwork and filings presenting himself as Airborne's CEO and control person. Such efforts to conceal true control of a company establish scheme liability. *See Zwebner*, 2016 WL 9526398, at *4.

3.  Airborne Engaged in Deceptive Conduct

Airborne, through Daniels, submitted false paperwork to the CSTC so that it would re-issue S-1 shares to Kabilafkas, Tim Kabilafkas, and others. *Id.* ¶ 75. "Knowledge and actions of a corporation's employees and agents are generally imputed to the corporation where the acts are performed on behalf of the corporation and are within the scope of their authority." *UCAR Int'l, Inc. v. Union Carbide Corp.*, 2004 WL 137073, at *13 (S.D.N.Y. Jan. 26, 2004), *aff'd*, 119 F. App'x 300 (2d Cir. 2004) (citing *United States v. Kopper*, 652 F.2d 290, 298 (2d Cir.1981)). The record therefore demonstrates that Airborne also engaged in deceptive conduct.

4.  Tim Kabilafkas Engaged in Deceptive Conduct

Like the other Defendants, Tim Kabilafkas engaged in deceptive conduct by submitting fraudulent paperwork to the CSTC. *Jean-Pierre*, 2015 WL 1054905, at *9. Specifically, he submitted paperwork to the CSTC that stated he had acquired his shares from Thai Shareholders

on May 14, 2015. EAF ¶¶ 73-4. In fact, the record evidence demonstrates that his son purchased the shares months later. EAF/AF ¶¶ 24-35. Tim Kabilafkas also drafted a declaration for the purpose of procuring a legal opinion submitted to Interactive to allow his shares to trade that contained misrepresentations. Tim Kabilafkas stated that he is not related to anyone who holds more than 10% of Airborne stock and that he does not have any inside information about Airborne. EAF ¶ 94.

In addition, Tim Kabilafkas facilitated his son's deceptive impersonation of him in calls with Merrill. In a January 2017 recorded call with Merrill Lynch, Tim Kabilafkas did not know the answer to questions about how he acquired his shares or how many shares he had deposited, so he said that someone would call Merrill back with better answers to its questions. Kabilafkas then called Merrill back on the same day to answer the questions. EAF ¶ 88. In a February 2017 recorded call, Tim Kabilafkas asked Merrill to email its questions about his Airborne shares to his email address to which Kabilafkas had access. When Merrill informed him it could not do so, Tim asked Merrill to call him back at Kabilafkas' phone number. EAF ¶ 89. Courts have determined that impersonation and hiding one's identity supports a finding of scheme liability, (*see e.g.*, *Sec. & Exch. Comm'n v. Muehler*, 2018 WL 1665637, at *6 (C.D. Cal. Apr. 4, 2018); *Zwebner*, 2016 WL 9526398, at *7); aiding and abetting such conduct, which Tim surely did, is also deceptive.

### D. Airborne, Kabilafkas, Daniels, and Tim Kabilafkas Acted with Scienter

"Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud." *Sec. & Exch. Comm'n v. StratoComm Corp.*, 652 F. App'x 35, 38 (2d Cir. 2016). Scienter also "may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Id.* (citation omitted). While scienter must be

shown to prove a violation of 10(b) or 17(a)(1), for Sections 17(a)(2) and 17(a)(3), a "showing of negligence is sufficient." *Ginder*, 752 F.3d at 574. "Representing information as true while knowing it is not, recklessly misstating information, or asserting an opinion on grounds so flimsy as to belie any genuine belief in its truth, are all circumstances sufficient to support a conclusion of scienter." *SEC v. Universal Exp., Inc.*, 475 F.Supp.2d 412, 424 (S.D.N.Y. 2007), *aff'd sub nom. SEC v. Altomare*, 300 Fed.Appx. 70 (2d Cir. 2008). The undisputed evidence in this case establishes that each of the Defendants acted with scienter.

### 1. Kabilafkas Acted with Scienter

Courts have held that those at the center of a fraudulent scheme have scienter. In *S.E.C. v. Milan Cap. Grp., Inc.*, No. 00 CIV. 108 (DLC), 2000 WL 1682761, at *7 (S.D.N.Y. Nov. 9, 2000), the court held that there was "no issue of material fact with respect to [defendant's] scienter" as the SEC had "offered ample evidence that [defendant] was at the center of the fraud." *See also CKB168 Holdings, Ltd.*, 210 F. Supp. 3d at 446.

Here, the record evidence demonstrates that Kabilafkas arranged for the purchase of the Ample-Tee shares (EAF/AF ¶¶ 24-35)); effectively controlled Airborne (*see supra* p. 17); made repeated misrepresentations to brokerages (*see supra* pp. 32-33); impersonated his father on recorded calls to brokers (EAF ¶¶ ¶ 86-87); directed Airborne's promotional "pumping" campaigns (EAF ¶ 102); and then sold his and his nominees Airborne stock at inflated prices (EAF/AF ¶¶ 107-119).

The evidence also demonstrates that Kabilafkas knew that representations he made to brokers were false. For example, in an August 2016 submission to Glendale he claimed that he was not an affiliate of Airborne, bought his S-1 Shares directly from a Thai Shareholder in 2016, had "no other relationship" to Airborne beyond being a shareholder, and was not aware of any

promotional activity by Airborne, among other representations. EAF ¶ 78. As discussed above, the undisputed evidence demonstrates that Kabilafkas bought the Ample-Tee shares from Crimeni, controlled Airborne, and directed Airborne's promotional activity. Thus, he was aware that his statements to the contrary were false.

In addition, the undisputed evidence establishes that Kabilafkas impersonated his father on a call with Merrill (EAF ¶ 86); Kabilafkas also deposited stock with Glendale in the name of Zernos and used Zernos' email account to communicate with Glendale. EAF ¶ 82. Courts have held that assuming the identity of other persons and placing shares in the name of nominees is inherently fraudulent. In *Zwebner*, 2016 WL 9526398, at *7, scienter was found as a matter of law when "[defendant] hid his ownership and control of [a shell company], placed shares in the names of unwitting nominees and assumed the identify of another person to further conceal his involvement in the registration, scheme and role at [the share company];" *see also Muehler*, 2018 WL 1665637, at *6.

Finally, scienter can be satisfied by a showing a defendant "benefitted in a concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). The evidence demonstrates that proceeds from sales of Airborne shares were almost all directed to accounts controlled in whole or in part by Kabilafkas and Tim Kabilafkas, and that the money was used to fund, *inter alia*, their real estate purchases and tax liabilities. EAF ¶ 119.

Defendants offer no argument to negate Kabilafkas' scienter other than to state that the SEC's evidence generally creates a "conflicting version of events." As noted above, Defendants offer no evidence to support any alternate version of events. *See supra* p. 5-6. As they "may not rely on conclusory allegations or unsubstantiated speculation," summary judgment therefore is proper. *DeFabio*, 623 F.3d at 81.

### 2. Daniels Acted with Scienter

The undisputed evidence demonstrates that Daniels was aware that Kabilafkas controlled Airborne, yet he omitted that fact from Airborne's public filings. The record evidence also demonstrates that Daniels routinely updated, deferred to, and sought approvals from Kabilafkas. EAF ¶ 40-51. For example, Kabilafkas sent draft Airborne public filings to Daniels so that the latter could sign and file them (EAF ¶ 42); Daniels sent Kabilafkas documents for his review and approval (EAF ¶¶ 42, 43, 46); and Kabilafkas had access to and used Daniels' email address to send emails and sign an agreement on behalf of Airborne. EAF ¶ 50. Daniels admitted that he was installed by Kabilafkas as Airborne's CEO. EAF ¶ 40; Dkt. No. 119, ¶ 23.

Daniels' scienter is also demonstrated by the fact that knew his representation that he purchased the Ample-Tee Airborne Shares directly from Chenard using $ 250,000 of his personal funds was false. EAF ¶ 52. The record evidence demonstrates that it was Kabilafkas that purchased the Airborne stock, while the undisputed testimony of Chenard established that he never sold any shares of Ample-Tee, never received $ 250,000 in connection with Ample-Tee, and did not know Daniels. *Id.*

### 3. Tim Kabilafkas Acted with Scienter

Tim Kabilafkas argues that the SEC has failed to show that he has the required scienter for a finding of liability because "a jury could theoretically conclude that Mr. Kabilafkas was unaware of his son's actions or, in the alternative, knew and approved of them, but had no knowledge or reason to believe they were improper." Dkt. No. 205 at 9. He states that the court should be "lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences, because such issues are appropriate for resolution by the trier of fact." *Id.* (quoting *In re: DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009)).

However, the record evidence demonstrates that Tim Kabilafkas knew that the following representations were false at the time they were made; he stated to Merrill on a recorded call that he had purchased his shares in a "private transaction" and that he had heard about Airborne through a stock advertisement. EAF ¶ 87. In fact, the record evidence establishes that Kabilafkas bought and controlled all the Airborne stock (EAF ¶¶ 28-32) and that he gave his father his Airborne shares. EAF ¶ 67; SEC 56.1 Reply ¶ 30.

In addition, as noted, the record evidence establishes that Tim Kabilafkas knowingly facilitated his son's impersonation of the father on calls and gave his son access to his email to impersonate him. EAF ¶ 86-89; *see supra* pp. 44-45.

Moreover, as with Kabilafkas, Tim Kabilafkas also "benefitted in a concrete and personal way from the purported fraud," because proceeds from the sale of Airborne shares were wired to an account in Tim Kabilafkas' name and to the TKRT. EAF ¶ 116.

This evidence is sufficient to demonstrate Tim Kabilafkas' scienter.

### 4. Airborne Acted with Scienter

As Airborne's control person, Kabilafkas' scienter is imputed to it; the same is true for Daniels' scienter, who, in his capacity as named president, was the person through whom Airborne repeatedly acted. *See SEC v. Rio Tinto PLC*, No. 17-cv-7994, 2019 WL 1244933, at *14 (S.D.N.Y. March 18, 2019); *SEC v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 390 (S.D.N.Y. 2014). Therefore, Airborne acted with scienter in connection with the materially false and misleading statements it made and with the other deceptive, manipulative, and fraudulent conduct it engaged in.

### E. Defendants' Misconduct Was in Connection with the Purchase or Sale of Securities

"The 'in connection with' factor has been broadly construed." *Credit Bancorp, Ltd.,* 195 F. Supp. 2d at 491. In order to satisfy the "in connection with" requirement, "[I]t is enough that

the fraud alleged coincide with a securities transaction – whether by the plaintiff or by someone else. The requisite showing, in other words, is deception in connection with the purchase or sale of any security, not deception of an identifiable purchaser or seller." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 85, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006). "Any statement that is reasonably calculated to influence the average investor satisfies the 'in connection with' requirement of Rule 10b-5." *Credit Bancorp*, 195 F. Supp. 2d at 491-92 (quoting *SEC v. Hasho*, 784 F. Supp. 1059, 1106 (S.D.N.Y. 1992)).

The record evidence demonstrates that misrepresentations were made in connection with a scheme to sell securities at inflated prices. Such conduct satisfies the "in connection with" requirement. *See e.g.*, *Boock*, 2011 WL 3792819, at *23; *Sec. & Exch. Comm'n v. Simeo*, 2021 WL 4041562, at *10 (S.D.N.Y. Sept. 3, 2021). And Defendants do not deny that the scheme was carried out in connection with the purchase and sale of securities.

### F.   Kabilafkas, Airborne, and Tim Kabilafkas Obtained Money or Property

Securities Act Section 17(a)(2) requires that a defendant "obtain money or property" by means of a material misrepresentation or omission. *Hurgin*, 2022 WL 4448561 at *8; *SEC v. Stoker*, 865 F. Supp. 2d 457, 462-63 (S.D.N.Y. 2012). Here, as a result of their misrepresentations, Kabilafkas and Tim Kabilafkas obtained nearly $18 million in trading proceeds. EAF ¶ 119. Airborne obtained approximately $22.8 million in investor proceeds during 2017 to 2018, while its materially false and misleading SEC filings were publicly available and while Airborne's deceptive promotional campaigns were ongoing. EAF ¶ 120.

### G.   Defendants Used the Means and Instrumentalities of Interstate Commerce

The use of email and bank wires, among other things, satisfies the "interstate commerce" requirement. *See, e.g.*, *SEC v. Norstra Energy, Inc.*, 202 F. Supp. 3d 391, 398-99 (S.D.N.Y. 2016); *SEC v. Tourre*, 2013 WL 2407172, at *11 (S.D.N.Y. June 4, 2013); *CKB168 Holdings*,

*Ltd.*, 210 F. Supp. 3d at 441 n. 24. Here, the undisputed evidence shows that Kabilafkas and others used email to communicate with each other and various third parties, including brokerages. It also shows that they used bank wires to transfer funds. *See, e.g.*, EAF/AF ¶¶ 72, 80, 84, 112-20.

**III.    Kabilafkas is Liable as a Control Person Under Exchange Act Section 20(a)**

To state a claim for control person liability, a plaintiff must show: (1) a primary violation by a controlled person, (2) control of the primary violator by the defendant, and (3) "that the controlling person was in some meaningful sense a culpable participant" in the primary violation. *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996). "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of the primary violators, whether through the ownership of voting securities, by contract, or otherwise.'" *Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 63 (S.D.N.Y. 2017) (quoting *In re Lehman Bros. Mortg.–Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011)).

As discussed above, Airborne violated Exchange Act Section 10(b) and Rule 10b-5 through making material misrepresentations and omissions and engaging in other deceptive conduct. *See supra* pp. 30-50. Moreover, as noted above, the record evidence shows that Kabilafkas controlled Airborne. *See supra* p. 17. That Kabilafkas was culpable in Airborne's deceptive conduct is evident through the fact that Kabilafkas used Airborne to advance his scheme and Airborne's misstatements and omissions were regarding Kabilafkas' conduct.

Summary judgment is granted on the SEC's Section 20(a) claim against Kabilafkas.

## IV.    Equitable Relief Against the Relief Defendants is Granted

The Court may grant equitable relief against a relief defendant if it is established that the relief defendant possesses property or profits illegally obtained, and the relief defendant has no legitimate claim to them. *See SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998).

Here, the undisputed evidence presented to the Court establishes that the TKRT and MKRT both received ill-gotten funds from the sale of Kabilafkas', his co-Defendants and nominees' sale of Airborne S-1 Shares. *See* EAF/AF ¶ 113-18. As a result, summary judgment is granted against the Relief Defendants.

## CONCLUSION

Plaintiff's motion for summary judgment is GRANTED. Defendants' motion for summary judgment is DENIED.

The Clerk of Court is respectfully directed to remove Dkt. Nos. 184, 186, 188, 194, and 196 from this court's list of open motions and to close the file.

Dated: September 12, 2023

_____
U.S.D.J

BY ECF TO ALL COUNSEL