UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,
                    *Plaintiff*,

-against-

AIRBORNE WIRELESS NETWORK,
KALISTRATOS KABILAFKAS (also
known as Kelly Kabilafkas, also known
as Mark McKinney), TIMOLEON KABILAFKAS
(also known as Tim Kabilafkas), CHRYSILIOS
CHRYSILIOU, PANAGIOTIS BOLOVIS, JACK          1:21-cv-01772 (CM)
EDWARD DANIELS, ERIC SCHEFFEY, AND
MOSHE RABIN,
                    *Defendants*,

-and-

TIMOLEON KABILAFKAS, in his capacity as
trustee of the TIM KABILAFKAS REVOCABLE
TRUST DATED JULY 24, 2001, AND
MAGDALINE KABILAKFAS, in her capacity as
trustee of the MAGDALINE KABILAFKAS 1989
TRUST DATED MAY 27, 1989 (also known as the
Magdaline Kabilafkas Revocable Trust),

                    *Relief Defendants*.


**DEFENDANTS KALISTRATOS KABILAFKAS'S, TIMOLEON KABILAFKAS'S, AND
MAGDALINE KABILAKFAS'S MOTION IN OPPOSITION TO PLAINTIFF
SECURITIES AND EXHANGE COMMISSION'S MOTION FOR FINAL JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................5

    I.    Direct Investors in Airborne Made Money ................................................5

    II.    The SEC's Calculation of Purported Losses Suffered by Traders................6

ARGUMENT ....................................................................................................9

    I.    The SEC Bears the Burden on its Motion..................................................9

    II.    The Request for "Disgorgement" Should Be Rejected as an Improper Penalty, Because It Goes Beyond Compensation ....................................9

        A.  The SEC's Request for "Disgorgement" is a Request for a Windfall .................12

        B.  The SEC's Request for Joint and Several Disgorgement is Impermissible..........16

    III.    The Penalties Sought Exceed Kabilafkas' and Tim's Pecuniary Gain ......................18

    IV.    The Injunctive Relief Sought Is Punitive, Not Equitable ...........................20

        A.  The "Obey the Law" Injunction Sought Here Is Punitive ...................20

        B.  The SEC's Punitive Injunction is Not Appropriate Here......................21

        C.  No Penny Stock Bar against Kabilafkas or Tim is Appropriate ...........................23

    V.    The Court Should Not Award Prejudgment Interest....................................24

CONCLUSION.................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

Cases

*Bravia Cap. Partners, Inc. v. Fike*,
    296 F.R.D. 136 (S.D.N.Y. 2013) ................................................................................. 6

*Ciminelli v. United States*,
    598 U.S. 306 (2023) ................................................................................................. 14

*Creative Glassware Indus. Co. v. Lifestyle Int'l LLC*,
    2022 WL 17261047 (S.D.N.Y. Nov. 29, 2022) ........................................................ 9

*Gabelli v. SEC*,
    568 U.S. 442 (2013) ................................................................................................... 9

*Gruber v. Gilbertson*,
    647 F. Supp.3d 100 (S.D.N.Y. 2022) ..................................................................... 24

*In re 650 Fifth Ave. & Related Properties*,
    830 F.3d 66 (2d Cir. 2016) ..................................................................................... 23

*Jones v. UNUM Life Ins. Co. of Am.*,
    223 F.3d 130 (2d Cir. 2000) ................................................................................... 24

*Kokesh v. SEC*,
    581 U.S. 455 (2017) ............................................................................................... 21

*Liu v. SEC*,
    591 U.S. 71 (2020) ............................................................................................ Passim

*Saad v. SEC*,
    873 F.3d 297 (D.C. Cir. 2017) ......................................................................... 5, 23

*SEC v. Ahmed*,
    72 F.4th 379 (2d Cir. 2023) ............................................................................ 11, 17

*SEC v. Cavanagh*,
    155 F.3d 129 (2d Cir. 1998) ............................................................................ 21, 22

*SEC v. Clark*,
    915 F.2d 439 (9th Cir. 1990) ................................................................................. 17

*SEC v. Commonwealth Chem. Sec., Inc.*,
    574 F.2d 90 (2d Cir. 1978) .............................................................................. 20, 22

*SEC v. Contorinis*,
    743 F.3d 296 (2d Cir. 2014) ................................................................................... 17

*SEC v. CR Intrinsic Invs., LLC*,
    164 F. Supp. 3d 433 (S.D.N.Y. 2016) ................................................................... 10

*SEC v. Findley*,
    2024 WL 707264 (D. Conn. Feb. 21, 2024) .................................................... 21, 22

*SEC v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996) ............................................................................ 16

*SEC v. Gallison*,
   2023 WL 3004882 (S.D.N.Y. Feb. 4, 2023) ..................................................... 23

*SEC v. Gentile*,
   939 F.3d 549 (3d Cir. 2019) .................................................................... 5, 20, 21

*SEC v. Govil*,
   86 F.4th 89 (2d Cir. 2023) .......................................................................... Passim

*SEC v. Graham*,
   823 F.3d 1357 ........................................................................................... 20, 21

*SEC v. Johnson*,
   368 F. Supp. 3d 247 (D. Mass. 2019) ............................................................... 23

*SEC v. Jones*,
   476 F. Supp. 2d 374 (S.D.N.Y. 2007) ............................................................... 22

*SEC v. Patel*,
   61 F.3d 137 (2d Cir. 1995) ............................................................................... 23

*SEC v. Pentagon Cap. Mgmt. PLC*,
   725 F.3d 279 (2d Cir. 2013) ................................................................ 4, 16, 19

*SEC v. Ripple*,
   No. 20 Civ. 10832 (AT) (S.D.N.Y. August 7, 2024) ............................................ 1

*SEC v. Savoy Indus., Inc.*,
   665 F.2d 1310 (D.C. Cir. 1981) ........................................................................ 21

*SEC v. Tourre*,
   4 F. Supp. 3d 579 (S.D.N.Y. 2014) .................................................................. 21

*SEC v. Wellshire Sec., Inc.*,
   773 F. Supp. 569 (S.D.N.Y. 1991) ............................................................. 21, 22

*SEC v. Westport Cap. Markets, LLC*,
   547 F. Supp. 3d 157 (D. Conn. 2021) .............................................................. 22

*SEC v. Whittemore*,
   659 F.3d 1 (D.C. Cir. 2011) ............................................................................. 17

*United States v. Milheiser*,
   98 F.4th 935 (9th Cir. 2024) ............................................................................ 14

*United States v. Telluride Co.*,
   146 F.3d 1241 (10th Cir. 1998) ....................................................................... 21


Statutes

15 U.S.C. § 77t(b) ................................................................................................. 10

15 U.S.C. § 77t(d) ................................................................................................. 20

15 U.S.C. § 77t(d)(2) ................................................................................................ 19

15 U.S.C. § 77t(d)(3) ................................................................................................ 10

15 U.S.C. § 77u(d)(3)(B)(iii) .................................................................................... 17

15 U.S.C. § 78t(a) ............................................................................................... 16, 18

15 U.S.C. § 78u ................................................................................................... 16, 18

15 U.S.C. § 78u-6(a)(2) ............................................................................................ 10

15 U.S.C. § 78u(5) .................................................................................................... 10

15 U.S.C. § 78u(d) .................................................................................................... 20

15 U.S.C. § 78u(d)(3) ............................................................................................. 4, 12

15 U.S.C. § 78u(d)(3)(a)(ii) ................................................................................. 10, 17

15 U.S.C. § 78u(d)(5) ......................................................................................... 12, 16

15 U.S.C. § 78u(d)(7) ......................................................................................... 10, 18

15 U.S.C. § 7246(a) ......................................................................................... 10, 11, 12

15 U.S.C. §§ 77t(d)(2), 78u(d)(3) ................................................................. 10, 16, 18

15 U.S.C. §§ 77t(g), 78u(d)(6) ................................................................................. 23

28 U.S.C. § 2462 ....................................................................................................... 19

Rules

Fed. R. Civ. P. 65(d) ............................................................................................ 20, 21

Defendants Kalistratos Kabilafkas ("Kabilafkas"), Timoleon Kabilafkas ("Tim"), and Magdaline Kabilafkas (Tim and Magdaline together, the "Trusts" or "Trustees") submit this memorandum of law and accompanying Declaration of Matthew A. Ford (the "Ford Decl.") in opposition to Plaintiff Securities and Exchange Commission's ("SEC") Motion for Final Judgment Against All Remaining Defendants and Relief Defendants (the "Motion," Dkt. 262).[1]

## PRELIMINARY STATEMENT

The SEC's request for over $75 million in disgorgement, penalties, and interest from Kabilafkas, who allegedly made just over $2.6 million from *bona fide* exchange executed sales of Airborne Wireless Network ("Airborne"; ticker symbol ABWN) stock must be rejected. The disproportionate award the SEC seeks reflects its ongoing practice of disregarding recent decisions and pronouncements by the legislative and judicial branches to reign in the SEC's unauthorized practice of obtaining huge and improper financial awards, which it funnels directly into the U.S. Treasury or as "whistleblower" awards, by mislabeling it "equitable" relief for investors.[2]

Judge Torres' opinion in *SEC v. Ripple*, No. 20 Civ. 10832 (AT) (S.D.N.Y. August 7, 2024) (attached to the Ford Decl. as Ex. A) issued just a few days ago, in which she denied the SEC's request for disgorgement, reflects a recognition that the SEC may not continue this practice of disregarding the Supreme Court's decisions in *Gabelli*, *Kokesh*, and *Liu*, which prohibit the SEC from unlawfully imposing penalties by referring to them as "disgorgement," an equitable form of relief. Nor may the SEC continue to disregard the Second Circuit's recent

---

[1] All references to "Ex." are references to exhibits to the Ford Decl. The memorandum in support of the Motion (Dkt. 263) shall be referred to as the "SEC Br."

[2] For example, the SEC recently bragged about issuing a $279 million whistleblower award. *See* SEC Press Release, dated May 5, 2023, SEC Issues Largest-Ever Whistleblower Award *available at* https://www.sec.gov/newsroom/press-releases/2023-89 (last visited Aug. 8, 2024).

ruling in *Govil*, which stands for the proposition that if the SEC wants to seek a return of money to an investor it claims lost money *as a result of a securities law violation*, it must show the investor actually lost money in the first place.

But the SEC does exactly that here, asking the Court to disregard binding precedent by incorrectly suggesting that disgorgement is only measured by "the wrongful gain obtained by the defendant," and relying on decades-old cases that espouse principals that did not survive *Liu* and *Govil*. SEC Br. at 8–9. Based on this incorrect principle, the SEC seeks $44 million in disgorgement here: $23 million in funds invested into the company in exchange for stock and $21 million in purported losses suffered by traders who traded ABWN stock on an exchange.

The SEC seeks this $23 million in disgorgement of funds invested in Airborne, although neither the Complaint (Dkt. 1) nor the Court's Order[3] find that Kabilafkas, Tim, or the Trusts ever personally received *any* of these funds. More critically, as explained below, the $23 million was invested into Airborne in exchange for common stock, warrants, and convertibles, which resulted in these investors making *huge* realized gains: over $8.5 million in profits. No congressionally authorized reason exists for the SEC to seek an additional $23 million windfall for these investors.

The SEC also seeks $21 million in purported disgorgement from Kabilafkas related to *bona fide* sales of ABWN stock at *exchange quoted prices* among *anonymous market participants* many of whom actually *made money* through these trades. Yet, millions of dollars' worth of these trades were placed by co-defendants who already settled out of this lawsuit. And the ones Kabilafkas did place netted him only $2.6 million and occurred over a two-year period during which the SEC has failed to identify any misstatement (or omission) that temporarily

---

[3] The Court's Decision and Order Granting Plaintiff's Motion for Summary Judgment and Denying Defendants' Motion for Summary Judgment (Dkt. 238) shall be referred to as the "Order."

"pumped" the stock price or to show that Kabilafkas's practice of selling small quantities of shares over those two years represented a "dump" that decreased ABWN's share price. Accordingly, the SEC's purported basis for seeking this $21 million in trader losses rests on a flawed market analysis: namely, specious "calculations" by SEC deputy director, Chyhe Becker. Becker purports to have relied on Blue Sheet data reflecting buys and sells of ABWN stock to arrive at a calculation of $51 million in net total losses suffered by a subset of retail traders.

In doing so, Becker made several fundamental methodological errors, including (i) improperly extending the relevant end date for this calculation from May 2018 (the last date of the securities law violations alleged in the Complaint and found in the Order) to March 2021 (the date the Complaint was filed), (ii) incorrectly defining "retail" traders as traders with brokerage accounts that contain a social security number while ignoring that individuals may trade through entities, trusts, or omnibus accounts, (iii) inexplicably excluding from her calculations all "retail" traders that made profits, (iv) improperly defining institutional investors as brokerage accounts without social security numbers (thereby inadvertently excluding "retail" traders trading though entities, trusts, or omnibus accounts), (v) *excluding all institutional investor trades* regardless of whether they made or lost money, and (vi) disregarding tens of millions of dollars in profit made by retail traders and institutional investors that offset the bloated $51 million loss calculation. Moreover, her methodology failed to include any particularized or individualized analysis, meaning that, for example, a "retail" day trader who opened and closed her position in ABWN within a span of 5 minutes but who lost a dollar represents a "victim" entitled to "disgorgement." Nor did it consider whether the same individual was trading in multiple accounts (as was the case with Amadeo Leira—whose trades are discussed further below).

Neither the $23 million in investor funds nor the $21 million in "retail" trader losses are subject to disgorgement. Before obtaining disgorgement, equity requires a showing that (1) a victim suffered a specific pecuniary loss, (2) a wrongdoer received a pecuniary gain of the same amount, and (3) both the pecuniary loss and pecuniary gain resulted from the alleged securities law violation. The disgorgement sought here fails to satisfy *any* of these prongs.

The SEC's request for another $45 million in civil money penalties also exceeds its congressional grant: a tier three penalty under 15 U.S.C. § 78u(d)(3) may not exceed the greater of $230,464 or "the gross amount of pecuniary gain to such defendant as a result of the violation." Because trading profits by Kabilafkas and Tim did not result from the alleged securities violations but rather from *bona fide sales* at exchange quoted prices, the maximum penalty imposed on each may not exceed $230,464. To the extent the Court holds otherwise, the penalty may not exceed a penalty of $2,644,325 for Kabilafkas and $5,763,547 for Tim. As the SEC acknowledges, civil money penalties may not be imposed jointly and severally. *SEC v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 288 (2d Cir. 2013); SEC Br. at 23–24.

The SEC's requests for injunctive relief, an "obey the law" injunction and penny stock bar, are also legally deficient. The SEC seeks an "obey the law" injunction for alleged conduct from six years ago without any finding of wrongdoing since that time nor previous instances of wrongdoing. Such a restraint on liberty is not *solely* equitable, because it serves to punish Kabilafkas for alleged prior violations of the law, label him a wrongdoer, remove his rights to defend against a subsequent lawsuit, and deter him and others from similar conduct. It serves neither to restore the *status quo ante* nor compensate a victim. The Court lacks authority to issue this sort of punitive restraint on Kabilafkas under the pretense of being an equitable injunction.

*SEC v. Gentile*, 939 F.3d 549, 554 (3d Cir. 2019); *Saad v. SEC*, 873 F.3d 297, 305 (D.C. Cir. 2017) (Kavanaugh, J., concurring). A lifetime penny-stock bar is likewise unjustified.

## STATEMENT OF FACTS

### I.    Direct Investors in Airborne Made Money

In fiscal years 2017–19, Airborne raised $22,768,734 from investors who in exchange received common stock, warrants, and convertible notes. Dkt. 203 at pp. 94–95. The warrants allowed investors to purchase Airborne stock at a pre-determined exercise price. Ex. B. Similarly, the investors holding convertible notes could exchange the notes for Airborne stock according to a pre-set formula (for example, 70% of the lowest price at which Airborne common stock traded during the 25 days preceding the conversion date). *Id.*

As reflected in the chart below, these investors did not suffer pecuniary harm and in fact made *at least* over $8.5 million dollars through their investments in Airborne:

| Investor | Invested ($) | Stock Sales ($) | Profit ($) |
|---|---|---|---|
| Adar Bays LLC | $1,600,000 | $2,202,338.40 | $602,338.40 |
| Anson Investments Master | $2,000,000 | $2,227,064.43 | $227,064.43 |
| Auctus Fund LLC | $277,500 | $395,280.50 | $117,780.50 |
| Black Mountain Equities | $0 | $115,562.40 | $115,562.40 |
| Concord Holding Group LLC | $962,499 | $1,614,837.90 | $652,338.90 |
| Eagle Equities, LLC | $1,600,000 | $2,364,874.31 | $764,874.31 |
| Einstein Investments LLC | $254,100 | $227,722.21 | ($26,377.79) |
| GS Capital Partners LLC | $444,000 | $676,130.60 | $232,130.60 |
| Lucas Hoppel | $86,250 | $191,873.25 | $105,623.25 |
| Hudson Bay Capital MGMT LP | $2,000,000 | $4,727,103.17 | $2,727,103.17 |
| Ionic Ventures, LLC | $2,000,000 | $2,607,521.44 | $607,521.44 |
| JSJ Investments Inc. | $200,000 | $449,066.69 | $249,066.69 |
| Sabby Management, LLC | $3,510,000 | $5,780,434.95 | $2,270,434.95 |
| Yorkville Advisors LLC[4] | $1,250,000 | Unknown | Unknown |
| **TOTAL:** | $16,184,349 | $23,579,810.25 | $8,645,461.25 |

---

[4] While insufficient data exists to determine whether Yorkville Advisors, LLC made or lost money on this investment, the hedge fund has been sued by the SEC for fraud and, thus, can hardly be said to be a "victim" entitled to disgorgement. *See* https://www.sec.gov/enforcement-litigation/litigation-releases/lr-22510 (last visited Aug. 10, 2024).

Sources: Exs. C–O.[5] And while the SEC did not bother to verify the information, had it made any effort to investigate (or even contact) these investors, it would have found numerous investors willing to admit that they profited from these investments. *See* Ex. P ("Hudson Bay has earned a profit on its" investment in Airborne). Indeed, the only investor (for whom evidence exists) that *may* have lost money is Einstein Investments LLC ("Einstein"), who *may* have lost approximately only $26,377. In any event, the SEC makes no allegation, and the Court has made no finding that Kabilafkas, Tim, or the Trusts received any of these funds. Order at 26 (finding that Airborne spent raised funds on advertising and research and development).

## II.    The SEC's Calculation of Purported Losses Suffered by Traders

In addition to seeking $23 million in "disgorgement" for the supposed benefit of investors who already made millions of dollars investing in Airborne, the SEC seeks an additional $21 million in "disgorgement" for the benefit of speculative traders, many of whom made money or suffered only nominal losses as a result of day trading ABWN stock. To support its attempt to obtain "disgorgement" on behalf of these speculators, the SEC cites to a declaration by SEC deputy director Chyhe Becker (the "Becker Declaration" or "Becker Decl." filed under Dkt. 263-5), and stock speculator Amadeo Leira (who repeatedly contradicted the SEC's theory of the case during his deposition).

---

[5] The $6,584,385 difference between the $22,768,734 the SEC seeks and the $16,184,349 shown in this chart reflects an approximation by the SEC of money purportedly invested through subscription agreements in which each such investor received common stock substantially below par value, as well as warrants to buy additional stock below par value. The common stock included a restrictive legend, which could be removed, permitting the investor to sell the steeply discounted stock at market prices, meaning that each subscriber *indisputably* had an unrealized gain. The SEC has failed to address this issue and insufficient evidence exists in the record to determine whether these unrealized gains became realized and how much profit each investor made. That is, the SEC has failed to meet its burden of showing these investors suffered pecuniary harm and has waived any argument to the contrary by not demonstrating such harm in its opening brief. *Bravia Cap. Partners, Inc. v. Fike*, 296 F.R.D. 136, 144 (S.D.N.Y. 2013).

The Becker Declaration purports to calculate the losses sustained by retail traders in Airborne using "Blue Sheets," which are trade records broker-dealers submit to the SEC at the SEC's request. Becker Decl. ¶ 5. Using these Blue Sheets, Becker removed all institutional traders and all retail traders who made money from the Blue Sheets. *Id.* ¶¶ 4, 7 n.3. Becker then identified 17,446 retail traders who purportedly lost money trading ABWN between 2016 and 2021. She calculated that this subset of retail traders had net losses of $51,019,684 on trades placed from July 8, 2016, to March 1, 2021, although Becker appears to concede (as she must) that no methodology exists to determine the counter parties on these trades given the high volume of ABWN trading during the relevant timeframe. *Id.* ¶ 4. Becker also excluded from her calculations certain defendants in this case and individuals the SEC deemed to be nominees of Kabilafkas. *Id.* ¶ 7 n.3.

Becker, however, did not use the Relevant Period in calculating trader losses. Instead, she used the period of July 8, 2016, to March 1, 2021, for her loss calculations, merely because the former date is when she first had trading data, and the latter date is when the SEC filed the complaint in this action. Becker Decl. ¶ 4.

Further, Becker limited her calculations exclusively to "retail" traders whose trades appeared in Blue Sheets, a total of only about 28% of all investors. *Id.* ¶ 6.[6] In fact, rather than reviewing the entirety of investor trades, Becker ignored large subsets of Airborne traders, including (i) retail traders trading through entities, trusts, or other investment vehicles, (ii) institutional investors, (iii) funds, (iv) investors outside the U.S., and (v) retail traders whose

---

[6] Quotes appear around the term "retail investors" in Becker's own declaration, suggesting the ambiguity of the term as used here. Becker's only methodology for determining whether there was a "retail investor" was determining whether the tax code indicator was equal to 1, which suggests that the Tax Identification Number is a Social Security Number. This flawed methodology also fails to consider that retail traders, that is individuals, may trade through entities, trusts, other investment vehicles, or have trades executed through omnibus accounts.

trades were executed through omnibus accounts. *Id.* ¶ 2 n.1. As a practical matter, this means Becker's calculations excluded the *tens of millions of dollars in profits* made by traders (aside from profits of the defendants in this action and their purported nominees). Accordingly, during her deposition, even Becker recognized that, overall, it is "possible that certain other investors made -- profited to an extent that exceeds the losses by the retail investors." Ex. R (68:4-7). Further, Becker acknowledged that a decrease in Airborne share price was not exclusively an indication of investor loss: in short selling, traders *profit from the decrease in the stock's price.* *Id.* (57:7-59:1). In conducting her analysis, Becker failed to perceive the significance of short selling and covering of shorts through buys.

In addition to Becker, the SEC cites to a declaration of speculative trader Amadeo Leira to support the "disgorgement" it seeks. Leira is a risk-seeking investor with a self-described "dangerous" strategy of "invest[ing] in one stock that's a substantial portion of my assets, versus diversifying, as you're supposed to do, so sometimes it works, sometimes it doesn't work." Ex. S (18:18-19:18) His investment strategy tolerates significant losses, and Leira is comfortable with this strategy for himself and his mother, for whom he makes "crazy" and "pretty risky" investment decisions, since highly risky trades may also result in abnormally large, realized gains. *Id.* (28:13-30:4) During his deposition, Leira displayed no interest in the management of Airborne or other companies he invested in, *id.* (58:9-20)[7], and emphasized that he does "absolutely not … rely on SEC filings when making investment decisions," *id.* (22:11-23:2) ("[I]t never came to mind to go to an SEC source to find some kind of opportunity or whatever, so I can't even imagine how—to even go about that.").

---

[7] *See also id.* (68:2-69:1; 76:20-77:22; 97:22-24; 148:22-149:18;).

## ARGUMENT

As explained in more detail below, each of the SEC's requests for remedies is legally and factually meritless and should be denied outright. The SEC is not entitled to disgorgement. And were the Court to award any penalties, the penalties should not exceed $230,464 for either Kabilafkas and Tim, or in the alternative $2,644,325 for Kabilafkas and $5,763,547 for Tim. Further, no "obey the law" injunction or penny stock bar is appropriate. Nor is it appropriate to impose any remedies against the Trusts.

## I.    The SEC Bears the Burden on its Motion

There is no "motion for final judgment" when issues of fact remain unresolved (as is the case here). There is, however, a motion for *summary* judgment, and the SEC may bifurcate a motion for summary judgment into two pieces—one for liability and one for damages—but that choice does not lessen the standard. The Court should clarify that the Rule 56 standard applies here and that the SEC retains the same burden, which the SEC cannot satisfy here.[8]

## II.    The Request for "Disgorgement" Should Be Rejected as an Improper Penalty, Because It Goes Beyond Compensation

"In civil actions, the SEC can seek civil penalties and equitable relief." *Liu v. SEC*, 591 U.S. 71, 75 (2020) (internal quotation marks omitted). On one hand, "penalties, which go beyond compensation, are intended to punish, and label defendants wrongdoers." *Gabelli v. SEC*, 568 U.S. 442, 451–52 (2013). On the other hand, equitable relief involves "strip[ping] wrongdoers of their ill-gotten gains," but "to avoid transforming an equitable remedy into a punitive sanction, courts restrict[] the remedy to an individual wrongdoer's net profits to be

---

[8] At a minimum, all defendants should have at least as many protections here as they would have had they defaulted, since even on default judgment the burden of establishing damages still rests with the plaintiff. *Creative Glassware Indus. Co. v. Lifestyle Int'l LLC*, 2022 WL 17261047, at *2 (S.D.N.Y. Nov. 29, 2022).

awarded *for victims*." *Liu*, 591 U.S. at 79 (emphasis added).[9] *See also id.* at 76-77 ("[E]quity never 'lends its aid to enforce a forfeiture or penalty.'").

One of the differences between a penalty and equitable relief is in the relationship between the wrong and the remedy. Penalties are tied to gains from a securities violation, specifically the greater of a statutory penalty or "the gross amount of pecuniary gain to such defendant as a result of the violation." *See* 15 U.S.C. §§ 77t(d)(2), 78u(d)(3). That is, Congress has authorized the SEC to seek and the Court to award penalties by reference to the financial gain to the wrongdoer, but penalties do not need to be tied to investor losses or even necessarily paid to victims. Instead, penalties may be sent to: (a) the U.S. Treasury, 15 U.S.C. § 77t(d)(3); (b) whistleblowers, 15 U.S.C. § 78u-6(a)(2); or (c) to a "fair fund" under 15 U.S.C. § 7246(a), which provides that when " the Commission obtains a civil penalty … the amount of such civil penalty shall … be added to and become part of a disgorgement fund" or other fund for victims. Distributions from a fair fund are upheld as long as they "fairly and reasonably distribute[s] the limited Fair Fund proceeds …." *SEC v. CR Intrinsic Invs., LLC*, 164 F. Supp. 3d 433, 435 (S.D.N.Y. 2016) (internal quotation marks omitted).

Equitable relief sought by the SEC, however, must comport with traditional notions of equity, which require a more precise connection between the securities law violation and the equitable relief sought. *See SEC v. Govil*, 86 F.4th 89, 103 (2d Cir. 2023). In addition to the separate power to seek injunctive relief, Congress authorized the SEC to seek "equitable relief," but only if such relief is "appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(5). Congress subsequently authorized the SEC to seek disgorgement under Sections 78u(d)(3)(a)(ii) and 78u(d)(7), but rather than expanding the SEC's remedial power, this

---

[9] Separately, Congress has also provided the SEC with the power to seek injunctive relief, 15 U.S.C. § 77t(b), which is also equitable in nature. Injunctive relief is addressed in section IV, *infra*.

language is "a 'belt and suspenders' clarification that *equitable disgorgement* is available" within the bounds of "traditional equitable limitations as recognized in *Liu*." *SEC v. Ahmed*, 72 F.4th 379, 396 (2d Cir. 2023) (emphasis added). Thus, Congress has restricted the SEC's ability to seek and the Court's power to award disgorgement unless it is "solely" equitable. The Court may not award disgorgement that "goes beyond" compensation, such as for the purpose of paying whistleblowers (including their attorneys), granting a windfall to an investor by awarding her disgorgement in an amount exceeding the amount she lost as a result of the violation, depositing money in the U.S. Treasury, or depositing money in its "fair fund." *Liu*, 591 U.S. at 80; *Govil*, 86 F.4th at 103; *SEC v. Ahmed*, 72 F.4th at 395. The SEC must identify the amount an investor lost as a result of the violation before a Court may disgorge money to that investor. If the SEC cannot, it may only seek a penalty, which may go into the SEC's fair fund for distribution as the SEC sees fit without equitable constraints. 15 U.S.C. § 7246(a).

In *Liu*, the Supreme Court delineated these boundaries between equitable relief and "a penalty outside … equitable powers," altering nearly 50 years of jurisprudence. *Liu*, 591 U.S. at 82. When used to deprive a wrongdoer of net profits from unlawful activity, equitable relief – whether called restitution, accounting, or disgorgement – is bounded by the "equitable principle that the wrongdoer should not be punished by paying more than a fair compensation to the person wronged." *Id.* at 80 (internal quotation marks and alterations omitted omitted). That is, equity requires: (1) any disgorgement amount may not exceed the pecuniary gain obtained by the wrongdoer; (2) any disgorgement amount awarded to a victim may not exceed the pecuniary harm suffered by that victim; and (3) both the pecuniary gain obtained by the wrongdoer and the pecuniary loss suffered by the victim must have resulted from the securities law violation. *See Liu*, 591 U.S. at 80; *Govil*, 86 F.4th at 103.

In one fell swoop, the SEC's request for disgorgement here violates all three of these limits on equitable relief delineated in *Liu* and its progeny. As Judge Torres did just a few days ago in *SEC v. Ripple*, Ex. A, the Court here must reject the SEC's reliance on stale caselaw defining disgorgement solely in reference to "the wrongful gain obtained by the defendant," which actually defines the standard for awarding a penalty under § 78u(d)(3). SEC Br. at 9.

**A. The SEC's Request for "Disgorgement" is a Request for a Windfall**

Following *Liu*, the Second Circuit found the connection between the wrong and the disgorgement amount sought critical to fulfilling the mandate that equitable relief must be "appropriate or necessary for the benefit of investors." *Govil*, 86 F.4th at 105-06 (quoting 15 U.S.C. § 78u(d)(5)).[10] To constitute a legitimate form of equitable relief, a court must make a predicate finding of pecuniary harm to ensure that any equitable relief is in fact "awarded for victims" since "an equitable remedy is about '*return[ing]* the funds to victims'" and "[f]unds cannot be returned if there was no deprivation in the first place." *Govil*, 86 F.4th at 102, 103 (*quoting Liu*, 86 F.4th at 75). *Were a victim who did not suffer pecuniary harm to be awarded any disgorged funds or were a victim who suffered pecuniary harm to be awarded disgorged funds exceeding his loss*, the court "would be conferring a windfall" outside of its equitable powers, restricted to "restor[ing] the status quo." *Govil*, 86 F.4th at 103; *Liu*, 591 U.S. at 80.

The Second Circuit also expressly framed disgorgement as comparable to a constructive trust—and a similar remedy, an accounting—where the wrongdoer acted as a trustee for a victim.

---

[10] Notwithstanding *Govil's dicta* concerning "reasonable approximation," it has become apparent that a "reasonable approximation" test for disgorgement cannot stand because it exceeds equity, since it contemplates disgorgement awards that go beyond compensation. Most cases permit the SEC to readily identify the exact amount of pecuniary harm suffered by an investor. In situations that are not amenable to this determination, such as insider trading cases or the instant case, the SEC has been authorized to seek civil money penalties to claw back any pecuniary gain by the wrongdoer, which then may be placed into the SEC's fair fund for distribution to victims without equity's limitations. 15 U.S.C. § 7246(a).

*Id.* at 103. In other words, equitable disgorgement requires a sufficient connection between the wrong and the relief: the wrongdoer surrenders ill-gotten gains obtained from the victim and the victim gets them back. Obtaining excessive funds and diverting them to third parties—even the Treasury—is a "windfall" that constitutes a penalty, not equitable relief. *Govil*, 86 F.4th at 103.

No disgorgement is appropriate here. As noted above, the SEC requests over $44 million in disgorgement. Of that $44 million, it seeks $23 million in disgorgement of funds to investors that collectively made more than $8.5 million investing in Airborne, and only one of whom *may* have lost money (a little over $26,000). The SEC also seeks an additional $21 million for the benefit of certain "retail" traders who purportedly lost money speculating on ABWN stock between July 8, 2016, and March 1, 2021. The Court, however, only found violations during the Relevant Period (August 2015 until May 2018), so Becker's calculations of losses of certain "retail" traders during an enlarged time are unreliable. Becker limited her calculations to retail traders whose trades appeared in Blue Sheets **and** who lost money, a total of only about 28% of all traders, while excluding retail traders who made money, individuals who traded through an entity, trust, other investment vehicle, institutional investors, funds, investors outside the US, and retail traders whose trades were executed in omnibus accounts. Becker Decl. ¶¶ 4, 7 n.3. Becker recognized that it is "possible that certain other investors made -- profited to an extent that exceeds the losses by the retail investors." Ex. S (68:4-7). This is more than a mere possibility; it is reality. As noted above, investors made tens of millions of dollars trading ABWN during the Relevant Period, including retail traders.

At best, the SEC simply has no idea whether the securities violations overall led to more losses or gains for traders; nor whether specific retail traders lost money on speculative day trading or as a result of the securities law violations found in the Order. And that is a problem of

the SEC's own making, as it chose the gerrymandered methodology Becker used (which was seemingly designed to inflate the number of trader losses).

This is not the first time the SEC has ignored the Second Circuit's guidance in *Govil* and improperly sought disgorgement without a predicate showing of pecuniary harm. In *SEC v. Ripple Labs, Inc.*, the Court rejected the SEC's request for disgorgement when the defendant sold securities to select buyers at undisclosed discounts, which purportedly caused pecuniary harm by depriving the non-favored buyers of the discount and also putting downward pressure on the securities. Ex. A at 10. The Court found this theory of harm to be reducible to the discredited notion that "the right to make an informed decision when considering whether to make [an] investment" is a property interest subject to disgorgement. *Id. See also Ciminelli v. United States*, 598 U.S. 306, 315 (2023). Similarly, here, the investors' mere knowledge of the undisclosed relationship between Kabilafkas and Airborne is not a form of pecuniary harm. And the Airborne investors made millions while the ABWN traders got the benefit of the bargain. *See United States v. Milheiser*, 98 F.4th 935, 944 (9th Cir. 2024); Ex. A at 9.

As critically, Kabilafkas, Tim, and the Trusts have not been found to have obtained a gross pecuniary gain of $44 million, a required element of disgorgement. The SEC has acknowledged, and the Court has found, that Airborne used the $23 million in investor funds for promotional activity and research and development, and there has been no allegation or finding of misappropriation. As to the $21 million, this comprises trading gains of all defendants, including those who entered into settlement agreements with the SEC and nominees for which no commingling has been alleged.

Finally, post-Order discovery shows that the SEC cannot establish the required link between the wrong and the remedy. Amadeo Leira, whom the SEC uses as its sole example of a

retail trader who lost money trading ABWN, in fact confirmed that he was not aware of the identity of the leadership of Airborne or any number of other companies he invested in, was not familiar with Kabilafkas or J. Edward Daniels, and never checked SEC filings—let alone its information about management—when making investment decisions. Ex. S (22:11-23:2).[11] Leira also repeatedly confirmed that he was aware that investing in Airborne was risky. *Id.* (33:6-11; 87:12-20; 146: 20-147:3).

ABWN Blue Sheets also undermine the government's allegations: the stock price fluctuated without any extreme changes over nearly two years, providing the opportunity for nearly any market participant to make money: buyers, sellers, and short sellers, which they did—tens of millions, in fact. Some traders chose not to cash in on unrealized gains because they hoped to *make more money*, but any subsequent losses resulted from the desire to *make even more money*, not from any securities law violation. Indeed, for the Airborne traders who lost money, even slightly different timing would have yielded vastly different results. For example, one investor (another claimed "victim" by the SEC) purchased 10,000 shares of Airborne on December 27, 2016, at $1.36. Ex. T. He sold those shares two days later, on December 29, 2016, at $1.31, thus taking a loss of $0.05 per share. *Id.* But by late January 2017, approximately one month later, the share price had risen above $1.36. Ex. U. Had the investor held the shares for one month, rather than two days, he would have made a profit. Such a trader is not a victim and stands in contrast to Kabilafkas, who placed many smalls trades over two years, none of which constitutes a "dump" of shares that caused the stock price to drop. Ex. Q. For these same reasons, the requests for disgorgement from Tim and the Trusts should be denied.

---

[11] *See also id.* (58:9-20; 68:2-69:1; 76:20-77:22; 97:22-24; 148:22-149:18).

The SEC's request for disgorgement is fundamentally flawed: this is not the kind of securities law violation subject to disgorgement. Equity requires a tight connection between the wrong and disgorgement so that it does not go "beyond compensation." The SEC's request for compensation untethered to loss suffered as a result of the securities law violation "test[s] the bounds of equity." *Liu*, 591 U.S. at 85. Because it is an improper request for disgorgement disguised as a penalty, the SEC's request for disgorgement should be denied.

### B.  The SEC's Request for Joint and Several Disgorgement is Impermissible

Courts at times stretched disgorgement beyond its equitable limits by imposing this remedy on a joint a several basis. *See, e.g., SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996). The problem was that previously, "[u]nlike the civil penalty, there [was] no statutory requirement that a disgorgement award be measured as to each individual defendant." *SEC v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 288 (2d Cir. 2013). Specifically, the authorization for penalties "requires that such awards be based on the 'gross amount of pecuniary gain *to such defendant*.'" *Id.* (quoting 15 U.S.C. § 77t(d)(2) (emphasis added)). By contrast, 15 U.S.C. § 78u previously lacked comparable language, so courts imposed joint and several disgorgement under 15 U.S.C. § 78t(a), which allows control persons to be "liable jointly and severally with … such controlled person." *First Jersey Sec., Inc.*, 101 F.3d at 1475.

Both the Supreme Court and Congress intervened to bring equitable disgorgement in line with equitable limits. In *Liu*, the Supreme Court interpreted 15 U.S.C. § 78u(d)(5)'s provision of authority to provide "equitable relief" as including disgorgement, but explained that equity courts exercised equitable "profits-based remedies against individuals or partners engaged in concerted wrongdoing, [but] not against multiple wrongdoers under a joint-and-several liability

theory." 591 U.S. at 83.[12] "The rule against joint-and-several liability for profits that have accrued to another appears throughout equity cases awarding profits." *Id.* (collecting cases). The Supreme Court admonished courts for "imposing joint-and-several disgorgement liability" even though "[t]he SEC's disgorgement remedy in such incarnations is in considerable tension with equity practices" and "could transform any equitable profits-focused remedy into a penalty." *Id.* at 85, 90.[13]

Congress then codified *Liu*'s central holding—that disgorgement must be equitable—a year later by amending 15 U.S.C. § 78u(d)(3)(a)(ii) to allow disgorgement "of *any unjust enrichment by the person who received such unjust enrichment* as a result of such violation.*"* 15 U.S.C. § 78u(d)(3)(a)(ii) (emphasis added); *SEC v. Ahmed*, 72 F.4th 379, 392 (2d Cir. 2023) (discussing the amendment and explaining that "[t]he express addition of 'disgorgement' ... is … a 'belt and suspenders' clarification that equitable disgorgement is available"). The terminology here parallels that of the penalty statute by permitting remedies on an individual-by-individual basis. *Compare* 15 U.S.C. § 78u(d)(3)(A)(ii) (permitting disgorgement "by the person who received such unjust enrichment") *with* 15 U.S.C. § 77u(d)(3)(B)(iii) (permitting penalties

---

[12] Justice Thomas further explained that the majority's reference to "partners" here is a reference to a legal partnership, not just anyone engaged in concerted wrongdoing. *Liu*, 591 U.S. at 101 (Thomas, J., dissenting). As Justice Thomas explained, the Supreme Court "has rejected joint and several liability in actions for an accounting," which is another profit-based equitable remedy that the Supreme Court explicitly analogized to disgorgement. *Id.*

[13] In so holding, the Supreme Court disavowed a trio of cases that condoned disgorgement on a collective basis when a defendant was forced to disgorge profits "that he channeled to friends, family, or clients," *SEC v. Contorinis*, 743 F.3d 296, 302 (2d Cir. 2014), when a tipper was forced to disgorge his tippee's profits, *SEC v. Clark*, 915 F.2d 439, 454 (9th Cir. 1990), and when a close relationship between the defendants and collaboration in executing the wrongdoing was found sufficient to impose joint and several disgorgement, *SEC v. Whittemore*, 659 F.3d 1, 10 (D.C. Cir. 2011). *Liu*, 591 U.S. at 90 (finding this trio "at odds with the common-law rule requiring individual liability for wrongful profits").

measured by gain "to such defendant").[14] This 2021 amendment thus abrogates prior cases including those relied on by the SEC, which apply disgorgement on a joint and several basis.[15]

Here, the SEC disregards the clear mandate from the Supreme Court and Congress by seeking to disgorge over *$44 million* from Kabilafkas, who made only $2.6 million trading ABWN. SEC Br. at 2; Anderson Decl. 263-1, ¶ 5(a). The vast majority of the SEC's exorbitant demand results from its attempt to hold Kabilafkas jointly and severally liable with Airborne, which fails as a matter of law in light of *Liu* and the 2021 amendments to § 78u limiting disgorgement to "the person," not multiple persons. *Id.*[16] The SEC's attempt to impose joint and several liability on Tim and the Trusts fails for similar reasons, as these are all separate persons.

### III.    The Penalties Sought Exceed Kabilafkas' and Tim's Pecuniary Gain

Congress has authorized the SEC to seek three tiers of penalties for securities law violations. 15 U.S.C. §§ 77t(d)(2), 78u(d)(3). But the penalty for any tier is either a specified statutory amount (up to $100,000 for a natural person under tier three, subject to adjustment for inflation) or "the gross amount of pecuniary gain to *such defendant* as a result of the violation." 15 U.S.C. §§ 77t(d)(2), 78u(d)(3) (emphasis added). Here, the SEC seeks a tier three penalty

---

[14] This reference to "person" contrasts with the use of the terms "natural persons" as contrasted with "any other person" under the statutory authorization of penalties. 15 U.S.C. §§ 77t(d)(2), 78u(d)(3). That is because any legal person—natural person or otherwise—is subject to disgorgement, qualified by the equitable constrains delineated in *Liu* that disgorgement apply to "individuals or partners engaged in concerted wrongdoing, [but] not against multiple wrongdoers under a joint-and-several liability theory." 591 U.S. at 83.

[15] If on reply, the SEC were to claim that 15 U.S.C. § 78t(a)'s general authorization of joint and several liability is sufficient to authorize joint and several disgorgement, this argument should be rejected as proving too such since it would also mean joint and several penalties would be permissible (and they are not, as the SEC concedes on SEC Br. at 23–24).

[16] The SEC's attempt to blur the boundaries between a company and an individual—even one found to be its "control person" for purposes of the Exchange Act—also disregards the corporate form, particularly because at no point does the SEC claim, and the Court has not found, that Kabilafkas accessed any of Airborne's money, that he comingled his assets with those of Airborne, or that Airborne failed to observe corporate formalities such that the SEC can "pierce the veil" against Airborne and hold it to be one "person" with Kabilafkas under 15 U.S.C. § 78u(d)(7).

against Kabilafkas and Tim. And while they dispute the findings in the Order, they do not dispute that the SEC may obtain a statutory tier three penalty of $230,464 against each.

The SEC, nonetheless, seeks $21,239,053 against Kabilafkas, an amount which far exceeds his pecuniary gain.[17] As the SEC's own accountant found, Kabilafkas made only $2,664,365 in trading profit. Anderson Decl. ¶ 5(a). That amount—or the statutory amount—is the maximum permissible penalty because that is Kabilafkas' gross pecuniary gain. The SEC only arrives at this far higher figure by aggregating almost $20 million in proceeds from *other individuals*, *id.* ¶¶ 5, 6, even though there is *no evidence* that Kabilafkas ever comingled his assets with these separate accounts. And penalties only apply to gains on a defendant-by-defendant basis—joint and several liability is unavailable. U.S.C. §§ 77t(d)(2) (permitting penalties equal to "pecuniary gain to *such defendant*") (emphasis added), 78u(d)(3) (same); *Pentagon Cap. Mgmt. PLC*, 725 F.3d at 288.[18]

With respect to Tim, the SEC seeks duplicative penalties for the same conduct by seeking two penalties because the SEC claims Tim violated two statutes, the Exchange Act and the Securities Act. SEC Br. at 23. But as the SEC is well-aware, as applied here, the Court found that the same conduct violated both statutes in effectively identical manners. Therefore, imposing two

---

[17] This amount is also inconsistent with the Order, where the Court found that, "Kabilafkas carried out or directed *nearly* $18 million in sales of Airborne S-1 Shares . . . ." Order at 28. (emphasis added). Further, the SEC is impermissibly including money in an account beginning in October 2015, Anderson Decl. ¶ 5(e), notwithstanding that the SEC commenced this action on March 2, 2021. Dkt. 1; 28 U.S.C. § 2462; *SEC v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 287 (2d Cir. 2013) ("any profit earned through [a securities law violation] earlier than five years before the SEC instituted its suit against the defendants may not be included as part of the civil penalty."). Separately, the SEC recognizes that Kabilafkas and Tim paid millions of dollars in taxes from ABWN trading proceeds, which should be deducted from the penalty amount. Dkt. 1 ¶ 9.

[18] The SEC's aggregation of various individuals' separate accounts into its calculation of a penalty for Kabilafkas is even harsher than joint and several liability, which would at least permit Kabilafkas to offset the payment by the amounts others have paid or will pay to the SEC.

penalties is inappropriate. The SEC may obtain only a single penalty in the amount of $230,464

against Tim, but in no event more than $5,763,547, his alleged gross pecuniary gain.

IV. **The Injunctive Relief Sought Is Punitive, Not Equitable**

A. **The "Obey the Law" Injunction Sought Here Is Punitive**

Courts may issue injunctive relief, but only if an injunctive order "state[s] its terms

specifically" and "describe[s] in reasonable detail—and not by referring to the complaint or other

document—the act or acts restrained or required." Fed. R. Civ. P. 65(d). These requirements that

injunctive relief be specific are critical because "the collateral consequences of an injunction can

be very grave." *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978) (internal

quotation marks omitted).

Although 15 U.S.C. § 78u(d) and 15 U.S.C. § 77t(d) authorize the SEC to seek injunctive

relief against securities law violations, in practice its requests for injunctive relief often "simply

reference or restate the text of statutory prohibitions," which "are called 'obey-the-law'

injunctions." *SEC v. Gentile*, 939 F.3d 549, 554 (3d Cir. 2019). Such injunctions amplify the

consequences for securities violations by permitting the SEC to litigate potential violations "by

contempt rather than by the statutory route." *Id.* at 564 (3d Cir. 2019) (internal quotation mark

omitted). While disagreements exist as to whether such injunctions are permissible, some courts

have held that "in the context of SEC enforcement actions and otherwise, 'obey-the-law'

injunctions are unenforceable." *SEC v. Graham*, 823 F.3d 1357, 1362 n. 2 (11th Cir. 2016)

(collecting cases). These injunctions "lack specificity and deprive defendants of the procedural

protections that would ordinarily accompany a future charge of a violation of the securities

laws," thereby violating Rule 65(d). *Id.* (internal quotation marks omitted).[19] They are punishment for past wrongdoing not intended to restore the *status quo ante*. *See Govil*, 86 F.4th at 103.

Here, the SEC has provided no detail as to the injunctive relief sought other than that it "enjoin Defendants from violating … the securities laws." SEC Br. at 4. The Defendants already are not allowed to do that. This is a quintessential "obey-the-law" injunction in violation of the specificity requirements of Rule 56(d) and it serves as punishment, not to restore the *status quo ante*. *Compare Kokesh v. SEC*, 581 U.S. 455, 464 (2017) ("Sanctions imposed for the purpose of deterring infractions of public laws are inherently punitive") *with United States v. Telluride Co.*, 146 F.3d 1241, 1248 (10th Cir. 1998) (injunction restoring wetlands is not a penalty since it "relates to actual harm caused by the defendants' prior actions").

## B. The SEC's Punitive Injunction is Not Appropriate Here

To the extent punitive injunctions are ever appropriate (including the "obey the law" injunction sought here), they are only appropriate when the SEC passes a high bar: "[i]n order for a permanent injunction to be awarded, '(t)he SEC must demonstrate that there is a substantial likelihood of future violation' of the securities laws." *SEC v. Findley*, 2024 WL 707264, at *7 (D. Conn. Feb. 21, 2024) (*quoting SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998)).[20] When

---

[19] *See also Gentile*, 939 F.3d at 564 ("obey-the-law injunctions pose a risk of overbreadth, lack of fair notice, unmanageability, and noncompliance with Federal Rule of Civil Procedure 65(d)"); *SEC v. Savoy Indus., Inc.*, 665 F.2d 1310, 1318–19 (D.C. Cir. 1981) (striking down broad "obey-the-law" language in an injunction in an SEC action that "could embrace nearly any sort of violation of the securities laws" and "subject to the federal civil contempt power future acts by [an individual] that may be completely unrelated to his lawbreaking in the past"); *SEC v. Tourre*, 4 F. Supp. 3d 579, 598 (S.D.N.Y. 2014) ("[T]he Court is skeptical of the utility of this kind of 'obey-the-law' injunction—after all, everyone is required to obey the law, the law comes with its own penalties, and merely reciting statutory provisions gives an individual little guidance on how to conform his conduct to the terms of the injunction.") (internal quotation marks omitted).

[20] *See e.g.*, *SEC v. Wellshire Sec., Inc.*, 773 F. Supp. 569, 576 (S.D.N.Y. 1991) ("The burden rests with the SEC to establish the likelihood of future violations [when moving for permanent injunctive relief].").

assessing the propriety of such a permanent injunction, courts consider the "*Cavanagh* factors,"[21] in addition to "traditional equitable concerns" including "the adverse effect of an injunction upon defendants … ." *Findley*, 2024 WL 707264, at *7.

The permanent "obey the law" injunctions the SEC seeks against Kabilafkas and Tim are punitive, not equitable. Airborne no longer is in operation and cannot be used as a vehicle for securities law violations. Thus, the injunction sought cannot be forward-looking: it serves to punish for an alleged securities violation that occurred between six and eight years ago. Tellingly, the two and a half pages of the SEC's brief devoted to supporting injunctive relief is focused almost exclusively on Kabilafkas's and Tim's *past* conduct. SEC Br. at 4-6. But the SEC must "go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence." *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 100 (2d Cir. 1978); *SEC v. Jones*, 476 F. Supp. 2d 374, 383 (S.D.N.Y. 2007) (same); *SEC v. Wellshire Sec., Inc.*, 773 F. Supp. 569, 576 (S.D.N.Y. 1991) (rejecting the "SEC['s] claims that the existence of past violations provides an inference that there will be future violations"). As the SEC neglects to acknowledge, a full *six years* have passed since the end of this alleged securities law violation, and at no point has the SEC claimed that any defendant has committed any further wrongdoing. *C.f. SEC v. Westport Cap. Markets, LLC*, 547 F. Supp. 3d 157 (D. Conn. 2021) (holding that several factors weigh against the imposition of a permanent injunction, including because the SEC did not show any evidence of violations since 2017). And of course, both Kabilafkas and Tim are first time offenders.

---

[21] These factors are: "[1] the fact that the defendant has been found liable for illegal conduct; [2] the degree of scienter involved; [3] whether the infraction is an "isolated occurrence;" [4] whether defendant continues to maintain that his past conduct was blameless; [5] and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated." *Cavanagh*, 155 F.3d at 135.

The SEC's claim that "Defendants have accepted no blame and shown no remorse," SEC Br. at 5, is a strawman of the Opposition to Summary Judgment (Dkt. 189). At no point have they claimed that they had "no obligation to tell investors the truth in Airborne's public filings." SEC Br. at 5.[22] Further, the SEC's contention that Kabilafkas has not accepted blame offends the Fifth Amendment right to remain silent and thus should bear no weight. *See* Order at 6; *In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66, 93 n.25 (2d Cir. 2016). He asserted his Fifth Amendment rights and said *nothing*.

Finally, even if injunctive relief were appropriate, it should be for a limited period of time, no more than 2 years, not a permanent bar. *See, e.g., SEC v. Patel*, 61 F.3d 137, 142 (2d Cir. 1995) (reversing lifetime bar; holding that "before imposing a permanent bar, the court should consider whether a conditional bar … and/or a bar limited in time … might be sufficient, especially where there is no prior history of unfitness"); *SEC v. Gallison*, 2023 WL 3004882, at *4 (S.D.N.Y. Feb. 4, 2023) (rejecting SEC request for permanent bar and instead imposing five-year bar given the defendant's "lack of repeat-offender status" and collecting cases with time-limited bars); *SEC v. Johnson*, 368 F. Supp. 3d 247, 253 (D. Mass. 2019) (imposing two-year bar for first-time offender who mislead investors about drug).

## C.  No Penny Stock Bar against Kabilafkas or Tim is Appropriate

The SEC may request that a Court issue a "penny stock" bar that precludes an individual from "participating in a penny stock offering." 15 U.S.C. §§ 77t(g), 78u(d)(6). But an "expulsion or suspension of a securities broker is a penalty, not a remedy," as it is the 'equivalent of capital punishment'" to bar an individual from an entire industry. *See Saad v. SEC*, 873 F.3d 297, 305

---

[22] Instead, the argument was that the SEC was improperly attempting to use Section 10b-5 claims to impose an obligation to disclose beneficial ownership that Congress confined to securities registered under Section 12 of the Exchange Act, which ABWN was not. Dkt. 189 at pp. 26–30.

(D.C. Cir. 2017) (Kavanaugh, J., concurring). A penny stock bar is even broader than an expulsion or suspension of a securities broker since it spans across industries, and the broad statutory language would substantially hinder any future attempt to gain employment. Such a bar is only permissible if the SEC can show that future misconduct is likely to occur, and it cannot do so here. The considerations here largely parallel those for the "obey the law" injunction and apply here with full force, particularly Kabilafkas and Tim are first time offenders and more than *six years* have passed without them committing any violation.

## V.    The Court Should Not Award Prejudgment Interest

Prejudgment interest may be awarded as a form of equitable relief; that is, prejudgment interest may not be awarded based on a civil money penalty, and the SEC does not claim otherwise. SEC Br. at 20-21; *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000) (prejudgment interest awards reflect "fairness and …equities"); *Gruber v. Gilbertson*, 647 F. Supp.3d 100, 123 (S.D.N.Y. 2022) (same). Because the SEC has failed to demonstrate entitlement to disgorgement, it is only entitled to civil money penalties. Prejudgment interest is inappropriate here.[23]

---

[23] To the extent the Court awards any disgorgement, the SEC's request to charge the IRS repayment rate (8%, as of May 9, 2024) would be an inequitable windfall for investors in Airborne, who are unlikely to have made any comparable returns by investing in alternative penny stocks. *Gruber*, 647 F. Supp.3d at 123 (denying request for prejudgment interest for investors who "invested in an individual microcap stock that might have yielded them a very high return, but which might equally have gone totally bust for reasons having nothing to do with" securities law violations.). The request for prejudgment interest may also be denied on this basis.

## CONCLUSION

For the foregoing reasons, the SEC's Motion should be denied.


Date:   August 11, 2024
New York, New York

Respectfully submitted,

__/s/ Matthew A. Ford_____
Matthew A. Ford
Arthur Kutoroff
Ford O'Brien Landy LLP
275 Madison Avenue, 24th Floor
New York, New York 10016
Telephone: (212) 858-0040
Facsimile: (212) 256-1047

*Attorneys for*
*Defendants Kalistratos Kabilafkas,*
*Timoleon Kabilafkas (together with*
*the Timoleon Kabilafkas Revocable*
*Trust dated July 24, 2001), and*
*Magdaline Kabilafkas (together with*
*the Magdaline Kabilafkas 1989 Trust*
*dated May 27, 1989)*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2024, a true and correct copy of the foregoing document has been electronically served on all counsel of record via the Court's CM/ECF system.

Date: August 11, 2024
New York, New York

Respectfully submitted,

__*/s/ Matthew A. Ford*_____
Matthew A. Ford
Arthur Kutoroff
Ford O'Brien Landy LLP
275 Madison Avenue, 24th Floor
New York, New York 10016
Telephone: (212) 858-0040
Facsimile: (212) 256-1047

*Attorneys for*
*Defendants Kalistratos Kabilafkas,*
*Timoleon Kabilafkas (together with*
*the Timoleon Kabilafkas Revocable*
*Trust dated July 24, 2001), and*
*Magdaline Kabilafkas (together with*
*the Magdaline Kabilafkas 1989 Trust*
*dated May 27, 1989)*